**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| IN RE TRANSDIGM GROUP, INC. SECURITIES LITIGATION | Case No.: 1:17-cv-01677-DCN<br>Judge Donald C. Nugent |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND JURY TRIAL DEMAND**

# TABLE OF CONTENTS


I. NATURE OF THE ACTION ....................1

I. SYNOPSIS OF THE FRAUD ....................2

II. JURISDICTION AND VENUE ....................8

III. THE PARTIES ....................8

A. Lead Plaintiff ....................8

B. Defendants ....................9

1. TransDigm ....................9

2. The Individual Defendants ....................9

IV. OVERVIEW OF THE TRANSDIGM FRAUD ....................11

A. TransDigm's "One-Two Punch" Business Model—Acquire Companies With Sole-Sourced Parts And Immediately Grossly Inflate Prices ....................11

B. Defendants Were Well Aware of TransDigm's History of Violating Government Regulations and Rules ....................15

1. The DoD's 2006 Audit Highlights TransDigm's Violation of Rules Requiring Cost Disclosures and Fair and Reasonable Pricing ....................15

2. The DoD's 2008 Audit Highlights TransDigm's Abuse Of Exclusive Distributors To Charge Excessive Prices To The Government ....................17

C. TransDigm Subsidiaries Deliberately Hid The Company's Identity As A Parent Entity In Violation of Government Regulations Designed to Detect "Waste, Fraud and Abuse" ....................19

D. TransDigm's Network of Captive Distributors Mimics the Aesthetics of a Competitive Market, Further Allowing TransDigm to Defraud the Government ....................24

E. Former Employees Confirm Defendants' Fraudulent Price-Gouging Sales Culture, Including "Indoctrination" Training Sessions and a Myriad of Tactics to Defraud the U.S. Government ....................29

F. TransDigm Insiders Capitalized on the Stock's Artificial Inflation Through Massive, Suspicious Insider Stock Sales ....................35

V. DEFENDANTS' FRAUD IS EXPOSED ....................38

A. The Truth Regarding Defendants' Fraudulent Price Gouging Scheme Is Revealed In Early 2017 ..... 38

B. Post-Class Period Events Further Confirm The Fraud ..... 42

VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 44

A. Second Quarter 2016 Results ..... 46

B. 2016 Analyst Day ..... 48

C. Third Quarter 2016 Results ..... 49

D. Fourth Quarter and Full Year 2016 Results ..... 52

E. Code of Business Conduct and Ethics, and Code of Ethics for Senior Financial Officers ..... 55

VII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ..... 56

VIII. LOSS CAUSATION ..... 63

IX. PRESUMPTION OF RELIANCE ..... 66

X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ..... 67

XI. CLASS ACTION ALLEGATIONS ..... 68

XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ..... 70

COUNT I ..... 70

COUNT II ..... 72

XIII. PRAYER FOR RELIEF ..... 74

XIV. JURY DEMAND ..... 74

## I. NATURE OF THE ACTION

1. Lead Plaintiff City of Hollywood Firefighters' Pension Fund ("Hollywood Firefighters" or "Lead Plaintiff"), on behalf of itself and all others similarly situated, alleges the following upon personal knowledge as to itself and its acts, and upon information and belief as to all other matters, based upon the ongoing investigation of its counsel. Many of the facts related to Lead Plaintiff's allegations are known only by Defendants, or are exclusively within Defendants' custody or control. Lead Counsel's investigation included, among other things, review and analysis of: (i) interviews with numerous, former employees of TransDigm Group Incorporated ("TransDigm" or the "Company"); (ii) TransDigm's public filings with the Securities and Exchange Commission (the "SEC"); (iii) in-depth research reports by securities and financial analysts; (iv) transcripts of TransDigm's conference calls with analysts and investors; (v) presentations, press releases, and reports regarding the Company; (vi) consultations with relevant experts; (vii) news and media reports concerning the Company and other facts related to this action; and (viii) data reflecting the pricing of TransDigm common stock. Lead Plaintiff believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery.

2. Lead Plaintiff asserts claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against Defendant TransDigm and Defendants W. Nicholas Howley ("Howley") and Terrance Paradie ("Paradie" and, together with Howley, the "Individual Defendants," and together with TransDigm, "Defendants"), and Section 20(a) of the Exchange Act against the Individual Defendants, on behalf of all investors who purchased or otherwise acquired TransDigm common stock between May 10, 2016 and March 21, 2017, inclusive (the "Class Period").

## I. SYNOPSIS OF THE FRAUD

3. On the surface, TransDigm appears to be the model of an American success story. Established in 1993, and incorporated ten years later, the Company quickly grew to become one of the world's foremost suppliers of commercial and military aerospace components. The game plan was simple: TransDigm acquired companies that were sole-source providers for certain aircraft components, meaning there were no other suppliers competing in the marketplace for that specific part. Immediately after executing the acquisition, TransDigm would capitalize on the lack of competition by slashing costs, laying off workers, and jacking up the component's price, sometimes by as much as over 700%. Fueled by these tactics, the Company boasted over $3 billion in annual net sales in 2016, with unmatched profit margins in the industry.

4. Significantly, at all relevant times, TransDigm's largest customer was the U.S. Government, with defense contracts accounting for approximately 30% of the Company's revenues. TransDigm's contracts with the Department of Defense ("DoD") are governed by a host of federal acquisition regulations that are explicitly designed to protect the U.S. Government—and the taxpayer—from potential abuses by sole-source providers like TransDigm. For example, a 2006 audit on TransDigm by the DoD Office of Inspector General specifically noted that the "Truth In Negotiations Act of 1962 (TINA) allows DoD to obtain cost or pricing data (certified cost information) from Defense contractors to ensure the integrity of DoD spending for military goods and services that are not subject to marketplace pricing." Generally, these and other regulations require TransDigm to provide transparency regarding costs; a fair and reasonable price for the Company's products; and, for contracts above $750,000, to certify that TransDigm has fully and truthfully disclosed all relevant cost and pricing information.

5. As was ultimately revealed, however, Defendants deliberately and fraudulently circumvented these regulations throughout the Class Period in an unrelenting attempt to inflate profits at the expense of the U.S. Government. Indeed, over the past year, investigative journalists, sophisticated market participants, and a Congress-initiated probe for "waste, fraud and abuse" have peeled back TransDigm's façade to reveal a complex web of obfuscated subsidiaries, captive distributors, rigged bidding, and false and/or missing Government contract information. Defendants implemented these and other illicit practices with a singular purpose in mind: to unlawfully conceal TransDigm's true product costs from the U.S. Government in order to justify the Company's exorbitant product prices.

6. TransDigm operates as a holding company that manufactures and sells its components through dozens of subsidiaries, many of which were once independent companies that TransDigm acquired. During the Class Period, numerous TransDigm subsidiaries actively concealed from the DoD the fact that TransDigm was their parent company, including removing all references to TransDigm on subsidiary filings with the Government, in violation of Federal regulations that specifically require Government contractors to disclose whether they are owned by another entity. These regulations were in place to prevent "fraud, waste, and abuse of taxpayer dollars" by providing transparency in "Federal spending patterns across corporations."

7. In addition, the Company's subsidiaries entered into exclusive distributor relationships to create the appearance of "competitive" bidding on Government contracts. Specifically, as soon as TransDigm acquired a subsidiary, it would immediately insert an exclusive distributor between the subsidiary and end-point customers, including the Government. Since TransDigm was the sole-source manufacturer for a given product, anyone seeking to bid on a Government contract would need to obtain the component part from this

"captive" distributor. Accordingly, when a TransDigm competitor obtained the product from the distributor, it necessarily did so at a higher price, translating into a higher contract bid. Through this arrangement, TransDigm created the illusion that there was a true "competitive" bidding process, when in fact the process was rigged to ensure that TransDigm was awarded the contract. What's more, in the event of an audit, Pentagon procurement officers would be provided with the costs the captive distributor paid for the product—and not the much lower costs that the Company actually incurred. At all times during the Class Period, Defendants were well aware of the illegality of these arrangements. In fact, the DoD Office of Inspector General specifically flagged the use of exclusive distributors as inherently problematic in a 2008 audit of a TransDigm distributor, concluding that the DoD "do[es] not believe the current exclusive distributor model is a viable procurement alternative for the DOD."

8. Defendants also implemented a concerted and systematic effort to indoctrinate subsidiaries' employees on a variety of techniques and tactics to hide costs and inflate prices. For instance, TransDigm trained employees to provide falsified "commercial" price information to the Government; to manipulate contract terms so as to avoid TINA and regulation price thresholds that would trigger greater Government scrutiny; to "break up" contracts across different subsidiaries and geographic regions for the same purpose; and to falsify contract product costs by any means necessary.

9. In so doing, Defendants violated the very tenet underpinning TINA and procurement regulations in the first place: that Government contractors like TransDigm provide transparent and truthful cost information, thereby ensuring that the DoD pays a fair and reasonable price for the U.S. military's much-needed products. Indeed, Defendants' fraud had a material, real-world impact on the U.S. military. The DoD itself specifically noted in its past

audits of TransDigm that these practices had an "adverse impact on the DoD challenge to maintain a superior level of combat readiness," resulting in insufficient funds "to support [] urgent warfighter needs."

10. As a direct result of Defendants' fraudulent scheme, TransDigm reported impressive net sales, earnings and profit margins throughout the Class Period, and its share price responded in kind. In addition, several Company insiders, including Defendant Howley, dumped massive amounts of their stock at prices that were artificially inflated by the fraud. Specifically, CEO Howley sold a staggering 144,500 shares of TransDigm common stock for proceeds of nearly $38 million, at prices near Class Period highs—sales that represented 84% of the stock that he beneficially owned, and which were effectuated outside of a typical 10b5-1 trading plan. In all, ten insiders—including the Company's Vice Chairman, a Senior Vice President and former CFO, and five Executive Vice Presidents—unloaded a total of 331,168 shares of TransDigm stock during the Class Period for proceeds of over $87 million, with some insiders selling nearly 90% of their TransDigm common stock beneficially owned.

11. The TransDigm fraud began to unravel on January 20, 2017, when Citron Research ("Citron") issued the first of two investigative reports exposing Defendants' illicit practices. The Citron report detailed Defendants' "dangerous acquire/leverage/price-raise" scheme, describing it as the "Valeant of the Aerospace Industry"—a reference to the disgraced pharmaceutical company that used hidden relationships with specialty pharmacies to improperly book revenue. The Citron report revealed that TransDigm's profitability was heavily dependent on price increases of as much as 700% on components sold to the Government. Further, Citron revealed TransDigm's captive distributor scheme, explaining that "TransDigm has been able to use the guise of multiple shell distributors, who have no pricing power, to make a bid seem

competitive, when in reality they are all shills for TransDigm." In reaction to the Citron report, TransDigm's share price dropped $24.86 per share, or nearly 10%, from $251.76 per share on January 19, 2017 to $226.90 per share on January 20, 2017—wiping out $1.3 billion in market capitalization in one trading day.

12. On March 9, 2017, Citron published a second report revealing that TransDigm subsidiaries failed to disclose that they were owned by TransDigm when bidding for Government contracts, in violation of regulations that explicitly required the disclosure of parent ownership as part of the Government's bidding qualification process. The report concluded that "TransDigm has intentionally used illegal tactics to inflate margins while avoiding price scrutiny from the U.S. Government." In reaction to the report, TransDigm's stock dropped an additional $10.26 per share, or 4.25%, wiping out over $542 million in market capitalization.

13. The revelations of TransDigm's business practices attracted the attention of the U.S. Congress, and precipitated a large scale investigation of the Company. On March 21, 2017, U.S. Congressman Ro Khanna (D., Calif.)—a member of the House Committee on Armed Services—issued a press release announcing that he had sent a letter to the Inspector General for the DoD, specifically requesting that it investigate TransDigm's business practices for "waste, fraud, and abuse" with respect to sales to the U.S. Government. Congressman Khanna's letter noted that TransDigm "has been operating as a hidden monopolist by (i) engaging in a series of unreasonable price increases of products for which it is the only supplier; (ii) disguising its cost structure and identity from Pentagon procurement officers; and (iii) unreasonably hiking prices." The letter also cited Federal regulations that are meant to "protect the taxpayer against sole source contractors like TransDigm," and which require suppliers to provide truthful "cost information" and "tell procurement officers if they belong to a holding company to allow the

Government access to transparency in pricing across a defense contractor's entire business." Notably, the letter concluded that "TransDigm appears to use a range of methods to evade these protections," including "a network of captive distributors that mimic the aesthetics of a competitive market," as well as the fact that Company subsidiaries failed to disclose TransDigm as their corporate parent in DoD filings—an offense that "carries significant penalties."

14. In response to Congressman Khanna's letter, TransDigm's stock price dropped an additional $23.09 per share over two trading days, a decline of nearly 10%, on extraordinarily high trading volume, wiping out approximately $1.22 billion in market capitalization.

15. Shortly after the end of the Class Period, Congressman Tim Ryan (D., Ohio) and, later, Senator Elizabeth Warren (D., Mass.), also joined the formal calls for an investigation into TransDigm. On June 27, 2017, the Office of the Inspector General for the DoD began an audit of TransDigm's Government sales—the first time it had done so in over ten years. The audit remains pending, and is expected to take up to two years to complete.

16. Meanwhile, the effects of the revelation of Defendants' fraud have had a material impact on the Company's business. On February 6, 2018, TransDigm reported disappointing earnings for its first quarter of fiscal 2018. TransDigm blamed "margin softness on the defense side that lowered our margins as a whole business," but failed to provide further explanation. The implication was crystal clear, however—no longer able to sustain its fraudulent scheme, TransDigm has finally been forced to provide transparent and truthful disclosures and pricing to the DoD, and its once industry-leading profitability is in decline as a result.

17. Investors who purchased TransDigm common stock at artificially-inflated prices during the Class Period have suffered substantial losses from Defendants' violations of the federal securities laws. This action seeks redress on behalf of these aggrieved shareholders.

## II. JURISDICTION AND VENUE

18. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

20. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. THE PARTIES

### A. Lead Plaintiff

21. Lead Plaintiff the City of Hollywood Firefighters' Pension Fund is a public pension system based in Hollywood, Florida. As of December 6, 2017, Hollywood Firefighters oversaw more than $225 million in assets. As set forth in its certification (*see* ECF No. 17-4), Hollywood Firefighters purchased TransDigm common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. On December 4, 2017, the Court appointed Hollywood Firefighters as Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B). ECF No. 33.

### B. Defendants

#### 1. TransDigm

22. Defendant TransDigm is a Delaware corporation with its principal executive offices located at 1301 East 9th Street, Suite 3000, Cleveland, Ohio 44114. TransDigm, through its wholly-owned subsidiaries, including TransDigm Inc., is a global designer, producer and supplier of aircraft components for use on commercial and military aircraft. TransDigm's securities are traded on the New York Stock Exchange ("NYSE") under the symbol "TDG." TransDigm is a holding company and conducts all of its operations through its subsidiaries.

#### 2. The Individual Defendants

23. Defendant W. Nicholas Howley ("Howley") is the co-founder of TransDigm Inc. and has been President and/or Chief Executive Officer ("CEO") of the Company since its inception. Howley is also Chairman of the Board of Directors of TransDigm, a position he has held since July 2003. Howley was highly involved in TransDigm's day-to-day business and in interfacing with its employees. As stated in the Company's 2016 Annual Proxy, Howley "has played an integral role in the Company's establishment and implementation of its core value drivers on an ongoing basis and in its rapid and strategic growth." Defendant Howley is also one of the highest paid C.E.O.s in American business.[1] In 2016, Howley received over $18.6 million in total compensation, up 47% from 2015. Most recently, in 2017, TransDigm paid Howley over $61 million in total compensation.

24. During the Class Period, Defendant Howley made materially false and misleading statements and omissions in press releases and during earnings calls, investor conferences and industry presentations, including on May 10, 2016, June 23, 2016, August 9, 2016, and

[1] Jon Huang and Karl Russell, "The Highest-Paid C.E.O.s in 2016," (NY Times May 26, 2017), *available at* https://www.nytimes.com/interactive/2017/05/26/business/highest-paid-ceos.html.

November 14, 2016. Defendant Howley also reviewed, approved, signed and certified TransDigm's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including on May 11, 2016, August 10, 2016, and November 15, 2016, which contained materially false and misleading statements and omissions.

25. Defendant Terrance Paradie ("Paradie") was Chief Financial Officer ("CFO") and Executive Vice President ("E.V.P.") of TransDigm from April 2, 2015 through January 2, 2018. On January 2, 2018, mere months after the DoD's commencement into its audit of TransDigm, the Company suddenly announced that Defendant Paradie was no longer CFO, effective immediately. Paradie was initially hired at TransDigm in April 2015, with former CFO Greg Rufus staying at TransDigm for over a year, until "the fourth quarter of calendar year 2016" to "ensure a smooth transition and transfer of TransDigm culture." Paradie barely had a year at the helm at TransDigm when he suddenly left the Company in January 2018 due to "personal reasons."

26. During the Class Period, Defendant Paradie made materially false and misleading statements and omissions in press releases and during earnings calls, investor conferences and industry presentations, including on May 10, 2016 and August 9, 2016. Defendant Paradie reviewed, approved, signed and certified TransDigm's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including on May 11, 2016, August 10, 2016, and November 15, 2016, which contained materially false and misleading statements and omissions.

27. Defendants Howley and Paradie are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, in part because of their positions with the Company, possessed the power and authority to control the contents of TransDigm's reports to the SEC, as well as its press releases and presentations to securities analysts, money and

portfolio managers and institutional investors, *i.e.*, the market. Each Individual Defendant was involved in the public statements alleged herein to be false or misleading and had the ability and opportunity to prevent those statements from being disseminated to the market or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading.

## IV. OVERVIEW OF THE TRANSDIGM FRAUD

### A. TransDigm's "One-Two Punch" Business Model—Acquire Companies With Sole-Sourced Parts And Immediately Grossly Inflate Prices

28. TransDigm designs, produces, and supplies commercial and military aerospace components worldwide. The U.S. Government is the Company's largest customer. In fiscal 2016, approximately 30% of all of the Company's sales were in the defense market, a significant portion of which were made directly to the Federal Government and also indirectly through defense original equipment manufacturers, or "OEMs," who incorporate the Company's products into aircraft and aircraft components contracted for and purchased by the Federal Government.

29. TransDigm operates as a private-equity-like business focused on acquiring companies that make high-margin, but relatively low-priced proprietary aerospace products with significant aftermarket sales. In other words, TransDigm does not develop products itself; rather, it is a holding company specializing in the acquisition of manufacturers of proprietary aerospace parts through highly-leveraged transactions. This model is similar to that utilized by many players in the specialty pharmaceutical industry to rapidly increase prices on specialty drugs with limited alternatives. This roll-up strategy has allowed TransDigm to steeply raise prices on aerospace products almost immediately after acquiring their manufacturers.

30. Specifically, TransDigm's business model is predicated on debt-fueled acquisitions and price increases. First, TransDigm identifies and acquires companies that manufacture smaller component parts of an airplane at low price points with significant aftermarket content—typically companies that make parts for older aircraft. These companies are more likely to be sole-source providers because there is reduced competition in that space, as airplanes are on the downward slope of their existing life and initial startup manufacturing costs are high. Approximately 80% of the Company's net sales for 2016 were derived from products for which the Company is the sole source provider.

31. The second step of TransDigm's business strategy is to grossly increase a sole-source product's price. Since TransDigm is often in a position where it is the only manufacturer for a part that a company needs, it takes advantage of this by charging prices that result in gross margins of 80-95%. This translates into price increases for products sold to the Government of up to 700% immediately after an acquisition. The table below provides examples of the egregious price increases that TransDigm implemented on Government aircraft components shortly after the Company acquired the manufacturers of those products:

| Company | Part | Pre-Acquisition Price | Post-Acquisition Price | % Increase |
|---|---|---|---|---|
| Aerosonic | Vibration Panel | $67.33 | $271.00 | 302% |
| Arkwin | Pawl | $972.00 | $1,950.00 | 101% |
| Harco | Cable Assembly | $1,837.03 | $7,863.00 | 328% |
| Skurka | Connector | $310.00 | $1,109.85 | 258% |
| Whippany | Motor Rotor | $654.56 | $5,474.00 | 736% |

32. Further, TransDigm would charge the Government prices that were far higher than its commercial prices. For example, a former Aftermarket Sales Manager of TransDigm

subsidiary AdelWiggins, CW[2] 1,[3] recalled that the subsidiary charged the Government a price that was 14 times more than the price it charged Boeing for the same component. Specifically, CW 1 recalled a valve that was made for a 737 aircraft. AdelWiggins sold the part to Boeing for $850 each, but when the Government asked for the part in the aftermarket, AdelWiggins would charge them an astonishing $12,500 for the exact same item.

33. This was not an isolated incident. Indeed, multiple former employees of TransDigm and its subsidiaries who were involved in defense sales confirmed that margins on those sales were substantially higher than the Company's publicly-reported overall margins (which included both commercial and defense sales). In addition to former employees interviewed during the course of Lead Plaintiff's investigation, several former employees also provided accounts to The Capitol Forum, a prominent investigative news and legal analysis company. The Capitol Forum was founded in 2011 and is dedicated to informing policymakers, investors, and industry stakeholders on how policy affects market competition. The Capitol Forum has been praised for its high investigative reporting, independent research, and expert opinion by industry insiders and Government officials, including the D.C. Attorney General and Deputy Assistant Attorney General. The Capitol Forum's staff includes experienced investigative journalists and executives from publications like Forbes and Bloomberg, as well as former partners from Vault 100 law firms.

---

[2] Former employees of TransDigm and/or its subsidiaries are referred to herein as Confidential Witness "CW __" and are referenced in the feminine form to maintain their confidentiality.

[3] CW 1 was an Aftermarket Sales Manager with AdelWiggins Group, a TransDigm subsidiary, for eight and a half years—from January 2007 until June 2015. AdelWiggins designs, manufactures and sells an extensive line of high-quality, custom designed fluid line components such as flexible connectors, quick disconnects, clamps, heaters and hoses, and lightning protection isolators. In this role, she was responsible for all the sales activities for products sold to any airlines or the military.

34. One former employee was quoted by The Capitol Forum as stating: "[w]e would never sell to the Government at cost…the lowest I can perceive would be a 50% margin…almost always 75-80%, if not more." Another former employee who worked at a different TransDigm subsidiary reported even higher margin expectations on sole-source product sales to the Government: "EBITDA [margin] expectations for aftermarket [sales] to military was in the range of 85%." In addition to increasing the per unit price of particular parts, especially once the opportunity for significant price increases began to fade, TransDigm would then aggressively reduce costs by laying off workers at acquired companies.

35. Indeed, although TransDigm frequently attributed its financial results to "three value drivers," i.e. "obtaining profitable new business, improving our cost structure, and providing highly engineered value-added products to customers," in reality TransDigm relied almost entirely on cost cutting and price increases for growth, and generated virtually no profitable new business. In fact, as Citron later confirmed in its January 20, 2017 report, were it not for price increases following acquisitions, TransDigm would have experienced negative 10% organic growth.

36. Accordingly, TransDigm used monopolistic tactics to unlawfully hike the prices of its proprietary products in sales to the U.S. Government. Defendants concealed from investors the extent to which TransDigm's profitability and purported growth were dependent on dramatic price increases far beyond industry norms. Such drastic price increases provided an illusory boost to profitability and were unsustainable, as they exposed TransDigm to undisclosed and foreseeable business and regulatory risks, and served to mislead investors as to TransDigm's true financial performance and prospects. Indeed, Federal regulations exist to specifically

prevent abuse of this nature by sole-source providers. Throughout the Class Period, TransDigm violated these rules.

### B. Defendants Were Well Aware of TransDigm's History of Violating Government Regulations and Rules

#### 1. The DoD's 2006 Audit Highlights TransDigm's Violation of Rules Requiring Cost Disclosures and Fair and Reasonable Pricing

37. Prior to the start of the Class Period, Defendants had long been on notice that TransDigm engaged in a multitude of unlawful practices that were specifically implemented to circumvent federal procurement regulations. TransDigm engaged in these practices in order to conceal from procurement officers the Company's true cost of its products and to justify exorbitant price increases for DoD contracts, thereby maximizing TransDigm's revenues.

38. For instance, on February 23, 2006, the DoD Office of the Inspector General ("OIG") issued an audit report entitled, "Acquisition: Spare Parts Procurements From TransDigm, Inc. (D-2006-055)" (the "2006 Audit"). The report stated that the 2006 Audit was initiated to investigate a TransDigm subsidiary for "charging the Defense Logistics Agency excessive prices and using the commercial item definition to avoid the Federal requirement to provide cost or pricing data." The "commercial item definition" referenced in the 2006 Audit refers to the Federal acquisition regulation that provide for a "commerciality" exemption. This provision, in many cases, exempts federal contractors from having to provide detailed cost information to justify its pricing where an item is also sold commercially. Essentially, the rationale of this exemption is that the commercial marketplace has already set a "fair and reasonable" price for the item, so that less independent justification of the price is required.

39. The 2006 Audit cited the specific legislative and federal regulation guidance that forms the foundation of the Government's dealings with defense contractors, particularly sole-source suppliers like TransDigm. For instance, the "Truth in Negotiations Act of 1962 (TINA)

allows DoD to obtain cost or pricing data (certified cost information) from Defense contractors to ensure the integrity of DoD spending for military goods and services that are not subject to marketplace pricing." Similarly, Federal Acquisition Regulation ("FAR") 15.402 "Pricing Policy" requires that contracting officers "purchase supplies and services from responsible sources at fair and reasonable prices," and provides that "[c]ontracting officers can determine fair and reasonable prices based on adequate competition, information related to prices such as price analysis, or information related to costs."

40. The 2006 Audit investigated several TransDigm subsidiaries for violations of these regulations, including AeroControlex, Adams Rite Aerospace, AdelWiggins, Champion Aerospace, and Marathon Norco Aerospace. The 2006 Audit also noted that of TransDigm's $293.3 million in net sales in 2003, "28 percent [was generated] from the defense sector, with DoD as TransDigm's largest customer."

41. The 2006 Audit noted that in determining a fair and reasonable price, contracting officers "relied on questionable price analysis" and failed to establish "the validity of the comparison and the reasonableness of the previous prices" paid for certain parts. Notably, in reference to an analysis that DLA contracting officers relied upon that was performed by the Navy Price Fighters, the report noted that the "Navy Price Fighters requested technical and cost data from TransDigm to help explain the price increases from September 2002 to April 2003, but TransDigm refused to provide the information."

42. With regard to the commerciality exemption, the 2006 Audit noted that "TransDigm applies a commercial pricing strategy to its sole-source military-unique items although no commercial market exists to establish reasonable prices by the forces of supply and

demand for the vast majority of items. This pricing strategy results in overpriced spare parts and increases the burden placed on the DoD budget."

43. The 2006 Audit further highlighted a host of TransDigm refusals to provide information or otherwise obfuscate its true product costs, including: (i) "TransDigm does not provide informal cost breakdowns or cost data"; (ii) "TransDigm stated it is not the company's policy to give cost data"; (iii) TransDigm was supposedly "unable to provide informal cost breakdowns due to limited accounting resources"; and (iv) "TransDigm considers this item proprietary and commercial and will not provide any cost breakdown."

44. Overall, the 2006 Audit investigation concluded that because of "the constraints of a sole-source contracting environment, Defense Logistics Agency contracting officers were unable to effectively negotiate prices for spare parts procured from TransDigm subsidiaries," and that the DLA ended up paying prices that were above and beyond "fair and reasonable price for 77 parts" from these subsidiaries, resulting in millions of dollars in added DoD expense.

**2. The DoD's 2008 Audit Highlights TransDigm's Abuse Of Exclusive Distributors To Charge Excessive Prices To The Government**

45. Similarly, on February 6, 2008, the DOD OIG released an audit report entitled "Procuring Noncompetitive Spare Parts Through An Exclusive Distributor" (the "2008 Audit"). The 2008 Audit focused its investigation on Dutch Valley Supply, the exclusive distributor for a TransDigm subsidiary. The 2008 Audit defined an "exclusive distributor" as "a nonmanufacturer that has an agreement with parts manufacturers to be the sole representative for their Government sales."

46. The 2008 Audit emphasized that the use of an exclusive distributor may be abused so as to conceal a manufacturer's true costs, resulting in the Government overpaying for goods and supplies. For instance, the report highlighted that contracting officers sometimes

relied on competitive bidding to determine that a contract price was fair and reasonable. However, with this type of exclusive distribution arrangement, "it is clear that competition will not be independent or fair, because Dutch Valley Supply, as the single-source distributor, inherently controls its 'competitors'' costs and delivery, which gives unfair insight and a decided advantage in winning awards over its 'competitors.'" As a result of this and other abuses, the 2008 Audit found that the DoD paid "49.5 percent more than the fair and reasonable price" for numerous items, and that "the contracting office had no insight into manufacturing costs."

47. The 2008 Audit also found that the DoD "paid excessive prices and profit to single-source contractors for noncompetitive spare parts when cost analysis is not performed." With respect to the DoD's dealings with TransDigm's exclusive distributor, "DoD contracting officers were unable to effectively negotiate prices or obtain best value for noncompetitive spare parts procured through Dutch Valley Supply," which resulted in the DoD paying "75 percent more than the fair and reasonable prices for 33 parts." The DoD stated that it would have paid almost $18 million more than fair and reasonable prices for the same items over the next 6 years "and this valuable procurement money will not be available to support other urgent warfighter needs."

48. Overall, the 2008 Audit excoriated the exclusive distributor model, concluding that "we do not see how the distributor model can add sufficient value or be an effective alternative procurement option for DoD." The report noted that Dutch Valley claims "that it provides value to DoD through reduced costs, improved readiness, and increased competition." However, the DoD concluded that it was "unable to validate any of Dutch Valley Supply's claims and determined that no or negligible added value was provided by the exclusive distributor."

49. Significantly, the 2008 Audit condemned the obfuscation methods of TransDigm's subsidiary, concluding that "[b]usiness practices such as these during a time of war clearly do not provide the best support to the warfighter."

**C. TransDigm Subsidiaries Deliberately Hid The Company's Identity As A Parent Entity In Violation of Government Regulations Designed to Detect "Waste, Fraud and Abuse"**

50. During the Class Period, TransDigm concealed the true cost of its product parts (and thereby its price-gouging) by fraudulently masking that it was the parent company of several subsidiaries. In blatant violation of Federal regulations, TransDigm failed to disclose that it was the parent company of one-third of its subsidiaries that registered with the System for Award Management ("SAM") database, thus deliberately thwarting Federal regulations designed to prevent "fraud, waste and abuse of taxpayer dollars" through detection of "Federal spending patterns across corporations."

51. Specifically, Federal Acquisition Regulations ("FAR") require Government contractors who register with the SAM database to disclose whether they are owned by another entity, and to identify the parent entity by legal name and by the parent entity's unique Commercial and Government Entity ("CAGE") code—an identifier assigned to suppliers to government and defense agencies as well as to governmental entities by the Defense Logistics Agency ("DLA").

52. The purpose of these requirements is to track the Government's total spending across a specific company and obtain more insight into supply chain traceability. As further explained on the Federal Service Desk's website, "FAR 52.204-17, Ownership or Control of

Offeror, requires entities to enter the immediate and highest level owners CAGE Codes when registering in SAM. This is a self-certification by the offeror."[4]

53. This rule was specifically designed to provide greater "transparency and reliability of data," and "to facilitate achievement of rigorous accountability of procurement dollars."[5] Further, the rule "[i]ncreased transparency and accuracy of procurement data," which would "broaden the Government's ability to implement fraud detection." The purpose of the rule was to "(1) support successful implementation of business tools that seek insight into Federal spending patterns across corporations; (2) facilitate traceability in the tracking of performance issues across corporations; (3) provide insight on contractor personnel outside the United States (at a corporate/full organization level); and (4) support supply chain traceability and integrity efforts. The use of the CAGE code provides a Government-managed unique identifier for these entities, and the final rule provides a mechanism for the entities themselves to identify their hierarchical structure to the Government." In other words, the regulation was designed to help detect widespread fraud or abuse across multiple subsidiaries—the exact scheme that TransDigm was perpetrating.

54. In violation of this important Government regulation, TransDigm deliberately hid its identity as the parent company of at least twelve subsidiaries that sold products to the U.S. Government. Since the SAM database required registrations to be updated on at least a yearly basis, these TransDigm subsidiaries submitted incorrect information more than once. In fact, some of the subsidiaries, like Skurka and Avionics, had been owned by TransDigm for well over a decade. By failing to list TransDigm as a parent entity, these subsidiaries prevented the

---

4 https://fsd.gov/fsd-gov/answer.do?sysparm_kbid=03722bca6fcc710045b164826e3ee4a7&sysparm_search=

5 https://www.gpo.gov/fdsys/pkg/FR-2014-05-30/html/2014-12387.htm.

Government from linking price increases across a range of seemingly separate companies to one single entity (TransDigm), a practice that affected procurement decisions and the transparency of pricing information.

55. Moreover, the fact that these subsidiaries failed to identify that TransDigm was their parent company was neither an accident nor an inadvertent mistake. The registration form requiring this information was not complicated or tricky. To the contrary, the registration form includes the clearly stated question: "Does another entity own or control the entity you are registering?" Registrants have only two choices: they may click "yes" or "no." It is implausible that a full one third of TransDigm's registered subsidiaries that filled out this form all inadvertently or mistakenly clicked "no." Indeed, these omissions were so egregious that Congressman Ro Khanna made them a focus of his March 20, 2017 letter to the DoD Inspector General, asking him to initiate a formal investigation of the Company. The twelve TransDigm subsidiaries are listed below:

| Company | Date of Registration |
|---|---|
| Acme Aerospace, Inc. | 11/28/16 |
| Adams Rite Aerospace, Inc. | 09/26/16 |
| Avionic Instruments, LLC | 01/20/17 |
| CDA InterCorp, LLC | 09/12/16 |
| CEF Industries, LLC | 12/09/16 |
| Dukes Aerospace, Inc. | 05/16/16 |
| Electromech Technologies, LLC | 02/07/17 |
| Electromech Technologies LLC DBA Tyee | 08/16/16 |
| Hartwell Corporation | 10/05/16 |
| Pexco Aerospace, Inc. | 05/12/16 |
| PneuDraulics, Inc. | 06/10/16 |
| Skurka Aerospace, Inc. | 05/04/16 |

*Source: Capital Forum analysis of DLA and SAM CAGE Codes*

56. The SAM form itself is clear that filing inaccurate reports—thereby making it more difficult for the Government to track spending—carries significant penalties. On the final page of the certification form, registrants are asked to review all information to ensure accuracy. This page also requires the registrant to confirm that they have read and understood all FAR provisions relating to their application, including the provisions in FAR 52.204-17 Ownership or Control of Offeror. Upon submitting a filing and under penalty of perjury, TransDigm employees read the following disclosure:

> By submitting this registration, you are certifying the information is accurate and complete. Knowingly providing false or misleading information may result in criminal prosecution under Section 1001, Title 18 of the United States Code. Criminal Penalties could include imposition of a fine, imprisonment or both. You may be subject to other remedies as well, including, but not limited to, administrative remedies, such as suspension and debarment; ineligibility to participate in programs conducted under the authority of the Small Business Act; or civil liability under the False Claims Act.

57. Furthermore, an April 2017 The Capitol Forum report concluded that, not only were TransDigm subsidiaries not disclosing the Company as its parent to avoid linking price increases to TransDigm, but an additional rationale for this practice was to create the false impression that bids from two separate TransDigm subsidiaries were independent and "competitive" with one another, without drawing attention to their shared parent company. The Capitol Forum sent a Freedom of Information Act ("FOIA") request to the DLA, and FOIA returns showed that at a minimum, two out-of-compliance TransDigm subsidiaries were bidding against each other and were not registered as TransDigm subsidiaries according to historical SAM data.

58. In addition to data evidencing that subsidiaries did not file accurate ownership disclosure forms with the Federal Government, former employees confirmed that subsidiaries actively sought to distance themselves from TransDigm. Indeed, former employees at

TransDigm subsidiaries interviewed by The Capitol Forum stated that TransDigm created a culture in which employees were not supposed to actively disclose a connection to the Company. According to one former employee, TransDigm instructed its employees "to not volunteer" the fact that TransDigm was the parent company of their subsidiary, and to "keep a low profile when possible." Another former employee echoed that statement, stating that the subsidiary's president "told me [that] we never want to portray that we're part of" TransDigm.

59. All three former employees interviewed by The Capitol Forum also independently discussed the practice of keeping the TransDigm logo off of business cards. According to one former employee of Skurka, "we actually had our business cards at Skurka that said 'A TransDigm Company' and the very first thing that my boss did when he saw [them]… was throw away all the business cards because it said 'A TransDigm Company' and came out with new business cards that just said Skurka."

60. CW 2,[6] a former business unit manager for TransDigm subsidiary Champion, confirmed this practice, recalling that Champion deliberately removed TransDigm's name from its business cards because the presence of TransDigm's name "made it difficult to do business." CW 2 added that the decision to remove TransDigm's name came "<u>straight from corporate</u>," and that Howley and other "C-level" management directed it. TransDigm's practice of avoiding disclosure of its identity as the parent company of its subsidiaries was thus a vital component of its scheme to mislead the Government.

---

[6] CW 2 worked as a Business Unit Manager with Champion Aerospace LLC ("Champion"), a subsidiary of TransDigm, from 2009 until August 2015. As a business unit manager, CW 2 was responsible for $45 million worth of sales, along with marketing and P&L for various product lines. CW 2 would go to the TransDigm headquarters in Cleveland, Ohio and report directly to C-Level staff, including Defendant Howley and former CFO Greg Rufus, on sales and EBITDA information.

### D. TransDigm's Network of Captive Distributors Mimics the Aesthetics of a Competitive Market, Further Allowing TransDigm to Defraud the Government

61. In addition to deliberately concealing TransDigm as the parent entity of its subsidiaries, the Company's illicit business practices included hiding cost structures through its use of exclusive distributors. In order to support its monopolistic price-gouging and avoid detection, TransDigm subsidiaries used exclusive distributors to make bids appear competitive so as to not attract Government attention. Also, if audits were required, this operational structure meant that Government procurement officers would audit the exclusive distributor, rather than TransDigm itself.

62. These practices violated Federal regulations requiring TransDigm to provide truthful and complete information regarding cost basis for products sold pursuant to DoD contracts. In addition, FAR Part 15, "Contracting by Negotiation," defines when adequate competition exists so that contracting officers can rely on competitive bidding to determine a fair and reasonable price for the military's goods. Specifically, FAR Part 15.403-1(c)(1)(i), "Adequate Price Competition," states that a "price is based on adequate price competition if two or more responsible offerors, <u>competing independently</u>, submit priced offers that satisfy the Government's expressed requirement..." The Acquisition Guide for the Defense Supply Center, Columbus, Ohio ("DSCC")—which purchased many products from TransDigm subsidiaries—echoed this provision. DSCC Acquisition Guide, Part 13, discusses price reasonableness determinations, stating: "Competitive quotations <u>from two or more sources</u> will normally produce a price that can be determined fair and reasonable."

63. Throughout the Class Period, TransDigm implemented structures to fraudulently take advantage of these "competitive" bidding provisions. For instance, TransDigm would use exclusive distributors, or non-manufacturers to serve as TransDigm's sole representative for

certain Government sales. As stated by the DoD in the 2008 Audit: "Distributors serve as 'middlemen' who perform all of the administrative tasks necessary to respond to and fill Government orders, including quoting, procuring, and receiving the item from the manufacturer and selling and shipping the item to the Government. The distributor model adds a duplicate layer of administration and shipments to the traditional procurement process."

64. When a vendor like TransDigm is a monopoly supplier, that supplier is required to turn over its cost information about the product to the Government, or allow the Government to conduct a thorough review to determine the likely cost of the product. However, by setting up a network of captive distributors to mimic the aesthetics of a competitive market, TransDigm was able to evade these rules and regulations, and hide the true cost of its products.

65. Indeed, rather than bid directly for a government contract, TransDigm would essentially bid through a captive distributor. TransDigm would sell its product to the distributor, and that distributor would then bid on the contract. On its face, the bid would appear "competitive," because other companies looking to submit a bid could purchase the product directly from the distributor that had the exclusive rights to the TransDigm part. However, in reality, the bid would not be competitive, because the TransDigm distributor would always have the lowest price to offer. That was because the distributor acquired the part directly from TransDigm, and the distributor would obviously charge the competitors a higher price for the product than the distributor had itself paid for it. Thus, when the distributor bid on the contract, its bid would invariably be lower than any competitors' bid.

66. Significantly, as set forth above at ¶¶45-49, TransDigm had long been on notice that this practice violated DoD regulations, and resulted in "unfair" bids that concealed a monopolistic, non-competitive market. In fact, a 2008 DoD OIG audit identified this practice

taking place involving Skurka Aerospace, Inc., a TransDigm subsidiary, and its exclusive distributor, Dutch Valley Supply. The 2008 DoD OIG audit noted that, with this type of exclusive distribution arrangement, "it is clear that competition will not be independent or fair, because Dutch Valley Supply, as the single-source distributor, inherently controls its 'competitors'' costs and delivery, which gives unfair insight and a decided advantage in winning awards over its 'competitors.'" In addition to expressing disdain of the exclusive distributor model, stating that it "increased lead times and associated inventory levels," the 2008 DoD OIG audit notably found that the Government was paying more than fair and reasonable prices and "this valuable procurement money will not be available to support other urgent warfighter needs."

67. Despite the DoD OIG's finding about the use of exclusive distributors, TransDigm continued to use this practice, even those affiliated with Dutch Valley. In fact, Skurka used ECI Defense Group, an affiliate of Dutch Valley, as the exclusive distributor for its "connectors," for which Skurka was a sole source manufacturer.

68. For example, in April 2012, ECI Defense, and two other distributors, Pioneer Industries and BDS Supply, all placed bids on a Government solicitation for 59 connectors. Because ECI Defense inherently controlled its competitors' costs and delivery, ECI's bid was approximately 15% less than the bids submitted by Pioneer and BDS. In sum, Pioneer and BDS Supply were unable to engage in true competitive bidding, as shown in the diagram below.




69. Prior to its acquisition by TransDigm, Skurka sold the part directly to the DLA. Corresponding to the acquisition and the shift to sales through distributors, TransDigm tripled the per unit price. However, TransDigm was able to mask this massive price increase because the DLA procurement officer saw that there were three bids, determined that the price was reasonable because there had been a competitive bidding process, and awarded the contract to the lowest bidder.

70. This structure was repeated on numerous occasions. Indeed, it was standard practice that as soon as TransDigm acquired a company that sold directly to the Government, it would immediately insert an exclusive distributor as the middle-man between the subsidiary and the Government. Year over year, TransDigm increased its reliance on distributors for sales of sole-source parts to the Government. In 2012, distributor sales comprised 48% of sales, yet by 2016 distributors accounted for 64% of sales.

71. In addition to the fact that "competitive" bids attracted less Government procurement scrutiny, TransDigm would also get the added benefit of hiding its identity as the monopoly supplier behind the product. CW 1 corroborated this practice, giving the example of AdelWiggins' use of distributor Dutch Valley in its deals with the Government for the sole purpose of avoiding cost scrutiny: "Because we are bidding it through Dutch Valley, we were shielded even with TINA." Indeed, as CW 1 put it: "[o]nce we [the salespeople] realized [bidding through Dutch Valley] shielded us, we didn't have to worry about a price breakdown or justifying our price" to the DLA.

72. Moreover, even if the Government asked the distributor for its costs to justify any questions into whether the price was fair and reasonable, the distributor was often labeled as the prime contractor and thus received the audit attention. Under this labeling, the price points of the distributor would be reported to procurement officers, as opposed to the substantially lower source costs incurred directly by TransDigm.

73. In addition, in many cases TransDigm had de facto control over these distributors, making them little more than shell middlemen used for the sole purpose of inflating prices, hiding costs, and creating the illusion of competition. As former employees confirmed in a March 2017 The Capitol Forum report, distributors agreed to be TransDigm pawns because the Company allowed these distributors to maintain a 15-20% margin (much higher than with non-exclusive distributors) on the TransDigm parts that they sold, which were especially lucrative given that many of these parts had already received a substantial increase in cost as a result of TransDigm acquiring them.

74. These distributors were also utterly dependent on TransDigm for their business—in many cases, 40%, 50% or even 70+% of a distributor's business came from TransDigm parts.

For example, The Capitol Forum determined that over 73% of sales to DoD by distributor Carp Industries were comprised of TransDigm components, giving TransDigm de facto control over Carp Industries. Use of a "distributor" in such circumstances had no legitimate business purpose and instead was intended solely to insulate TransDigm from Government audits and cost scrutiny, to protect TransDigm's grossly inflated pricing, and fabricate the appearance of legitimate "competition" between TransDigm's exclusive distributor and other suppliers.

**E. Former Employees Confirm Defendants' Fraudulent Price-Gouging Sales Culture, Including "Indoctrination" Training Sessions and a Myriad of Tactics to Defraud the U.S. Government**

75. In order to facilitate its Government price-gouging scheme, TransDigm held regular training seminars for employees of its subsidiaries who were involved in sales to the U.S. Government. The message of these training seminars was clear: use any tactic available to maximize the price charged to the Government, and avoid Government scrutiny of TransDigm's pricing at all costs. TransDigm's training seminars were led by Halle Terrion, currently the general counsel and chief compliance officer for TransDigm, and included a power-point presentation titled "Understanding How the Government Buys." According to one former management level employee interviewed by The Capitol Forum who attended the seminars, these meetings were "very-well orchestrated indoctrination sessions."

76. By way of background, federal acquisition regulations are designed to ensure that federal agencies like DoD pay a "fair and reasonable price" for items it purchases from private companies. These regulations include a contract price "threshold" of $750,000, known as the Truth in Negotiations Act ("TINA") threshold. *See* FAR 15.403-4. On contract bids above the TINA threshold, offerors must submit "<u>certified cost or pricing data</u>," that the contractor has certified is "accurate, complete and current." *See* FAR 15.403-4. The regulations define "cost or pricing data" as comprising "<u>all facts</u> that, as of the date of price agreement, or, if applicable, an

earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price, prudent buyers and sellers would reasonably expect to affect price negotiations significantly."[7]

77. The regulations further emphasize that "[c]ost or pricing data are factual . . . and are verifiable," comprising "all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred." Moreover, even on contracts below the $750,000 TINA threshold, procurement officers are directed to obtain, and contractors are expected to provide "whatever data the contracting officer needs in order to determine fair and reasonable prices."

78. Notwithstanding these regulations, TransDigm's seminars trained its employees to avoid providing cost information by any means possible, including avoiding the TINA threshold however they could. The reason for this was simple. TransDigm's prices were so grossly out of line with their costs that the Government never would have paid them had they had access to true cost information. As CW 3[8] stated, the goal was to make sure the Government was kept in the dark in order to justify the exorbitant mark-ups that the Company was charging, and that Pentagon procurement officers were "never going to get any cost data out of TransDigm because then [they] can figure out how much [TransDigm is] making." CW 2 also confirmed that TransDigm made a practice of hiding cost information from the Government any way it could.

[7] Federal Acquisition Regulation; Definition of Cost or Pricing Data, 48 C.F.R. § 2.101.

[8] CW 3 was employed with TransDigm subsidiary AvtechTyee ("Avtech") from February 2012 until April 2017, most recently as a Business Unit Manager and Aftermarket Sales Manager. CW 3 attended quarterly meetings directed by senior level executives, along with other business unit and product line managers.

79. Specifically, according to former management level employees of multiple TransDigm subsidiaries, TransDigm trained its employees to use a myriad of tactics to avoid Government scrutiny. One method Defendants used was to deceptively break up large contracts into smaller contracts to artificially avoid hitting the TINA contract price threshold of $750,000, and thereby triggering the requirement to provide detailed "certified cost or pricing data" to ensure that the Government pays a fair and reasonable price. As such, TransDigm sought to keep its contracts below the TINA threshold of $750,000.

80. For example, as one former employee interviewed by The Capitol Forum explained, the Company could use geographically-dispersed distributors to artificially split up a contract:

> If the Government comes to me for [$]2.1 million in spares, that's auditable right? Because it's above the [$]750,000 threshold, so it's going to limit my profitability. But if I'm working out of a North American distributor, a European distributor, and an Asian distributor, that [$]2.1 million now will only be [$]700,000 out of each one.

81. The former employee noted that, in fact, it was a violation of the defense acquisition regulations to split up a contract in this way without a "compelling reason." So employees were trained to effectively fabricate purportedly "compelling reasons," *i.e.* to mislead the Federal Government. For example, the former employee said, "my compelling reason could be, look, it's geographically distributed, each of those markets has a different requirement, it's the best way for me to administrate and service the need, the interest of the Government is best served with my working through these three distributors instead of doing it all out of one. And now I've avoided the TINA threshold, which means I get more profit." In other words, TransDigm's justifications for breaking up its contracts were bogus, and were purely invented to avoid the TINA threshold and thus maximize profit and minimize scrutiny.

82. Defendants also pressured employees to provide procurement officers with falsified "commercial" pricing information to justify inflated sale prices and avoid cost disclosure. As stated above, Federal acquisition regulations provide for a "commerciality" exception that exempts federal contractors from having to provide detailed cost information because the commercial marketplace has already set a "fair and reasonable" price for the item, so that less independent justification of the price is required.

83. Defendants sought to fraudulently take full advantage of this exception. As a former TransDigm employee interviewed by Capitol Forum explained, "we would furnish [commercial price data] to the Government [instead of] cost data. And it fulfilled the same requirement, that you had approved fair and reasonable pricing, correct? If I'm pricing it—if I'm getting it from the commercial side somewhere else, is it then not fair or reasonable by market? Yeah, right. So that was the strategy." CW 2 confirmed that the commerciality exception was a "huge tool" for the Company, whereby TransDigm and its subsidiaries could avoid disclosing cost information.

84. Significantly, however, in order to take advantage of the commerciality exception, contractors were required by law to provide adequate commercial sales data to demonstrate a market price, and DFARS specifies that this sales data must include "any related discounts, refunds, rebates, offsets, or other adjustments." *See* 48 C.F.R. §§ 215.401, 252.215-7010. However, TransDigm did not disclose this required information. Instead, it made a practice of defrauding the Government using phony "list prices" (which did not reflect actual commercial sales prices) to justify its pricing. Indeed, while TransDigm regularly provided large rebates to its commercial customers—often 25% or more—The Capitol Forum revealed that TransDigm

would not disclose these rebates to the Government in its "commercial" sales data, thus dramatically inflating its true commercial sale prices.

85. As one former TransDigm employee interviewed by The Capitol Forum explained, "we had a Government price list, and it was exactly the same as our list price that we offered for sale to our distributors" who sold to commercial customers, such as airlines. However, in reality, the distributors sold to commercial customers for less than the list price, at which point TransDigm rebated the price difference to the distributor. Thus, the "list price" did not reflect the true commercial sale price. The former employee provided the following example to The Capitol Forum:

> we showed that we sold everything to Aviall [a major TransDigm distributor], and if the purchasing agent pushed us too hard, we would show that we would have shipped an invoice, a boat load of [Part X (actual part name withheld to protect identity of source)], so we would show a nice healthy volume of [Part X], that went out at list price, and that's all we had to prove. We didn't have to admit that we were ultimately rebating to the distributors based on these contract prices.

86. The Capitol Forum also confirmed with another former employee that it was a common practice to provide inflated invoices to the Federal Government without disclosing price-adjustments for rebates. In many cases, the undisclosed rebates created an enormous difference between the inflated list price and the actual sale price that TransDigm ultimately charged the U.S. Government:

> **Rebate grows with price increase.** We asked one of the former employees about the effect price increases on a part would have on the rebate, and posed this question: "Let's say Aviall has a contract with United, and the list price is $100, and the contract price is $80, and so the rebate is $20. TransDigm comes in and buys the subsidiary, and the list price becomes $150, but Aviall is still under contract with United for $80, and so the rebate becomes $70. But when TransDigm is selling to the Government, they are saying, 'list price is $150,' even though Aviall is getting a $70 rebate?" To which the former employee responded, "That's right."

87. In addition to instructing employees to break up large contracts and manipulate commercial pricing, Defendants also trained employees to deny and obstruct any Government request for cost or pricing information, and, if audited, obscure the Company's cost basis—including by providing distributor costs, as opposed to TransDigm's true costs, wherever possible—and to use pressure tactics to wear down procurement officers to get them to accept higher prices.

88. Indeed, according to former management-level employees of multiple subsidiaries that spoke to The Capitol Forum, TransDigm instructed its employees to "challenge every single [cost information] request from a prime or an auditor," and to determine what information was "required" based on a "very strict, limited interpretation of what the regulation requires us to do," i.e. on the narrowest possible reading of what information they were required to provide. Further, employees were told to "do everything we possibly could to avoid an audit. And if we had to succumb to an audit, we were to challenge every single request for data."

89. Further, while TransDigm trained its employees that avoiding an audit altogether was always the goal, it was not always avoidable. For example, when TransDigm acted as a subcontractor for a prime contractor such as Boeing, the prime contractor sometimes forced TransDigm's subsidiaries to submit to audit. In those scenarios, TransDigm trained its employees in tactics to stall, obstruct, and/or obscure the audit process, including inflating cost basis to justify exorbitant profits. For example, one former employee specifically described how TransDigm instructed its employees to inflate the cost of production when audited: "[t]he guidance would be something like, if during an audit you're required to show an hourly rate for technicians, find the most expensive technicians that have to do with the specific product and if the auditor wants to include a wider pool of employees, you challenge that." This allowed the

subsidiary to establish an artificially high cost-basis for purposes of the audit, which benefitted the Company since its contracts with the Government typically determined allowable profit based on "cost," (e.g. 8% profit allowed over cost), so that the larger and more inflated TransDigm's cost basis, the larger its total allowed profit.

90. All told, Defendants used every fraudulent trick in the book to price gouge the U.S. Government. In turn, Defendants' fraud had a massive real-world impact on the military's ability to maintain combat-readiness. Indeed, as stated by the DoD Office of Inspector General in its audit report on TransDigm, the rapidly increasing cost of component parts was significant because of "its adverse impact on the DoD challenge to maintain a superior level of combat readiness and force structure as well as improve equipment quality and responsiveness. Since the terrorist attacks of September 11, 2001, and with the ongoing operations in Afghanistan and Iraq, demands for spare parts have increased. The procurement of spare parts is essential in assisting war fighters with carrying out their missions."

**F. TransDigm Insiders Capitalized on the Stock's Artificial Inflation Through Massive, Suspicious Insider Stock Sales**

91. Defendants capitalized on the fraudulent scheme to personally profit by tens of millions of dollars. Indeed, Defendant Howley alone materially benefitted from the artificially inflated price of the Company's common stock through sales that were highly suspicious in timing and magnitude. Specifically, while in possession of material, nonpublic information, Howley sold 144,500 shares of the Company's common stock at artificially inflated prices—84% of the common stock that Howley beneficially owned, according to TransDigm's publicly-reported Form 4 filings—reaping enormous insider trading proceeds of nearly $38 million:

**Howley, W. Nicholas, Chairman/CEO/Co-Founder**

| Date | Shares | Price | Value |
|---|---|---|---|
| 06/08/16 | 100,000 | $265.01 | $26,501,202 |
| 09/14/16 | 7,500 | $281.50 | $2,111,279 |
| 12/08/16 | 37,000 | $251.25 | $9,296,247 |
| **Total** | **144,500** | **$262.34** | **$37,908,729** |

92. Defendant Howley's massive sales were also suspicious because they were not made pursuant to an SEC Rule 10b5-1 executive trading plan, even though Howley had previously adopted such a plan for sales made in prior years. In so doing, Howley was able to liquidate a large position quickly, without delay and restriction, thereby circumventing the very safeguards that 10b5-1 trading plans were meant to provide. Rule 10b5-1 trading plans were established by the SEC to allow insiders of publicly traded corporations to set up a trading plan for selling stocks they own. Specifically, 10b5-1 trading plans allow major shareholders to sell a predetermined number of shares at a predetermined time. Notably, Defendant Howley's sales were instead open-market transactions and were designed to maximize his personal benefit from the artificial inflation in the Company's stock price.

93. In addition to Defendant Howley, TransDigm insiders including the Company's Vice Chairman, its former CFO, and a number of Executive Vice Presidents, also took full advantage of the artificial inflation of TransDigm common stock caused by Defendants' knowingly false and misleading statements. During the Relevant Period, ten TransDigm insiders from the highest levels of the management team each obtained gross proceeds of $1 million or

higher. Moreover, Defendant Howley, Robert Henderson[9] and Bernt Iversen[10] alone took home $64 million in proceeds, a vast amount for three individuals.

94. Collectively, the insider selling at TransDigm was massive. Just during the period from May 10, 2016 through June 30, 2016, six insiders sold 198,740 shares for proceeds of $52 million. Of that, Howley accounted for over half alone, grossing $26.5 million by selling 100,000 shares in a single trading day on June 8, 2016. All told, TransDigm insiders sold over 330,000 shares of TransDigm common stock during the Class Period at materially inflated prices for proceeds of more than $87 million:

| Insider | Position | Shares | Average Price | Gross Proceeds | % of Holdings Sold |
|---|---|---|---|---|---|
| Howley | Chairman/CEO | 144,500 | $262.34 | $37,908,729 | 84% |
| Henderson | Vice Chairman | 57,000 | $261.29 | $14,893,567 | 70% |
| Iversen | EVP: M&A | 40,000 | $273.12 | $10,924,921 | 89% |
| Rufus | SVP: ex-CFO | 21,000 | $244.31 | $5,130,455 | 64% |
| Leary | EVP | 20,740 | $259.89 | $5,390,152 | 69% |
| Palmer | EVP | 20,500 | $281.84 | $5,777,743 | 84% |
| Valladares | EVP | 10,000 | $254.38 | $2,543,826 | 67% |
| Jones | EVP | 7,500 | $285.92 | $2,144,380 | 65% |
| Reiss | EVP | 6,000 | $252.99 | $1,517,936 | 63% |
| Graff | Director | 3,928 | $251.33 | $987,224 | 32% |
| Total | | 331,168 | | $87,218,932 | |

95. Moreover, even when including exercisable options as listed in TransDigm's proxy statements, these TransDigm executives' insider selling still represent material

[9] Robert S. Henderson served as Chief Operating Officer of Airframe at TransDigm from October 2014 to December 2016. Henderson is currently Vice Chairman of TransDigm, a position he has held since January 2017, and also serves as President of AvtechTyee, a TransDigm subsidiary.

[10] Bernt G. Iversen, II, has been the Company's Executive Vice President of Mergers & Acquisitions and Business Development since May 2012. Prior to his E.V.P. role, for over two decades, he held positions at TransDigm-related companies, including more recently as President of Champion Aerospace Inc., a subsidiary of TransDigm from 2006 to 2010.

percentages of their overall holdings. For instance, when including exercisable options as listed in TransDigm's proxy statements, Howley, Henderson, Rufus and Graff sold approximately 18%, 26%, 14% and 13% of their total holdings, respectively.

96. Defendants were thus clearly motivated to perpetuate the fraudulent scheme alleged herein in order to benefit from the artificially inflated price of the Company's common stock through insider sales that were highly suspicious.

## V. DEFENDANTS' FRAUD IS EXPOSED

### A. The Truth Regarding Defendants' Fraudulent Price Gouging Scheme Is Revealed In Early 2017

97. On January 20, 2017, Citron Research ("Citron") issued a report revealing that TransDigm was employing an unsustainable business strategy, driven almost entirely by acquisitions—financed by copious amounts of debt—and by subsequent massive price hikes. The report detailed that TransDigm's business model resulted in "egregious price increases foisted on the Government." Describing TransDigm as the "Valeant of the Aerospace Industry," the report made the shocking disclosure that "TransDigm has been able to use the guise of multiple shell distributors, who have no pricing power, to make a bid seem competitive when in reality they are all shills for TransDigm."

98. The report stated that these business practices had allowed the Company to inflate its profit margins significantly above its industry peers. In addition, the report alleged that the Company had thwarted a prior Government audit into its cost structure by employing a variety of stonewalling tactics.

99. Citron further emphasized that TransDigm's growth was highly unsustainable and maintained only by its price-gouging of the Government—a scheme that would likely end once

the Federal Government caught on, causing the Company's financial results to plummet. As Citron explained:

> The ugly underbelly of TransDigm's business is that aggressive year-over-year price increases are the only thing shielding TransDigm from revealing negative organic growth of close to -10%. Any combination of U.S. Government pressure and/or OEM's pressing on their own supply chains will expose their business to actual gross revenue contraction and a devastating cut in EPS, followed by multiple contraction.

100. In reaction to the Citron report, TransDigm's share price dropped $24.86 per share, or nearly 10%, from $251.76 per share on January 19, 2017 to $226.90 per share on January 20, 2017—wiping out $1.3 billion in market capitalization in one trading day.

101. On March 9, 2017, Citron published a second report titled "Citron Exposes More Undisclosed Relationships at TransDigm," stating that TransDigm was "exploiting and deceiving the Federal Government" and exposing that TransDigm had deliberately concealed its identity as the parent company of a full one-third of its subsidiaries that contracted for the Government. Specifically, no fewer than twelve different TransDigm subsidiaries—more than one-third of the TransDigm subsidiaries that sold to the Government—all had "coincidentally" failed to disclose that they were owned by TransDigm when bidding for Government contracts, in violation of Federal regulations requiring disclosure of parent ownership as part of the Government's bidding qualification process.

102. Moreover, as the March 9, 2017 Citron report made clear, the fact that twelve different TransDigm subsidiaries failed to disclose their parent company could not have been a mere "clerical error," as TransDigm reportedly claimed. Indeed, as the report showed, the online registration form for the federal bidding process included the clear-cut question "Does another entity own or control your Immediate Owner?" Next to the question were two clearly-marked options to be clicked – "Yes" or "No." Moreover, the form required registrants to read a

disclosure stating that they were certifying the information was accurate and complete, and that providing false information could result in "criminal prosecution" and "imposition of a fine, imprisonment or both," as well as civil and administrative remedies. Thus, the report concluded that the likelihood that all twelve subsidiaries had simply made a mistake when submitting the form was not plausible, and that "TransDigm has intentionally used illegal tactics to inflate margins while avoiding price scrutiny from the U.S. Government."

103. In reaction to Citron's March 9, 2017 report, TransDigm's stock dropped $10.26 per share, or 4.25%, from a close of $241.63 per share on March 9, 2017 to a close of $231.37 per share on March 10, 2017, wiping out over $542 million in market capitalization.

104. Finally, on March 21, 2017, U.S. Congressman Ro Khanna (D., Calif.) issued a press release announcing that he had sent a letter to the DoD Acting Inspector General, Mr. Glenn Fine, requesting an investigation of TransDigm's business practices with respect to sales to the Government. As detailed below, the letter revealed to investors TransDigm's range of methods to evade Federal regulations that "protect the taxpayer against sole source contractors like TransDigm":

> [F]ederal regulations protect the taxpayer against sole source contractors like TransDigm. When a vendor is understood to be a monopoly supplier, that supplier is required to in turn offer cost information about the product to the Government or otherwise the Government must conduct a thorough review of the likely cost of the product. In addition, vendors must tell procurement officers if they belong to a holding company to allow the Government access to transparency in pricing across a defense contractor's entire business.

105. Congressman Khanna's letter specifically noted that "TransDigm appears to use a range of methods to evade these protections," including a "network of captive distributors that mimic the aesthetics of a competitive market," which results in a procurement officer not "realizing that he or she is in fact buying from a monopoly":

> TransDigm avoids showing that it is a monopoly provider of parts by setting up a network of captive distributors that mimic the aesthetics of a competitive market. Despite the illusion of competition, distributors that provide TransDigm parts, for the most part, are buying from one TransDigm subsidiary, and that subsidiary sets its price to distributors. The procurement officer, however, sees multiple sellers of the product, without realizing that he or she is in fact buying from a monopoly. Thus, the officer does not know to ask for the cost structure. Even when competition among distributors is limited, the officer may simply ask the distributor for its cost information, rather than asking TransDigm for its cost information.

106. Congressman Khanna's letter also emphasized that the DoD had previously informed TransDigm that the practice of using captive distributors was inherently problematic and not a "viable procurement alternative for the DOD":

> In fact, your office identified exclusive distributors as problematic in a 2008 audit of Dutch Valley, which is a TransDigm distributor. You concluded in 2008: "We do not believe the current exclusive distributor model is a viable procurement alternative for the DOD."

107. The letter further identified TransDigm's practice of concealing the fact that TransDigm was the parent entity for its subsidiaries in U.S. Government procurement databases:

> Furthermore, in DOD filings known as SAM registration forms, 12 TransDigm subsidiaries failed to disclose TransDigm as their corporate parent . . . . The SAM form itself is clear that filing inaccurate reports—thereby making it more difficult for the Government to track spending—carries significant penalties.

108. Congressman Khanna also emphatically stated: "TransDigm Group has been operating as a hidden monopolist by (i) engaging in a series of unreasonable price increases of products for which it is the only supplier; (ii) disguising its cost structure and identity from Pentagon procurement officers, and (iii) unreasonably hiking prices…" Congressman Khanna urged the DoD to ensure that military funding does not benefit "a few individual financiers" at the expense "of our troops and weapons systems." The Congressman concluded by requesting that the DoD Office of the Inspector General "open an investigation into TransDigm Group for potential waste, fraud and abuse in the defense industrial base."

109. As a result of Congressman Khanna's letter, TransDigm's stock price dropped $23.09 per share over two trading days, from $237.94 on March 20, 2017 to $214.85 on March 22, 2017, a decline of nearly 10%, on extremely high trading volume, wiping out approximately $1.22 billion in market capitalization.

**B. Post-Class Period Events Further Confirm The Fraud**

110. Following Congressman Khanna's letter to the DoD, on April 18, 2017, Ohio Congressman Tim Ryan, a member of the House Appropriations Committee and the Subcommittee on Defense, sent a letter to the Acting DoD Inspector General, joining Congressman Khanna's request for the DoD OIG to open an investigation into TransDigm for "waste, fraud, and abuse in the defense industrial base."

111. On June 11, 2017, CNBC reported that Senator Elizabeth Warren (D., Mass.) had urged the DoD Inspector General to investigate TransDigm's sales to the DoD. The letter, which Senator Warren had sent to the DoD on May 19, 2017, referred to prior requests by Representative Khanna and Congressman Tim Ryan (D., Ohio), and stated:

> As a member of the Senate Committee on Armed Services, I have also been monitoring reports that suggest TransDigm WorldWide has used a variety of tactics to avoid sharing cost information with the Government for parts for which it is the sole source supplier. These reports further show that TransDigm has unreasonably raised prices on many parts shortly after completing acquisitions of the companies that produce them.

112. On June 27, 2017, in response to requests from Congress, the DoD OIG announced that it would begin an audit of sales of parts by TransDigm and its subsidiaries to the DoD. Specifically, a memo addressed to DLA and DoD procurement officials dated June 27, 2017, and published on the DoD's website, announced, in relevant part:

> SUBJECT: Audit of Spare Parts Procured From TransDigm Group Inc. (Project No. D2017-D000AH-0162.000)

> We plan to begin this audit in June 2017. We are conducting this audit in response to several congressional requests. Our general objective is to determine whether the DoD is purchasing spare parts at fair and reasonable prices from TransDigm Group Inc. We will consider suggestions on additional or revised objectives.

113. The audit is still not complete and its results have not been disclosed. However, according to The Capitol Forum, the DoD OIG's ongoing audit of TransDigm has an expected completion date of sometime between late 2018 and early 2019. As stated by Defendant Howley during an August 8, 2017 earnings conference call: "These audits typically go slowly. This will likely take well over a year to conclude." Notably, Howley concluded his discussion of the DoD audit by stating: "I will not comment further on this unless we decide public disclosure is appropriate."

114. In addition to the DoD OIG audit, The Capitol Forum reported that on November 8, 2017, the House and Senate Armed Services Committees requested for the U.S. Government Accountability Office ("GAO") to conduct an investigation of "monopolistic practices" in spare parts procurement. The Armed Services Committee is reportedly concerned that the DLA "is paying excessive prices for noncompetitive spare parts" and is "aware of allegations that some contractors who provide spare parts to the Government may be disguising their cost structures from procurement officers, in effect acting as 'hidden monopolists', decreasing competition and increasing prices to the Government." The final report will likely be produced during the same time period as the expected end date of the DoD OIG's ongoing audit of TransDigm.

115. In the meantime, the revelation of the TransDigm fraud is taking a toll on its financial results. On February 6, 2018, TransDigm reported financial results that missed analyst estimates, indicating that the DoD audit was starting to dampen TransDigm's ability to price-gouge the Government. In its earnings call for the first quarter of fiscal 2018, TransDigm

blamed its declining profitability entirely on nebulous and unspecified "headwinds" in defense that led to lower than expected profit margins:

> I know that, with 10% growth in aftermarket, some would feel that maybe it should be higher. As we look through it, the shipments that we had, we were impacted by some margin softness on the defense side that lowered our margins as a whole business . . . .
>
> Beyond the shipments that we had available to us, we shipped, that's the only thing that I can see that might explain or does explain the somewhat lower margin than we would have expected[--]some headwinds on the defense side of the business . . . .

116. Moreover, the fraud's implications are now materially affecting the Company's private sector contracts. The latest manifestation of the fraud's impact on the Company's business includes Boeing re-engineering Dreamliner part specifications to enable more suppliers to provide tie rods to the aviation platform, a move that will cost TransDigm subsidiary AvtechTyee a $12 million-per-year contract to supply tie rods to the aircraft. A Boeing spokesperson confirmed the design change, stating that "in 2017, Boeing made the decision to move the 787 tie rod work package from AvtechTyee to other suppliers." While stating that specific figures were proprietary, the Boeing spokesperson did confirm that savings from this redesign were "significant." Boeing's action was clearly taken in response to TransDigm raising prices on proprietary aircraft parts.

## VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

117. Defendants made false and misleading statements and material omissions during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder. Throughout the Class Period, TransDigm's press releases, investor presentations, and public filings made with the SEC included material misstatements and/or omissions concerning the Company's growth and profitability, which were artificially inflated as a result of Defendants' illicit business practices.

118. In their statements, Defendants repeatedly emphasized TransDigm's consistent business strategy and value-based pricing, which purportedly differentiated the Company from its competitors and created intrinsic shareholder value. Moreover, TransDigm consistently reported margins that were several times higher than those of its peer aerospace component manufacturers, resulting in outsized profits, and attributed these results to the Company's purportedly superior business strategy and operations.

119. As detailed above, Defendants disguised TransDigm's exorbitant cost structure and identity from government officials through a variety of means, including by colluding with exclusive distributors to make noncompetitive government bids appear competitive, and instructing subsidiaries to unlawfully hide TransDigm's identity as a parent entity when submitting government bids. TransDigm also instructed employees to submit false commercial market prices (the commercial list price instead of the reduced-commercial rebate price) to government officials in order to charge the Government an inflated price for products, while concealing the Company's true costs. Defendants used numerous tactics to avoid giving cost information to the government, avoid audits, and stay below contract price thresholds that would have triggered greater scrutiny and would have prevented TransDigm from furthering its unsustainable, illicit business model.

120. Defendants' material misstatements and omissions thus created in the market an unrealistically positive assessment of TransDigm's business, operational status, profitability, and future growth prospects as the Company was relying on improper and unlawful business practices to boost profitability.

### A. Second Quarter 2016 Results

121. On May 10, 2016, the first day of the Class Period, TransDigm issued a press release announcing its financial results for the second quarter ended April 2, 2016 ("Q2 2016"), reporting substantial growth. For Q2 2016, TransDigm generated net sales of $796.8 million, up 28.7% on a year-over-year basis, and net income of $138.6 million, up 25.0%. Defendant Howley attributed TransDigm's strong financial results to the Company's "constant focus on [its] value-based operating strategy."

122. Also on May 10, 2016, TransDigm held an investor conference call to discuss its Q2 2016 financial results. At the start of the call, Defendant Howley attributed the Company's financial results to its "unique in the industry" business model with "its consistency and its ability to sustain and create intrinsic shareholder value," as well as its "well-proven value-based operating strategy, based on our three value driver concept"—which were described in the Company's SEC filings as "obtaining profitable new business, improving our cost structure, and providing highly engineered value-added products to customers." Defendant Paradie made similar statements during the call, attributing TransDigm's improved profit margins to "the strength of our proprietary products, [and] continually improving our cost structure."

123. Moreover, Kevin M. Stein ("Stein"), COO of the Company's power business, touted TransDigm's "keys to delivering shareholder value," including the Company's "planning processes, unique application of the TransDigm value drivers and our organizational focus on accretive acquisitions that meet our strategic vision." Stein further emphasized the Company's acquisition model, stating that when the Company acquired a new business, it focused on "implementation of our value creation process and metrics, restructuring the company into our

business unit focus groups, focusing the engineering and business development efforts on winnable and profitable new business and finally, we tighten up the cost structure."

124. Defendants' statements identified above in ¶¶121-23 were materially false and misleading, and omitted material facts when made. The Company's ostensible profitability and high margins were not the result of the TransDigm's "value-based operating strategy," but of Defendants' fraudulent price gouging scheme. Specifically, TransDigm's financial results and growth were dependent on a range of unlawful practices, including: (i) radically overcharging the Government through exorbitant price increases that Defendants knew were unsustainable; (ii) illicitly concealing that TransDigm was the parent company of its subsidiaries, in violation of regulations designed to assist the Government in detecting "waste, fraud, and abuse"; (iii) using a network of captive distributors that mimic the aesthetics of a competitive market and avoid cost scrutiny; (iv) falsifying commercial pricing information when requested by the Government; and (v) using a variety of Corporate-directed tactics to avoid additional Government audit or inquiry into pricing, including splitting up contracts to multiple distributors to avoid triggering TINA contract size thresholds that would have resulted in heightened scrutiny. *See* ¶¶28-90. TransDigm's business strategy was therefore not "unique in the industry" and supportive of the Company's strong profit margins and financial results, but was rather artificially manufactured by Defendants' widespread unlawful conduct.

125. On May 11, 2016, TransDigm filed its 2Q 2016 Form 10-Q with the SEC, reiterating the Company's financial results. The 2Q 2016 10-Q emphasized the Company's "net increase in gross profit of approximately $34 million" for the quarter, and attributed this growth in significant part to the Company's "core value-driven operating strateg[y]" of "obtaining profitable new business."

126. The statements in ¶125 above were materially false and misleading, and omitted material facts when made. In reality, the Company's increase in gross profit was almost entirely due to price increases that were only enabled by Defendants' fraudulent scheme, and TransDigm did not generate a material amount of "profitable new business." Indeed, as revealed by Citron's in-depth analysis of TransDigm's price increases and their impact on the Company's financial results (published in Citron's January 20, 2017 report), TransDigm's organic profit growth (*i.e.* growth other than by acquisition) relied almost entirely on exorbitant price increases obtained in large part through Defendants' fraudulent and unsustainable scheme to price-gouge the Government. In fact, absent Defendants' fraud, TransDigm would suffer from negative 10% organic growth, confirming that price increases were the Company's only significant driver of organic profit growth, and that there was no evidence of profitable new business being generated. *See, e.g.*, ¶¶97-99.

**B. 2016 Analyst Day**

127. On June 23, 2016, TransDigm held its 2016 Analyst Day in New York City. Defendant Howley again touted the Company's "consistent strategy," stating "we know how to create value…we know more about generating value than most people do in this industry." Howley stressed how TransDigm's "price" created value and that "we price to reflect the value we provide..." Furthermore, throughout the 2016 Analyst Day presentation, Defendant Howley and other top TransDigm executives consistently emphasized "profitable new business" as the reason for TransDigm's growth.

128. Defendants' statements identified above in ¶127 were materially false and misleading, and omitted material facts when made. In reality, the "prices" that TransDigm set were exorbitant, unreasonable, and inflated through unlawful tactics that violated Government

regulations concealed TransDigm's true product costs from Pentagon procurement officers. In fact, TransDigm's financial results and growth were dependent on a range of methods, including: (i) radically overcharging the Government through exorbitant price increases that Defendants knew were unsustainable; (ii) illicitly concealing TransDigm as the parent company of its subsidiaries in violation of regulations designed to assist the Government in detecting "waste, fraud, and abuse"; (iii) using a network of captive distributors that mimicked the aesthetics of a competitive market and avoided cost scrutiny; (iv) falsifying commercial pricing information when requested by the Government; and (iv) using a variety of Corporate-directed tactics to avoid additional Government audit or inquiry into pricing, including splitting up contracts to multiple distributors to avoid triggering TINA contract size thresholds that would have resulted in heightened scrutiny. *See, e.g.*, ¶¶28-90.

129. Further, the Company's high profits were almost entirely due to its exorbitant price increases, and the Company did not generate a material amount of "profitable new business." Indeed, as Citron later revealed, TransDigm's organic profit growth (i.e. growth other than by acquisition) relied almost entirely on exorbitant price increases obtained primarily through Defendants' fraudulent and unsustainable scheme to price-gouge the Government. In fact, absent Defendants' fraud, TransDigm would suffer from negative 10% organic growth, confirming that price increases were the Company's only significant driver of organic profit growth, and that there was no evidence of profitable new business being generated. *See, e.g.*, ¶¶97-99.

**C. Third Quarter 2016 Results**

130. On August 9, 2016, TransDigm issued a press release announcing its financial results for the third quarter ended July 2, 2016 ("3Q 2016"). For 3Q 2016, TransDigm reported

net sales of $797.7 million, up 15.4%, and net income of $140.6 million, up 41.9%. The press release attributed the increase in net income to sales growth and improvements to TransDigm's "operating margin resulting from the strength of [the Company's] proprietary products and continued productivity efforts." Defendant Howley also stated that the Company's strong margins "reflect the strength of our proprietary products and our continued focus on intrinsic value creation."

131. On the same day, TransDigm held an investor conference call to discuss its Q3 2016 financial results. Defendant Howley again attributed the Company's financial success that quarter to a business model that is "unique in the industry, both in its consistency and its ability to sustain intrinsic shareholder value," and the Company's "simple well-proven value-based operating strategy." Defendant Paradie emphasized that the Company's financial results were attributable to the "strength of our proprietary products and continuing improving our cost structure."

132. Defendants' statements identified above in ¶¶130-31 were materially false and misleading, and omitted material facts when made. In reality, TransDigm's strong financial results were not attributable to "the strength of [its] proprietary products and continued productivity efforts," but to exorbitant and unreasonable price increases that were unlawfully disguised from Pentagon procurement officers and were dependent on a range of illicit practices. These practices included: (i) radically overcharging the Government through price increases that Defendants knew were unsustainable; (ii) illicitly concealing TransDigm as the parent company of its subsidiaries in violation of regulations designed to assist the Government in detecting "waste, fraud, and abuse"; (iii) using a network of captive distributors that mimicked the aesthetics of a competitive market and avoided cost scrutiny; (iv) falsifying commercial pricing

information when requested by the Government; and (iv) using a variety of Corporate-directed tactics to avoid additional Government audit or inquiry into pricing, including splitting up contracts to multiple distributors to avoid triggering TINA contract size thresholds that would have resulted in heightened scrutiny. *See*, *e.g.*, ¶¶28-90.

133. On August 10, 2016, TransDigm filed its 3Q 2016 Quarterly Report for the quarter ended July 2, 2016 on Form 10-Q with the SEC ("3Q 2016 10-Q"). The 3Q 2016 10-Q stated that the Company's "gross profit increased by $84.0 million, or 23.4%, for the quarter ended July 2, 2016 compared to the comparable quarter last year," and attributed this growth in significant part to the Company's "core value-driven operating strateg[y]" of "<u>obtaining profitable new business</u>."

134. The statements in ¶133 above were materially false and misleading, and omitted material facts when made. In reality, the Company's increase in gross profit was not due to "profitable new business," but to excessive price increases that were only enabled by Defendants' fraudulent scheme. Indeed, as revealed by Citron's in-depth analysis of TransDigm's price increases and their impact on the Company's financial results (published in Citron's January 20, 2017 report), TransDigm's organic profit growth (*i.e.* growth other than by acquisition) relied almost entirely on exorbitant price increases obtained through Defendants' fraudulent and unsustainable scheme to price-gouge the Government. In fact, absent Defendants' fraud, TransDigm would suffer from <u>negative</u> 10% organic growth, confirming that price increases were the Company's only significant driver of organic profit growth, and that there was no evidence of profitable new business being generated. *See, e.g.*, ¶¶97-99.

**D. Fourth Quarter and Full Year 2016 Results**

135. On November 14, 2016, TransDigm issued a press release announcing its financial results for the fourth quarter ("4Q 2016") and fiscal year ended September 30, 2016 ("FY 2016"). For 4Q 2016, TransDigm generated net sales of $875.2 million, up 8.1%, and net income of $154.7 million, up 9.2%. For FY 2016, TransDigm generated net sales of $3.174 billion, up 17.2% on a year-over-year basis, and net income of $586.4 million, up 31.1%. The Company attributed the increase in net income to "improvements to [its] operating margin resulting from the strength of [its] proprietary products, continued productivity efforts and favorable product mix."

136. Also on November 14, 2016, TransDigm held an investor conference call to discuss its 4Q 2016 and FY 2016 financial results. Defendant Howley again attributed TransDigm's performance to its "consistent strategy" of implementing a business model that is "unique in the industry, both in its consistency and its ability to sustain and create intrinsic shareholder value."

137. Defendants' statements identified above in ¶¶135-36 were materially false and misleading, and omitted material facts when made. Contrary to Defendants' representations, TransDigm's financial results were not the result of "the strength of [its] proprietary products, continued productivity efforts and favorable product mix," or of its "consistent strategy" of implementing a "unique" business model. Rather, the source of these results was Defendants' fraudulent scheme to price-gouge the U.S. Government. In reality, TransDigm's financial results and growth were dependent on a host of illicit practices, including: (i) radically overcharging the Government through exorbitant price increases that Defendants knew were unsustainable; (ii) illicitly concealing TransDigm as the parent company of its subsidiaries in violation of

regulations designed to assist the Government in detecting "waste, fraud, and abuse"; (iii) using a network of captive distributors that mimicked the aesthetics of a competitive market and avoided cost scrutiny; (iv) falsifying commercial pricing information when requested by the Government; and (iv) using a variety of Corporate-directed tactics to avoid additional Government audit or inquiry into pricing, including splitting up contracts to multiple distributors to avoid triggering TINA contract size thresholds that would have resulted in heightened scrutiny. *See, e.g.*, ¶¶28-90.

138. On November 15, 2016, TransDigm filed its 2016 Annual Report on Form 10-K with SEC ("2016 10-K"). The 2016 10-K was signed by the Individual Defendants and reaffirmed the Company's fourth quarter and fiscal year 2016 financial results. The 2016 10-K again emphasized the Company's "value-driven operating strategy," and stated that a key component of this strategy was that it priced its products "fairly" to reflect the "value" provided by the Company:

> *Providing Highly Engineered Value-Added Products to Customers*. We focus on the engineering, manufacturing and marketing of a broad range of highly engineered niche products that we believe provide value to our customers. We believe we have been consistently successful in communicating to our customers the value of our products. This has generally enabled us to price our products to fairly reflect the value we provide and the resources required to do so.

139. The statements in ¶138 above were materially false and misleading, and omitted material facts when made. Contrary to Defendants' representations, TransDigm's product pricing had no connection whatsoever to the "value" provided by the Company or the "resources required" (i.e. costs) to produce them, and thus was in no sense "fair." Indeed, as detailed further herein, TransDigm's exorbitant pricing was enabled by a plethora of deceptive tactics designed to avoid disclosing any cost information to the Federal Government, in violation of Federal regulations. *See, e.g.*, ¶¶28-90. Had TransDigm provided truthful, complete and honest cost

information to the Government as required by Federal regulations, procurement officers would certainly have determined that TransDigm's prices did not meet the "fair and reasonable" standard set by regulations, and would have dramatically reduced the prices the Government paid TransDigm's subsidiaries for their components.

140. The 2016 10-K also stated that "gross profit increased by $278.3 million, or 19.2%, for the fiscal year ended September 30, 2016 compared to the comparable period last year," and attributed this growth in significant part to the Company's "core value-driven operating strateg[y]" of "obtaining profitable new business."

141. The statements in ¶140 above were materially false and misleading, and omitted material facts when made. In reality, the Company's increase in gross profit was almost entirely due to price increases that were only enabled by Defendants' fraudulent scheme, and TransDigm did not generate a material amount of "profitable new business." Indeed, as revealed by Citron's in-depth analysis of TransDigm's price increases and their impact on the Company's financial results (published in Citron's January 20, 2017 report), TransDigm's organic profit growth (*i.e.* growth other than by acquisition) relied almost entirely on exorbitant price increases obtained in large part through Defendants' fraudulent and unsustainable scheme to price-gouge the Government. In fact, absent Defendants' fraud, TransDigm would suffer from negative 10% organic growth, confirming that price increases were the Company's only significant driver of organic profit growth, and that there was no evidence of profitable new business being generated. *See, e.g.*, ¶¶97-99.

**E. Code of Business Conduct and Ethics, and Code of Ethics for Senior Financial Officers**

142. TransDigm's Code of Business Conduct and Ethics was described in the Company's 2016 10-K and posted and published on TransDigm's website.[11] The Code of Business Conduct and Ethics featured TransDigm's "longstanding policy" to "conduct its business lawfully and ethically." Specifically, during the Class Period, the Code of Conduct emphasized "the Company's policy to comply with all applicable local, national and international laws, rules and regulations…"

143. In addition to the Code of Business Conduct and Ethics, TransDigm's Code of Ethics for Senior Financial Officers was described in TransDigm's 2016 10-K and falsely stated that "[s]enior financial officers shall act with honesty and integrity."[12] The Code of Ethics further stated that "Senior financial officers shall endeavor to comply with all laws, rules and regulations of federal, state, and local governments, and all applicable private or public regulatory agencies."

144. Defendants' statements in ¶¶142-43 above were materially false and misleading, and omitted material facts when made. First, the Individual Defendants did not act "with honesty and integrity" in TransDigm's dealings with the Government, but instead facilitated a deceptive and fraudulent price gouging scheme, which was dependent on a host of unlawful practices, as described above. *See, e.g.*, ¶¶28-90. Second, TransDigm did not "comply with all laws, rules and regulations," but instead rampantly violated Government regulations through the practices described above. Defendants' intentionally orchestrated that TransDigm fraud

---

[11] *See* https://www.transdigm.com/investor-relations/corporate-governance/

[12] The Code of Ethics for Senior Financial Officers is also posted on the Company's website: https://www.transdigm.com/investor-relations/corporate-governance/

specifically to circumvent these rules and regulations, and ultimately to defraud the U.S. Government, taxpayers, and the Company's shareholders.

## VII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

145. As alleged above, numerous facts raise a strong inference that Defendants knew, or were severely reckless in disregarding, the true facts regarding TransDigm's widespread illicit practices. Specifically, Defendants were well aware that TransDigm was artificially inflating its profitability by egregiously price gouging the U.S. Government, engaging in waste, abuse and fraud. These facts include, in addition to the allegations set forth above, the following.

146. *Prior to the Class Period, TransDigm and several of its subsidiaries and exclusive distributors were the subject of Government audits, which specifically concluded that the Company was engaging in practices that contravened Federal Acquisition Regulations*. In 2006, TransDigm was audited by the DoD, which focused on TransDigm's "excessive prices and using the commercial item definition to avoid the Federal requirement to provide cost or pricing data." ¶¶4, 37-44. The 2006 Audit highlighted myriad unlawful and illicit practices that TransDigm perpetrated to circumvent Federal regulations, including that TransDigm: (i) "refused to provide" information regarding price increases; (ii) "applies a commercial pricing strategy to its sole-source military-unique items although no commercial market exists," resulting in "overpriced spare parts and increase[d] burden placed on the DoD budget"; (iii) did not provide "cost breakdowns or cost data"; (iv) cited "limited accounting resources" as an excuse to explain its failure to provide cost information; and (v) considered an item "proprietary and commercial and will not provide any cost breakdown." *Id*.

147. Notably, the 2006 Audit concluded that DLA contracting officers "were unable to effectively negotiate prices for spare parts procured from TransDigm subsidiaries," that the DLA

paid TransDigm millions of dollars more than the fair and reasonable price for 77 parts, and that the DLA would continue to pay unfair prices if the problems were not addressed. ¶44. Defendants were thus indisputably on notice that TransDigm was violating Government regulations meant to ensure that the DoD paid fair and reasonable prices for the Company's products.

148. Moreover, the 2008 Audit specifically highlighted TransDigm's abuse of exclusive distributors to mimic the aesthetics of a competitive bidding process—a prelude to the illicit practices in which Defendants engaged during the Class Period. Specifically, the 2008 Audit found that Skurka Aerospace, Inc., a TransDigm subsidiary, and its exclusive distributor, Dutch Valley Supply, were using their exclusive agreement to engage in bid-rigging-like practices that created the illusion of competition, when in fact there was only one source of the relevant part and only one bidder (the TransDigm-affiliated distributor) could win. ¶¶7, 45-49. The 2008 Audit noted that, with this type of exclusive distribution arrangement, "it is clear that competition will not be independent or fair, because Dutch Valley Supply, as the single-source distributor, inherently controls its 'competitors'' costs and delivery, which gives unfair insight and a decided advantage in winning awards over its 'competitors.'" ¶46. The report further concluded that the DoD "do[es] not believe the current exclusive distributor model is a viable procurement alternative for the DOD," and included the remarkable assessment that "[b]usiness practices such as these during a time of war clearly do not provide the best support to the warfighter." ¶¶7, 48-49. Thus, Defendants were well aware that TransDigm's business practices ran afoul of important Government regulations meant to protect DoD and taxpayer resources.

149. *Defendants intentionally concealed the fact that TransDigm was the parent company of twelve of its subsidiaries, in violation of indisputably clear Government regulations.*

As set forth above, twelve different TransDigm subsidiaries—more than one-third of the Company's subsidiaries that were registered to sell products to the DoD—failed to disclose that TransDigm was the parent entity in violation of Federal regulations. ¶¶50-60. The Government made no secret that these regulations were in place so that the DoD could track spending across corporations and to enable procurement officers to accurately determine a fair and reasonable price for defense products. It is not plausible to believe that each of these subsidiaries would have inadvertently failed to disclose this critical information, particularly when the registration process was written in layman's terms and was crystal clear on the importance of accurately and completely identifying a parent entity. ¶¶50-56. These omissions were the result of a deliberate and corporate-directed effort to conceal TransDigm's affiliation in order to avoid Government scrutiny and enable Company-wide fraud and abuse of DoD regulations and protocols. Defendants' subterfuge supports a strong inference of scienter.

150. *The Congressionally-backed Government investigations of TransDigm concern Defendants' illicit and unlawful practices*. At the end of the Class Period, Congressman Ro Khanna called for a formal investigation of TransDigm's business practices for "waste, fraud and abuse," noting that the Company operated as a "hidden monopol[y]" and urging the DoD to ensure that military funding does not benefit "a few individual financiers" at the expense "of our troops and weapons systems." ¶¶13, 104-08. Congressman Tim Ryan, as well as Senator Elizabeth Warren, joined in these condemnations, citing TransDigm's "range of methods" and "variety of tactics" to evade Federal regulations and "avoid cost information with the government for parts for which it is the sole source supplier." ¶¶110-11. Senator Warren highlighted that "TransDigm has unreasonably raised prices on many parts shortly after completing acquisitions of the companies that produce them." ¶111.

151. Following these urgent calls for investigations into the Company, the DoD OIG announced that it had commenced an audit of TransDigm, which is expected to take up to two years to complete. ¶¶112-13. In addition, the House and Senate Armed Services Committees requested for the U.S. GAO to conduct a separate investigation into "monopolistic practices" in spare parts procurement. ¶114. The Committees cited concerns that "is paying excessive prices for noncompetitive spare parts" and is "aware of allegations that some contractors who provide spare parts to the government may be disguising their cost structures from procurement officers, in effect acting as 'hidden monopolists', decreasing competition and increasing prices to the government." *Id*. These Congressional rebukes and Government investigations into the heart of Defendants' unlawful practices provide strong support for scienter.

152. *TransDigm's Government sales—and the outsized profit margins they provided—were of critical importance to the Company*. TransDigm's single largest customer was the U.S. Government, and the Company's defense contracts represented approximately 30% of its revenues. ¶¶4, 28, 40. Accordingly, TransDigm's Government sales—and the outsized profit margins that they supplied—were the Company's core business and of critical importance to its financial success. In fact, through Defendants' fraudulent scheme, TransDigm earned "gross margins of 54.5% selling airplane parts to our Government," while in contrast Boeing and Lockheed's gross margins were 13.6% and 10.91%. Moreover, Defendants' fraudulent practices concealed the fact that TransDigm implemented obscene price increases on sole-source parts after acquiring their manufacturers—increases of up to 700%. ¶¶3, 31-34. The fact that Defendants' fraud concerned such a crucial aspect of TransDigm's business is further indicative of scienter.

153. *Former TransDigm employees confirm that Defendants were directly involved in implementing the fraudulent scheme*. Defendants were directly involved in implementing the fraudulent scheme by "indoctrinating" employees through training sessions and seminars on methods and tactics to defraud the Government. Specifically, corporate seminars run by TransDigm's General Counsel and Chief Compliance Officer, as well as other concerted management training sessions, taught subsidiary leadership to break up contracts to stay under the TINA threshold and minimize, if not eliminate completely, Government scrutiny; apply the commerciality exception to products that should not have been eligible for the exception; conceal the use of rebates when representing commercial price in order to avoid disclosing TransDigm's true product costs; and prevent DoD contracting officials from obtaining pricing and cost data at all costs. *See* ¶¶75-90.

154. Further, accounts from former employees, the Citron reports, and the 2008 Audit confirm TransDigm's improper usage of distributors. TransDigm used distributors to limit government transparency and access to data, and to create the false appearance of competitive bids when, in fact, the bidding process was rigged so that a TransDigm-affiliated exclusive distributor would undoubtedly prevail. ¶¶45-49, 61-74. These and other practices were directly orchestrated by TransDigm's executive management, and provide powerful evidence of scienter.

155. *Defendants' Insider Selling is Highly Indicative of Scienter.* As set forth in § IV(F) above, during the Class Period, Defendant Howley and other senior TransDigm executives took full advantage of Defendants' fraud by selling massive amounts of TransDigm stock, under extremely suspicious circumstances, and at prices that were artificially-inflated by Defendants' false and misleading statements.

156. Specifically, between June 8, 2016 and December 8, 2016, and while in possession of material, nonpublic information regarding TransDigm's business, TransDigm insiders—including Howley, the Company's Vice Chairman, its former CFO, and a number of Executive Vice Presidents—sold over 330,000 shares of the Company's common stock at materially inflated prices for proceeds of more than $87 million. These TransDigm insiders sold a majority of their shares, with most selling at least 2/3 and some selling nearly 90% of their TransDigm common stock beneficially owned. Defendant Howley alone sold over 144,000 shares of TransDigm stock at prices that were close to Class Period highs, reaping proceeds of more than $37 million, representing approximately 84% of his common stock that he beneficially owned. Moreover, Defendant Howley made his sales outside of his 10b5-1 executive trading plan (unlike his previous sales in 2012 and 2013), evidencing his intent to liquidate large positions quickly and without restriction based on his possession of material adverse undisclosed facts about the Company. ¶¶91-96.

157. Defendants were thus motivated to perpetuate the fraudulent scheme alleged herein in order to benefit from the artificially inflated price of the Company's common stock through insider sales that were highly suspicious. These illicit insider sales further contribute to a strong inference of scienter.

158. *Defendants' Compensation Structure Incentivized Fraud.* As a result of TransDigm's compensation structure, Defendants and other Company executives had a direct incentive to manipulate TransDigm's profits to inflate the Company's share price and achieve compensation goals. The Company's approach to compensation is that TransDigm is viewed as a private equity firm; thus, TransDigm's claimed philosophy is to "pay base salaries at a level less than similarly situated companies, preferring instead to compensate officers through

performance-based equity." Indeed, 100% of TransDigm executives' incentive compensation—and the vast majority of their total compensation—is performance-based, and the Company's measure of performance is heavily tied to EBITDA growth and acquisition performance.

159. Thus, Defendants were incentivized to perpetrate the fraud and bolster the Company's profits. In 2016, for instance, Howley received $18,650,700 in compensation with only $32,750 attributable to his salary, and the rest attributable to "performance." In 2017, Howley received a whopping $61,023,102 in compensation, again with nearly all of it being "performance"-based. A February 6, 2018 *Bloomberg* article noted that Howley surprisingly received such high compensation when shares of TransDigm merely "returned 4.7 percent in the fiscal year ended Sept. 30, including reinvested dividends, trailing the 19 percent gain for the S&P 500 Index." Howley ranks in the top 10 of S&P CEOs with the highest take-home pay.[13] Further, as shown, in the chart below, Howley has received approximately $278 million over five years, by far the most among his peers during this time period:




[13] https://www.bloomberg.com/graphics/2017-ceos-take-home-pay/

160. *The manner in which Defendants' illicit scheme came to light supports scienter*. TransDigm did not voluntarily disclose Defendants' fraudulent scheme. It instead has been revealed through public and Congressional scrutiny of the Company's unlawful practices. *See e.g.* ¶¶97-109. Even after the publication of the Citron Reports exposing Defendants' unlawful practices, Congressional rebukes of "waste, fraud and abuse," and the commencement of the DoD audit and the GAO investigation, Defendants still did not admit to the scheme. They instead have ignored these startling revelations and Government concerns, dismissing them as an industry custom. ¶¶110-116. When pressed to provide additional details regarding these probes, Defendant Howley instead demurred, stating: "I will not comment further on this unless we decide public disclosure is appropriate." ¶113.

## VIII. LOSS CAUSATION

161. During the Class Period, shares of TransDigm's publicly traded common stock traded on the NYSE. The market for shares of TransDigm's common stock was open, well-developed and efficient at all relevant times.

162. Throughout the Class Period, the price of TransDigm common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above. Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of TransDigm common stock, by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of TransDigm common stock fell precipitously as the prior artificial inflation dissipated. As a result of their purchases of TransDigm common stock during

the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

163. By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of TransDigm's business. Defendants' false and misleading statements had the intended effect, and caused TransDigm common stock to trade at artificially inflated levels throughout the Class Period, with TransDigm common stock reaching as high as $293.18 per share on October 4, 2016. On January 19, 2017, the last trading day before Defendants' fraud began to be revealed, TransDigm common stock traded at $251.76 per share, the last closing price prior to Citron's first report. From its Class Period closing high of $291.81 per share on September 7, 2016 to its closing price of $214.85 per share on March 22, 2017, TransDigm's stock price dropped $76.96 per share, or 26.4%, wiping out roughly $4 billion in market capitalization.

164. On January 20, 2017, Citron published an investigative report, exposing Defendants' illicit price gouging scheme. The report revealed that the Company used multiple shell distributors that had no pricing power to avoid detection by making Government bids seems competitive. Citron emphasized that the "easiest way for the Government to encourage competitive bidding would be to audit the bidding process." In response to the January 20, 2017 Citron report, the price of TransDigm's common stock precipitously declined by 9.87% on unusually high trading volume, closing at $226.90 per share from a prior-day close of $251.76, representing a $24.86-per share decline, and wiping out over $1.3 billion in market capitalization in a single trading day.

165. On March 9, 2017, Citron published a report exposing that TransDigm subsidiaries had failed to disclose that they were owned by TransDigm when bidding for

Government contracts, in violation of numerous laws and regulations. This report was based on an investigation that exposed that twelve TransDigm subsidiaries submitted incorrect ownership information that is required to be updated yearly as part of the Government's bidding qualification process. The report found that "TransDigm has intentionally used illegal tactics to inflate margins while avoiding price scrutiny from the U.S. Government." In reaction to Citron's March 9, 2017 report, TransDigm's stock dropped $10.26 per share, or 4.25%, from a close of $241.63 per share on March 9, 2017 to a close of $231.37 per share on March 10, 2017, wiping out over $542 million in market capitalization.

166. On March 21, 2017, Congressman Ro Khanna sent a letter to the U.S. Department of Defense's Inspector General asking for an investigation into TransDigm's business practices. Specifically, the letter revealed to investors TransDigm's range of methods to evade Federal regulations that "protect the taxpayer against sole source contractors like TransDigm." Rep. Khanna noted TransDigm's "hidden monopol[y]" and urged the DOD to ensure that military funding does not benefit "a few individual financiers" at the expense "of our troops and weapons systems." In response to Rep. Khanna's letter, TransDigm shares dropped another $23.09 per share, or 9.7%, over a two-day period, from $237.94 on March 20 to $214.85 on March 22, 2017—wiping out an additional $1.22 billion in market capitalization.

167. The drastic and continuing decline in TransDigm's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the Company's share price negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## IX. PRESUMPTION OF RELIANCE

168. At all relevant times, the market for TransDigm's common stock was efficient for the following reasons, among others:

a. TransDigm's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

b. As a regulated issuer, TransDigm filed periodic reports with the SEC and the New York Stock Exchange;

c. TransDigm regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. TransDigm was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

169. As a result of the foregoing, the market for TransDigm's common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of TransDigm's common stock. All purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of TransDigm stock at artificially inflated prices, and a presumption of reliance applies.

170. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding TransDigm's business and operations—information that Defendants were obligated to disclose—positive

proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

171. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about TransDigm's present business and operations, its present financial condition, and its internal controls, among others.

172. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding TransDigm's sales practices and compliance with Government regulations, among others. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by TransDigm were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

173. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the

particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of TransDigm who knew that the statement was false when made.

## XI. CLASS ACTION ALLEGATIONS

174. Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased, or otherwise acquired, the common stock of TransDigm between May 10, 2016 and March 21, 2017, inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of TransDigm at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

175. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, TransDigm shares were actively traded on the New York Stock Exchange. As of January 30, 2017, there were over 52.84 million shares of TransDigm common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds-of-thousands of members of the proposed Class. Class members who purchased shares of TransDigm common stock may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

176. Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

177. Lead Plaintiff will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

178. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts, as alleged herein;

b. whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

c. whether Defendants acted with scienter; and

d. the proper way to measure damages.

179. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act, and SEC Rule 10b-5 Promulgated Thereunder (Against All Defendants)**

180. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

181. This Count is asserted on behalf of all members of the Class against Defendants TransDigm, Howley, and Paradie for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

182. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

183. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and other investors similarly situated in connection with their purchases of TransDigm common stock during the Class Period.

184. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the

other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of TransDigm common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the other members of the Class, regarding, among other things, TransDigm's business and operations; (b) artificially inflate and maintain the market price of TransDigm common stock; and (c) cause Lead Plaintiff and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

185. Defendants TransDigm, Howley, and Paradie are liable for all materially false and misleading statements made during the Class Period, as alleged above.

186. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of TransDigm common stock, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

187. Lead Plaintiff and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for TransDigm common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiff and the other members of the Class would not have purchased TransDigm common stock at the prices they paid, or at all, if they had been aware that the

market price had been artificially and falsely inflated by these Defendants' misleading statements.

188. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of TransDigm common stock during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act (Against Defendants Howley and Paradie)

189. Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

190. This Count is asserted on behalf of all members of the Class against Defendants Howley and Paradie for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

191. During their tenures as officers and/or directors of TransDigm, each of these Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act. *See* ¶¶23-27. By reason of their positions of control and authority as officers and/or directors of TransDigm, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by TransDigm during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

192. In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Howley and Paradie had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. Defendants Howley and Paradie signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by TransDigm during the Class Period. Defendants Howley and Paradie were also directly involved in providing false information, and Defendants Howley and Paradie certified and approved the false statements disseminated by TransDigm during the Class Period. As a result of the foregoing, Defendants Howley and Paradie, together and individually, were controlling persons of TransDigm within the meaning of Section 20(a) of the Exchange Act.

193. As set forth above, TransDigm violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

194. By virtue of their positions as controlling persons of TransDigm, and as a result of their own aforementioned conduct, Defendants Howley and Paradie are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff, and the other members of the Class, who purchased or otherwise acquired shares of TransDigm common stock. As detailed above in ¶¶121-44, during the respective times these Defendants served as officers and/or directors of TransDigm, each of these Defendants was culpable for the material misstatements and omissions made by the Company.

195. As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or other acquisition of TransDigm common stock.

## XIII. PRAYER FOR RELIEF

196. WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a. Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b. Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiff and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c. Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

## XIV. JURY DEMAND

197. Lead Plaintiff hereby demands a trial by jury.

Dated: February 16, 2018

Respectfully Submitted,

*/s/ Scott D. Simpkins*
Scott D. Simpkins (0066775)
**CLIMACO WILCOX PECA & GAROFOLI CO., LPA**
55 Public Square, Suite 1950
Cleveland, Ohio 44113
Telephone: (216) 621-8484
Facsimile: (216) 771-1632
sdsimp@climacolaw.com

***Local Counsel for Lead Plaintiff***

**SAXENA WHITE P.A.**
Maya Saxena (*pro hac vice*)
Joseph E. White, III (*pro hac vice*)
Lester R. Hooker (*pro hac vice*)

Dianne M. Anderson (*pro hac forthcoming*)
150 East Palmetto Park Road
Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
danderson@saxenawhite.com

-and-

Steven B. Singer (*pro hac vice*)
Joshua H. Saltzman (*pro hac forthcoming*)
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com

***Lead Counsel for Lead Plaintiff***

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on February 16, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 16, 2018.

*/s/ Scott D. Simpkins*
Scott D. Simpkins (0066775)