## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

IN RE TRANSDIGM GROUP, INC.
SECURITIES LITIGATION

Case No.: 1:17-cv-01677-DCN

Judge Donald C. Nugent

## SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
## THE FEDERAL SECURITIES LAWS AND JURY TRIAL DEMAND

# <u>TABLE OF CONTENTS</u>

I.      NATURE OF THE ACTION ............................................................................ 1

II.     SYNOPSIS OF THE FRAUD ......................................................................... 2

III.    JURISDICTION AND VENUE ...................................................................... 9

IV.     THE PARTIES ............................................................................................. 10

        A.      Lead Plaintiff ................................................................................... 10

        B.      Defendants ....................................................................................... 10

                1.      TransDigm .......................................................................... 10

                2.      The Individual Defendants ................................................. 10

V.      OVERVIEW OF THE TRANSDIGM FRAUD ............................................ 12

        A.      TransDigm's "One-Two Punch" Business Model: Acquire Companies with Sole-Sourced Parts and Immediately Grossly Inflate Prices ......................................... 12

        B.      Defendants Were Well Aware of TransDigm's Repeated Violations of Government Regulations and Rules ......................................................................... 20

                1.      The DoD's 2006 Audit Highlights TransDigm's Violation of Rules Requiring Cost Disclosures and Fair and Reasonable Pricing .................. 20

                2.      The DoD's 2008 Audit Highlights TransDigm's Abuse Of Exclusive Distributors To Charge Excessive Prices To The Government ............... 24

                3.      Even After Government Audits Put Defendants On Notice Of TransDigm's Fraudulent Practices, Defendants Continued Their Price-Gouging Scheme During The Class Period ............................................. 26

        C.      Former Employees Confirm that TransDigm's Most Senior Officers Ordered Subsidiaries To Hide the Company's Identity as a Parent Entity in Violation of Government Regulations Designed to Detect "Waste, Fraud and Abuse" .......... 30

        D.      TransDigm's Network of Captive Distributors Mimics the Aesthetics of a Competitive Market, Further Allowing TransDigm to Defraud the Government 36

        E.      Former Employees Confirm That Defendants Explicitly Ordered and Trained Employees To Price-Gouge, Including Through "Indoctrination" Training Sessions and a Myriad of Tactics to Defraud the U.S. Government ................... 43

i

F.      TransDigm Insiders Capitalized on the Stock's Artificial Inflation Through Massive, Suspicious Insider Stock Sales ............................................................. 52

VI.     DEFENDANTS' FRAUD IS EXPOSED ....................................................... 55

A.      The Truth Regarding Defendants' Fraudulent Price Gouging Scheme Is Revealed In Early 2017.................................................................................... 55

B.      "For TransDigm, Dirty Tricks are a Way of Business"—Post-Class Period Events Continue to Confirm the Fraud ................................................................ 59

1.      Bipartisan Congressional Condemnation of TransDigm Sparks A Full-Blown DoD OIG Probe of the Company .................................................. 59

VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ... 64

A.      Second Quarter 2016 Results.................................................................. 65

B.      2016 Analyst Day ................................................................................. 68

C.      Third Quarter 2016 Results..................................................................... 69

D.      Fourth Quarter and Full Year 2016 Results ........................................... 71

E.      Code of Business Conduct and Ethics, and Code of Ethics for Senior Financial Officers .................................................................................................. 74

VIII.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................. 75

IX.     LOSS CAUSATION................................................................................. 83

X.      PRESUMPTION OF RELIANCE.................................................................. 86

XI.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ............................................................................. 87

XII.    CLASS ACTION ALLEGATIONS ............................................................... 88

XIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........................................ 90

COUNT I ................................................................................................... 90

COUNT II .................................................................................................. 92

XIV.    PRAYER FOR RELIEF .............................................................................. 93

XV.     JURY DEMAND ...................................................................................... 94

## I.    NATURE OF THE ACTION

1.      Lead Plaintiff City of Hollywood Firefighters' Pension Fund ("Hollywood Firefighters" or "Lead Plaintiff"), on behalf of itself and all others similarly situated, alleges the following upon personal knowledge as to itself and its acts, and upon information and belief as to all other matters, based upon the ongoing investigation of its counsel.  Many of the facts related to Lead Plaintiff's allegations are known only by Defendants or are exclusively within Defendants' custody or control.  Lead Counsel's investigation included, among other things, review and analysis of: (i) interviews with numerous, former employees of TransDigm Group Incorporated ("TransDigm" or the "Company"); (ii) TransDigm's public filings with the Securities and Exchange Commission (the "SEC"); (iii) in-depth research reports by securities and financial analysts; (iv) transcripts of TransDigm's conference calls with analysts and investors; (v) presentations, press releases, and reports regarding the Company; (vi) consultations with relevant experts; (vii) news and media reports concerning the Company and other facts related to this action; and (viii) data reflecting the pricing of TransDigm common stock.  Lead Plaintiff believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery.

2.      Lead Plaintiff asserts claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against Defendant TransDigm and Defendants W. Nicholas Howley ("Howley") and Terrance Paradie ("Paradie" and, together with Howley, the "Individual Defendants," and together with TransDigm, "Defendants"), and Section 20(a) of the Exchange Act against the Individual Defendants, on behalf of all investors who purchased or otherwise acquired TransDigm common stock between May 10, 2016 and March 21, 2017, inclusive (the "Class Period").

*"TransDigm has repeatedly purchased companies that are sole providers of Department of Defense (DoD) items and engaged in price gouging. The abuses have been sufficiently common and severe to merit an ongoing DoD Inspector General (DoD-IG) investigation . . . The alarm bells should be ringing . . . .  For TransDigm, dirty tricks are a way of business."*

U.S. Representatives Jackie Speier and Walter B. Jones,
Letter to Secretary of Defense James Mattis (Oct. 29, 2018)

## II.    <u>SYNOPSIS OF THE FRAUD</u>

3.      Established in 1993 and incorporated ten years later, TransDigm appeared to be the quintessential American success story, quickly growing to become one of the world's foremost suppliers of commercial and military aerospace components, with annual sales of $3 billion in 2016 and unmatched profit margins in its industry.  Throughout the Class Period, Defendants specifically told investors that TransDigm's financial success was attributable to the Company's focus on a "value-based operating strategy," its "consistency and its ability to sustain and create intrinsic shareholder value" and "continually improve cost structure," and the "strength" of TransDigm's "proprietary products."  However, as would later be revealed by well-respected investigative journalists, sophisticated market participants and a years-long, ongoing Congress-initiated Department of Defense ("DoD") probe, Defendants' representations were materially false and misleading.

4.      Unbeknownst to investors, TransDigm's meteoric rise was the direct result of a plethora of unscrupulous and unlawful practices, the sole purpose of which were to maximize the Company's revenue at the expense of its largest customer—the U.S. Government.  Defendants' fraud was straightforward: TransDigm would acquire other companies that were sole-source providers for older aircraft components, meaning there were no other suppliers competing in the marketplace for that specific part.  Immediately after the acquisition, TransDigm would capitalize on the lack of competition by slashing costs, laying off workers, and jacking up the

component's price, sometimes by as much as <u>over 700%</u>. The Company would then use a complex web of undisclosed subsidiaries, captive distributors, rigged bidding, and manipulated or even falsified pricing information to hide its true costs and the corresponding component price increases from Government procurement officers. In so doing, TransDigm violated a host of federal acquisition regulations that were enacted to prevent "fraud, waste, and abuse of taxpayer dollars" by mandating a fair and reasonable price and cost transparency for sole-source products. In other words, these regulations were specifically designed to protect the Government, American soldiers and ultimately the taxpayer from price gouging abuses by sole-source providers like TransDigm.

5.     Defendants implemented a variety of unlawful tactics to side-step these regulations. For instance, during the Class Period, numerous TransDigm subsidiaries actively concealed the fact that TransDigm was their parent company, including removing all references to TransDigm on subsidiary filings with the Government, in violation of Federal regulations that specifically require Government contractors to disclose whether they are owned by another entity. The subsidiaries' failure to disclose their relationship to TransDigm resulted in instances where, unbeknownst to the Government, multiple TransDigm subsidiaries "bid" against each other, thereby creating the illusion of a competitive market.

6.     In addition, the Truth in Negotiations Act of 1962 ("TINA") required that for contracts above $750,000, TransDigm had to <u>certify</u> that the Company had fully and truthfully disclosed all relevant cost and pricing information. Defendants trained employees to avoid the TINA threshold and the associated cost and pricing information, including at "indoctrination" training sessions led by the Company's General Counsel, and at quarterly lunch presentations organized by the Company's most senior officers. TransDigm's subsidiaries were instructed to

break up orders across multiple product distributors, as well as to lie to customers about product pricing to induce the customer to order in separate tranches to avoid the TINA threshold.

7.     TransDigm's subsidiaries would also enter into exclusive relationships with distributors to create the appearance of "competitive" bidding on Government contracts.  As soon as TransDigm acquired a subsidiary, it would immediately insert an exclusive distributor between the subsidiary and end-point customers, including the Government.  Since TransDigm was often the sole-source manufacturer for a given product, anyone seeking to bid on a Government contract would need to obtain the component part from this "captive" distributor. Then, in the event of an audit, the Company would provide Pentagon procurement officers with the costs the captive distributor paid for the product, and not the much lower costs that TransDigm actually incurred.

8.     TransDigm's illicit and unlawful practices were confirmed in a series of investigative reports issued by The Capitol Forum, a prominent Washington, D.C.-based news and legal analysis firm that has been praised for its tenacious and in-depth investigative reporting.  For example, an analysis of component price parts revealed that, after acquiring a new subsidiary, TransDigm would inflate prices by as much as 700%.   Former employees interviewed by The Capitol Forum confirmed that TransDigm's subsidiaries would break up bids to avoid hitting the TINA threshold, and that if eventually forced to provide pricing data, the subsidiaries would provide information that was misleading or doctored.

9.     Significantly, Lead Plaintiff's own independent investigation—including the detailed accounts of multiple, high-ranking former executives and employees of TransDigm from across the nation—has further confirmed Defendants' fraud.  These former employees include a former TransDigm Director of Engineering and Director of Sales, a former Director of

Operations, and even the former Executive Assistant to then-Chief Operating Officer and current CEO, Kevin Stein.  The accounts of the former employees confirmed that TransDigm's senior-most officers, including Defendant Howley, directed the Company's fraudulent price-gouging scheme, which was regularly discussed in various meetings in which the Individual Defendants participated, including "roundtable discussions" and quarterly meetings known as "Product Line Reviews" that Howley attended and spearheaded.  During these meetings, the participants would discuss the "gritty details of every sale we ever made," including a list of product price hikes that would be highlighted "like we were proud of them."  These former employees confirm that the Company would charge the Government "routine 20% increases annually on sole-source stuff, especially on stuff that's out of production."  Indeed, in one particularly telling meeting emblematic of Howley's absolute control over TransDigm's price increases, Howley asked an employee to double the price of a product, and that employee questioned whether he was serious.  Howley responded in no uncertain terms: "you're god***n right it's a real f**king question."

10.     In addition to Defendants' mandate to employees to implement exorbitant price increases, Defendants would also train employees on tactics to mask TransDigm's true product costs from Government inquiries.  For instance, Defendants would explicitly instruct employees and subsidiaries to "break[] up orders to avoid hitting" the TINA threshold.  When asked whether Defendant Howley was directly involved in these discussions, one former employee responded: "No comment.  But, yeah."  The former employees confirmed that, with respect to the Company's illicit practices, "everybody was on the same page" and "well versed" on implementing these tactics Company-wide.

11.     As a direct result of Defendants' fraudulent scheme, TransDigm reported impressive net sales, earnings and profit margins throughout the Class Period.  Fueled by

Defendants' material misrepresentations and omissions, TransDigm's share price responded in kind—and Defendants took full advantage.  While Defendants were engaging in their fraudulent scheme, several Company insiders, including Defendant Howley, dumped massive amounts of their stock at prices that were artificially inflated by the fraud.  Specifically, CEO Howley sold a staggering 144,500 shares of TransDigm common stock for proceeds of nearly $38 million, at prices near Class Period highs—sales that represented 84% of the stock that he beneficially owned, and which were effectuated outside of a typical 10b5-1 trading plan.  In all, ten insiders—including the Company's Vice Chairman, a Senior Vice President and former CFO, and five Executive Vice Presidents—unloaded a total of 331,168 shares of TransDigm stock during the Class Period for proceeds of over $87 million, with some insiders selling nearly 90% of their TransDigm common stock beneficially owned.

12.     TransDigm's fraud began to unravel in January 2017, when investigative journalists, sophisticated market participants, and a Congressional probe for "waste, fraud and abuse" began to peel back TransDigm's veneer to reveal a complex web of obfuscated subsidiaries, captive distributors, rigged bidding, and false and/or missing Government contract information.  On January 20, 2017, Citron Research ("Citron") issued the first of two investigative reports exposing Defendants' illicit practices.  The Citron report detailed Defendants' "dangerous acquire/leverage/price-raise" scheme, and described TransDigm as the "Valeant of the Aerospace Industry"—a reference to the disgraced pharmaceutical company that used hidden relationships with specialty pharmacies to improperly book revenue.  The Citron report revealed that TransDigm's profitability was heavily dependent on price increases of as much as 700% on components sold to the Government.  Further, Citron revealed TransDigm's captive distributor scheme, explaining that "TransDigm has been able to use the guise of

multiple shell distributors, who have no pricing power, to make a bid seem competitive, when in reality they are all shills for TransDigm."  In reaction to the Citron report, TransDigm's share price dropped $24.86 per share, or nearly 10%, from $251.76 per share on January 19, 2017 to $226.90 per share on January 20, 2017—wiping out $1.3 billion in market capitalization.

13.     On March 9, 2017, Citron published a second report revealing that TransDigm subsidiaries failed to disclose that they were owned by TransDigm when bidding for Government contracts, in violation of regulations that explicitly required the disclosure of parent ownership as part of the Government's bidding qualification process.  The report concluded that "TransDigm has intentionally used illegal tactics to inflate margins while avoiding price scrutiny from the U.S. Government."  In reaction to the report, TransDigm's stock dropped an additional $10.26 per share, or 4.25%, wiping out over $542 million in market capitalization.

14.     The revelations of TransDigm's business practices resulted in bipartisan condemnation from Congress.  On March 21, 2017, U.S. Congressman Ro Khanna, a member of the House Committee on Armed Services, issued a press release announcing that he had sent a letter to the Inspector General for the DoD, specifically requesting that it investigate TransDigm's business practices for "waste, fraud, and abuse" with respect to sales to the U.S. Government.  Congressman Khanna's letter noted that TransDigm "has been operating as a hidden monopolist by (i) engaging in a series of unreasonable price increases of products for which it is the only supplier; (ii) disguising its cost structure and identity from Pentagon procurement officers; and (iii) unreasonably hiking prices."  The letter also cited Federal regulations that are meant to "protect the taxpayer against sole source contractors like TransDigm," and which require suppliers to provide truthful "cost information" and "tell procurement officers if they belong to a holding company to allow the Government access to

transparency in pricing across a defense contractor's entire business."  Notably, the letter concluded that "TransDigm appears to use a range of methods to evade these protections," including "a network of captive distributors that mimic the aesthetics of a competitive market," as well as the fact that Company subsidiaries failed to disclose TransDigm as their corporate parent in DoD filings—an offense that "carries significant penalties."

15.     In response to Congressman Khanna's letter, TransDigm's stock price dropped an additional $23.09 per share over two trading days, a decline of nearly 10%, on extraordinarily high trading volume, wiping out approximately $1.22 billion in market capitalization.  Shortly after the end of the Class Period, Representative Tim Ryan and Senator Elizabeth Warren also joined the formal calls for an investigation into TransDigm.

16.     On June 27, 2017, these Congressional calls to action resulted in the DoD's Office of the Inspector General commencing an audit of TransDigm's sales to the Government— the first time it had done so in over ten years.  The audit remains pending and is expected to take up to two years or more to complete.

17.     On January 2, 2018, mere months after the DoD's commencement into its audit of TransDigm, the Company suddenly announced that Defendant Paradie was no longer CFO, effective immediately.  Paradie had been CFO for barely a year at the time of his sudden and suspiciously-timed departure.

18.     The fallout from Defendants' fraud continues to this day.  On October 29, 2018, Representatives Jackie Speier and Walter Jones wrote a letter to Secretary of Defense James Mattis, calling on him to block TransDigm's proposed acquisition of Esterline, a sole source manufacturer of aircraft defensive measures, until the Inspector General completed its audit.  In their letter, Representatives Speier and Jones noted that "[f]or TransDigm, dirty tricks are a way

of business," and that the Company "continues its practice of creating multiple companies to sell products, which lie about their subsidiary status, to deceive procurement officers."  The Representatives further stated that TransDigm has "repeatedly purchased companies that are sole providers of Department of Defense (DoD) items and ***engaged in price gouging***. The abuses have been sufficiently common and severe to merit an ongoing DoD Inspector General (DoD-IG) investigation . . . ***The alarm bells should be ringing***."  The letter concluded that "TransDigm has shown no signs of changing," and that the proposed acquisition "***raises significant concerns related to competition, accountability, and national security***."

19.     As a result of Defendants' violations of the federal securities laws, investors who purchased TransDigm common stock at artificially inflated prices during the Class Period have suffered substantial losses.  This action seeks redress on behalf of these aggrieved shareholders.

## III.     JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

22.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

IV.    **THE PARTIES**

A.    **Lead Plaintiff**

23.    Lead Plaintiff the City of Hollywood Firefighters' Pension Fund is a public pension system based in Hollywood, Florida.  As of December 6, 2017, Hollywood Firefighters oversaw more than $225 million in assets.  As set forth in its certification (*see* ECF No. 17-4), Hollywood Firefighters purchased TransDigm common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On December 4, 2017, the Court appointed Hollywood Firefighters as Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  ECF No. 33.

B.    **Defendants**

1.    **TransDigm**

24.    Defendant TransDigm is a Delaware corporation with its principal executive offices located at 1301 East 9th Street, Suite 3000, Cleveland, Ohio 44114.  TransDigm, through its wholly-owned subsidiaries, including TransDigm Inc., is a global designer, producer and supplier of aircraft components for use on commercial and military aircraft. TransDigm's securities are traded on the New York Stock Exchange ("NYSE") under the symbol "TDG." TransDigm is a holding company and conducts all of its operations through its subsidiaries.

2.    **The Individual Defendants**

25.    Defendant W. Nicholas Howley ("Howley") is the co-founder of TransDigm Inc. and was its President and/or Chief Executive Officer ("CEO") from inception until April 30, 2018, when he was named Executive Chairman and replaced by Kevin Stein. From July 2003, Howley was also the Chairman of TransDigm's Board of Directors.  Howley was highly involved in TransDigm's day-to-day business and in interfacing with its employees.  As stated in the Company's 2016 Annual Proxy, Howley "has played an integral role in the Company's

10

establishment and implementation of its core value drivers on an ongoing basis and in its rapid and strategic growth." Defendant Howley is also one of the highest paid CEOs in American business.[1]  In 2016, Howley received over $18.6 million in total compensation, up 47% from 2015.  Most recently, in 2017, TransDigm paid Howley over $61 million in total compensation. As part of his 2019 compensation package as Executive Chairman, Howley is entitled to a base salary of over $1.3 million, option grants valued at over $12.1 million, and is eligible for a bonus of up to 125% of his base salary.

26.     During the Class Period, Defendant Howley made materially false and misleading statements and omissions in press releases and during earnings calls, investor conferences and industry presentations, including on May 10, 2016, June 23, 2016, August 9, 2016, and November 14, 2016.  Defendant Howley also reviewed, approved, signed and certified TransDigm's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including on May 11, 2016, August 10, 2016, and November 15, 2016, which contained materially false and misleading statements and omissions.

27.     Defendant Terrance Paradie ("Paradie") was Chief Financial Officer ("CFO") and Executive Vice President ("E.V.P.") of TransDigm from April 2, 2015 through January 2, 2018. On January 2, 2018, mere months after the DoD's commencement into its audit of TransDigm, the Company suddenly announced that Defendant Paradie was no longer CFO, effective immediately.  Paradie was initially hired at TransDigm in April 2015, with former CFO Greg Rufus staying at TransDigm for over a year, until "the fourth quarter of calendar year 2016" to "ensure a smooth transition and transfer of TransDigm culture."  Paradie barely had a year at the

---

[1] Jon Huang and Karl Russell, "The Highest-Paid C.E.O.s in 2016," (NY Times May 26, 2017), *available at* https://www.nytimes.com/interactive/2017/05/26/business/highest-paid-ceos.html.

helm at TransDigm when he suddenly left the Company in January 2018 due to "personal reasons."

28.     During the Class Period, Defendant Paradie made materially false and misleading statements and omissions in press releases and during earnings calls, investor conferences and industry presentations, including on May 10, 2016 and August 9, 2016.  Defendant Paradie reviewed, approved, signed and certified TransDigm's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, including on May 11, 2016, August 10, 2016, and November 15, 2016, which contained materially false and misleading statements and omissions.

29.     Defendants Howley and Paradie are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, in part because of their positions with the Company, possessed the power and authority to control the contents of TransDigm's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each Individual Defendant was involved in the public statements alleged herein to be false or misleading and had the ability and opportunity to prevent those statements from being disseminated to the market or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading.

## V.      OVERVIEW OF THE TRANSDIGM FRAUD

### A.      TransDigm's "One-Two Punch" Business Model: Acquire Companies with Sole-Sourced Parts and Immediately Grossly Inflate Prices

30.     TransDigm designs, produces, and supplies commercial and military aerospace components worldwide.  The U.S. Government is the Company's largest customer.  In fiscal

2016, approximately 30% of all of the Company's sales were in the defense market, a significant portion of which were made directly to the Federal Government and also indirectly through defense original equipment manufacturers, or "OEMs," who incorporate the Company's products into aircraft and aircraft components contracted for and purchased by the Federal Government.

31.     TransDigm operated as a private-equity-like business focused on acquiring companies that make high-margin, but relatively low-priced proprietary aerospace products with significant aftermarket sales.  In other words, TransDigm does not develop products itself; rather, it is a holding company specializing in the acquisition of manufacturers of proprietary aerospace parts through highly-leveraged transactions.  This model is similar to that utilized by many players in the specialty pharmaceutical industry to rapidly increase prices on specialty drugs with limited alternatives.  This roll-up strategy has allowed TransDigm to steeply raise prices on aerospace products almost immediately after acquiring their manufacturers.

32.     Specifically, TransDigm's business model is predicated on debt-fueled acquisitions, price increases, and mass layoffs.  First, TransDigm identifies and acquires companies that manufacture smaller component parts of an airplane at low price points with significant aftermarket content—typically companies that make parts for older aircraft.  These companies are more likely to be sole-source providers because there is reduced competition in that space, as airplanes are on the downward slope of their existing life and initial startup manufacturing costs are high.  Approximately 80% of the Company's net sales for 2016 were derived from products for which the Company is the sole source provider

13

33.     The second step of TransDigm's business strategy is to grossly increase a sole-source product's price.  Indeed, former senior employees[2] of TransDigm have confirmed that the Company's business model depended on price gouging—and that TransDigm's most senior officers were directly responsible for maintaining and setting those exorbitant price increases. For instance, CW 4, who was the Director of Sales and then Director of Engineering at TransDigm subsidiary Champion Aerospace ("Champion") from 1991 to 2014, succinctly explained that prices were "substantially increased on sole-source products because there wasn't anything the aftermarket could do about it."  She added that she had "seen routine 20% increases annually on sole-source stuff, especially on stuff that's out of production."  CW 4 had firsthand knowledge of these substantial price increases; as the Director of Sales she "interfaced with the leadership in TransDigm's Cleveland office on a quarterly basis" and "led the sales effort from [Champion] to the airlines, as well as to OEM [original equipment manufacturer] customers."

34.     Since TransDigm is often in a position where it is the only manufacturer for a part that a company needs, it takes advantage of this by charging prices that result in gross margins of 80-95%.  CW 4 gave an example of out of production price increases, using an MD-80 plane to illustrate his point: "those planes haven't been made since the early nineties. They're out of production, but they're flown every day. They have to buy spare parts for them – every thousand hours, they change the sparkplugs" to jet engine igniters. "I remember," she continued, "in the late nineties before TransDigm bought Champion Aerospace, the price for an MD-80 igniter was somewhere around $40-$60, according to the airline. Today, the price is going to be $400-$500. They go up every year a double-digit percent."

---

[2] Former employees of TransDigm and/or its subsidiaries are referred to herein as Confidential Witness "CW __" and are referenced in the feminine form to maintain their confidentiality.

35.     An analysis performed by The Capitol Forum, a prominent investigative news and legal analysis company, confirmed CW 4's account.  The Capitol Forum was founded in 2011 and is dedicated to informing policymakers, investors, and industry stakeholders on how policy affects market competition.  The Capitol Forum has been praised for its tenacious and in-depth investigative reporting, independent research, and expert opinion by industry insiders and Government officials, including the D.C. Attorney General and Deputy Assistant Attorney General, partners at Vault 100 law firms, law professors, and investment advisory firms.  The Capitol Forum's staff includes experienced investigative journalists and executives from publications like Forbes and Bloomberg, as well as former partners of Vault 100 law firms. The Capitol Forum found price increases for products sold to the Government <u>of up to 700%</u> immediately after an acquisition.  The table below provides examples of the egregious price increases that TransDigm implemented on Government aircraft components shortly after the Company acquired the manufacturers of those products:[3]

| Company | Part | Pre-Acquisition Price | Post-Acquisition Price | % Increase |
|---|---|---|---|---|
| Aerosonic | Vibration Panel | $67.33 | $271.00 | 302% |
| Arkwin | Pawl | $972.00 | $1,950.00 | 101% |
| Harco | Cable Assembly | $1,837.03 | $7,863.00 | 328% |
| Skurka | Connector | $310.00 | $1,109.85 | 258% |
| Whippany | Motor Rotor | $654.56 | $5,474.00 | 736% |

---

[3] The Capitol Forum also published a subsequent analysis of TransDigm's price increases in a February 3, 2017 report.  Significantly, even after eliminating some of the largest product price increases, The Capitol Forum's analysis concluded that the increase "between pre- and post-acquisition prices was more pronounced in general."

15

36.     In addition to CW 4, multiple senior employees of TransDigm confirmed that TransDigm's illicit price gouging scheme was a core tenet of its business model, and well-known to Defendants.  CW 2, who was responsible for $45 million worth of sales as the Business Unit Manager at TransDigm subsidiary Champion Aerospace from 2009 until August 2015, and who would go to the TransDigm headquarters in Cleveland to report directly to C-Level executives, including Defendant Howley and former CFO Greg Rufus, on sales and EBITDA information, confirmed that Howley not only had knowledge of TransDigm's price increases, but was also directly involved in ordering the increases.  CW 2 recalled one particularly striking meeting she attended around 2010 where Howley and employees discussed product pricing, which was emblematic of Howley's intimate involvement in the Company's pricing decisions, and his iron-fisted control over TransDigm.  During this meeting, Howley asked one employee, "what if you raise the price twofold" on a product.  The employee thought it was a joke, and did not answer.  When Howley pressed him, the employee said he thought it was not a real question.  CW 2 vividly remembered Howley's words as if they were spoken only yesterday: Howley coldly responded, "you're god***n right it's a real f**king question." CW 2 explained that this was the culture at TransDigm and people who were new to the company could not believe they would be doubling prices on products.  CW 2 added that the employee was gone shortly after the interaction.

37.     Further, confidential witnesses also confirm that TransDigm would charge the Government prices that were far higher than its commercial prices.  For example, CW 1,[4] a

---

[4] CW 1 was an Aftermarket Sales Manager with AdelWiggins Group ("AdelWiggins"), a TransDigm subsidiary, for eight and a half years, from January 2007 until June 2015. AdelWiggins designs, manufactures and sells an extensive line of high-quality, custom designed fluid line components such as flexible connectors, quick disconnects, clamps, heaters and hoses, and lightning protection isolators.  In this role, she was responsible for all the sales activities for

former Aftermarket Sales Manager of TransDigm subsidiary AdelWiggins, recalled that the subsidiary charged the Government a price that was <u>14 times more than</u> the price it charged Boeing for the same component.  Specifically, CW 1 recalled a valve that was made for a 737 aircraft.  AdelWiggins sold the part to Boeing for $850 each, but when the Government asked for the part in the aftermarket, AdelWiggins would charge them <u>an astonishing $12,500 for the exact same item</u>.

38.     This was not an isolated incident.  Indeed, multiple former employees of TransDigm and its subsidiaries who were involved in defense sales confirmed that margins on those sales were substantially higher than the Company's publicly-reported overall margins (which included both commercial and defense sales).  In addition to former employees interviewed during the course of Lead Plaintiff's investigation, several former employees also provided accounts to The Capitol Forum.

39.     One former employee was quoted by The Capitol Forum as stating: "[w]e would never sell to the Government at cost . . . the lowest I can perceive would be a 50% margin . . . almost always 75-80%, if not more."  Another former employee who worked at a different TransDigm subsidiary reported even higher margin expectations on sole-source product sales to the Government: "EBITDA [margin] expectations for aftermarket [sales] to military was in the range of 85%."  In addition to increasing the per unit price of particular parts, especially once the opportunity for significant price increases began to fade, TransDigm would then aggressively reduce costs by laying off workers at acquired companies.

40.     Indeed, although TransDigm frequently attributed its financial results to "three value drivers"—i.e. "obtaining profitable new business, improving our cost structure, and

products sold to any airlines or the military.

17

providing highly engineered value-added products to customers"—in reality, TransDigm relied almost entirely on price gouging for growth, and generated virtually no profitable new business.  In fact, as Citron later confirmed in its January 20, 2017 report, were it not for price increases following acquisitions, TransDigm would have experienced <u>negative 10% organic growth</u>.

41.     Former employees also confirmed that the Company's most senior executives, including Howley, set financial targets for TransDigm's subsidiaries, ordered the subsidiaries to increase the prices to astronomical levels, and fired the subsidiaries' leadership if the subsidiaries failed to meet financial targets. For instance, CW 4 explained that the reason TransDigm had to increase its prices was because of the "enormous debt they had to service" as a result of the acquisitions. The whole operation, she explained, is predicated on "fantastic growth," but in reality, the market was sometimes like "the market for air conditioners in Nome, Alaska; finite. You can't wish for it to double year over year.  You can't wish for growth beyond what it is. If you're going to be up 14% year over year . . . the only way you can do that is pricing."

42.     CW 4 also described Howley as "the real rubber meeting the road" in terms of fiscal planning to meet these growth goals.  After each subsidiary provided a "forecast" of sales, costs, and other metrics that it could achieve by the end of the fiscal year to TransDigm's headquarters, CW 4 explained that TransDigm would send it back to the subsidiary as a "crude model" on the first of June, which included TransDigm's financial directive: "TransDigm is gonna tell you what they want.  Like, your market is gonna grow by X%, and of that per cent, Y% is gonna be inflation and Z% will be price increase. They tell you what the price increase is gonna be, and you have to figure out how to—at the divisional level—how to deliver that much price increase. <u>The easiest way—raise the price on sole-source stuff.</u>"

43.     CW 2 confirmed CW 4's account, explaining that TransDigm would tell a subsidiary that it must attain "this kind of growth this year" and noting that growth targets would come through in subsidiaries' sales budgets, which were set by Howley.  The pressure to raise prices was unrelenting.  CW 5,[5] a former Contract Administrator at AdelWiggins who was responsible in part for submitting quotes and bids to the Government, recalled that every six months she would be told to bump the prices up 5%.  She took issue with these increases, especially when it came to Government contracts because she did not feel it was right to try to charge the Government such high prices.

44.     CW 4 added that it was the Sales Director's job to "pull[] the lever on the price increase."  TransDigm and its subsidiaries would go back and forth several times, sending revised versions of the plan: "you'd sent it to them in July, they'd look at it and reject it . . . you'd go back and regrind and get close to what they asked for, and they'd come and meet you or you'd meet with them, and you'd go back over it with PowerPoint slides and then they'd reject it . . . and then eventually it would be put into a plan book."  Those "plan books" "would have everything, everything in the organization; budgets, planned sales by month; within those sales, how much was price, how much was new business, etc., broken out by market segment."

45.     Accordingly, TransDigm used monopolistic tactics to unlawfully hike the prices of its proprietary products in sales to the U.S. Government.  CW 4 explained that selling to the Government was a good way to "hit your forecast" and avoid "a severe tongue lashing if not a

---

[5] CW 5 was a Contract Administrator with AdelWiggins who worked on submitting bids to the U.S. government to win contracts.  She worked there from November 2009 until October 2015. CW 5 was responsible for providing day-to-day quotes that were sent to the government as well as perusing government websites for RFQs [Request for Quotes] to which AdelWiggins could respond.

beating" for missing it.  This was, in part, because when selling to the Government, "you waited [them] out and eventually, they caved."

46.    Defendants concealed from investors the extent to which TransDigm's profitability and purported growth were dependent on dramatic price increases far beyond industry norms.  Such drastic price increases exposed TransDigm to undisclosed and foreseeable business and regulatory risks, which misled investors as to TransDigm's true financial performance and business prospects.  Indeed, Federal regulations exist to specifically prevent this exact type of abuse by sole-source providers.  Throughout the Class Period, TransDigm violated these rules.

**B.    Defendants Were Well Aware of TransDigm's Repeated Violations of Government Regulations and Rules**

**1.    The DoD's 2006 Audit Highlights TransDigm's Violation of Rules Requiring Cost Disclosures and Fair and Reasonable Pricing**

47.    Prior to the start of the Class Period, Defendants had long been on notice that TransDigm repeatedly engaged in a multitude of unlawful practices that were specifically implemented to circumvent federal procurement regulations.  TransDigm engaged in these practices in order to conceal from procurement officers the Company's true cost of its products and to justify exorbitant price increases for DoD contracts, thereby maximizing TransDigm's revenues.

48.    On February 23, 2006, the DoD Office of the Inspector General issued an audit report entitled, "Acquisition: Spare Parts Procurements From TransDigm, Inc. (D-2006-055)" (the "2006 Audit").  The report stated that the 2006 Audit was initiated to investigate TransDigm subsidiary AeroControlex for "charging the Defense Logistics Agency excessive prices and using the commercial item definition to avoid the Federal requirement to provide cost or pricing data."  The "commercial item definition" referenced in the 2006 Audit refers to the Federal

acquisition regulation that provide for a "commerciality" exemption.  This provision, in many cases, exempts federal contractors from having to provide detailed cost information to justify its pricing where an item is also sold commercially.  Essentially, the rationale of this exemption is that the commercial marketplace has already set a "fair and reasonable" price for the item, so that less independent justification of the price is required.

49.     The 2006 Audit cited the specific legislative and federal regulation guidance that forms the foundation of the Government's dealings with defense contractors, particularly sole-source suppliers like TransDigm.  For instance, the "Truth in Negotiations Act of 1962 (TINA) allows DoD to obtain cost or pricing data (certified cost information) from Defense contractors to ensure the integrity of DoD spending for military goods and services that are not subject to marketplace pricing."   Similarly, Federal Acquisition Regulation ("FAR") 15.402 "Pricing Policy" requires that contracting officers "purchase supplies and services from responsible sources at fair and reasonable prices," and provides that "[c]ontracting officers can determine fair and reasonable prices based on adequate competition, information related to prices such as price analysis, or information related to costs."

50.     The 2006 Audit's initial objective was "to evaluate whether prices charged by AeroControlex . . . were fair and reasonable," the DoD-IG quickly "expanded [its] scope of review to AeroControlex's parent company, TransDigm, and all its subsidiaries," including AeroControlex, Adams Rite Aerospace, AdelWiggins, Champion Aerospace, and Marathon Norco Aerospace.  The 2006 Audit also noted that of TransDigm's $293.3 million in net sales in 2003, "28 percent [was generated] from the defense sector, with DoD as TransDigm's largest customer."

21

51.     The 2006 Audit noted that for a coupling assembly that had increased in price over 21% in the span of just six months, the "Navy Price Fighters requested technical and cost data from TransDigm to help explain the price increases from September 2002 to April 2003, but TransDigm refused to provide the information."  The inexplicable and unjustified price increase for this coupling was symptomatic of TransDigm's practice as a whole.  The 2006 Audit found that, with respect to the commerciality exception, "TransDigm applies a commercial pricing strategy to its sole-source military-unique items although no commercial market exists to establish reasonable prices by the forces of supply and demand for the vast majority of items. This pricing strategy results in overpriced spare parts and increases the burden placed on the DoD budget." In particular, the DoD IG found that TransDigm's subsidiary AeroControlex "refused to provide more detailed cost data to support the substantial price increase" of an F-15 fighter oil pump assembly that had increased in price over 71% in just 21 months.

52.     In all, the 2006 Audit concluded that the Defense Logistics Agency ("DLA") paid TransDigm $5.3 million more than the fair and reasonable price for 77 parts, observing that:

When contracting officers requested information other than cost or pricing data to support substantial price increases, TransDigm routinely refused to provide the requested data. TransDigm's refusal to provide requested information delayed negotiations, resulting in longer administrative lead times, rising military demands, and in some cases urgent procurements. . . .

• TransDigm does not provide informal cost breakdowns or cost data for small purchases.

• TransDigm is unable to provide a cost breakdown for orders under $100,000.

• TransDigm no longer offers cost breakdowns.

• TransDigm does not provide cost data for purchases under $550,000.

• TransDigm considers this item proprietary and commercial and will not provide any cost breakdown.

22

- TransDigm accepts the Government counteroffer instead of providing a cost breakdown.

- Due to the total dollar value of the request for quote, an informal cost breakdown cannot be prepared at this time. The prices quoted are based on TransDigm's current material costs, labor, overhead, and general and administrative rates, which have been audited by the U.S. Government.

- TransDigm is unable to provide informal cost breakdowns due to limited accounting resources.

- TransDigm's quote is based on increases in material and labor costs. Material has escalated [omitted] percent while labor and overhead has increased close to [omitted] percent.

- TransDigm did not respond to the request.

- TransDigm stated it is not the company's policy to give cost data.

- TransDigm offered a lower unit price only if that price is found fair and reasonable by the contracting officer.

53.     With respect to TransDigm's use of distributors, the 2006 Audit determined that TransDigm's tactic of using dealers to feign competition gave it "an inherent advantage in winning contract awards" due to being the sole-source manufacturer.  The DoD OIG noted the lack of independence between the dealers and TransDigm, stating: "dealers consistently stated that they do not stock these parts and normally contact the sole-source manufacturer when a Government requirement becomes known. As a result, the dealers are not independent of the sole-source manufacturer."

54.     Overall, the 2006 Audit investigation concluded that because of "the constraints of a sole-source contracting environment, Defense Logistics Agency contracting officers were unable to effectively negotiate prices for spare parts procured from TransDigm subsidiaries," and that the DLA ended up paying prices that were above and beyond "fair and reasonable price for 77 parts" from these subsidiaries, resulting in millions of dollars in added DoD expense.

23

### 2. The DoD's 2008 Audit Highlights TransDigm's Abuse Of Exclusive Distributors To Charge Excessive Prices To The Government

55.    Similarly, on February 6, 2008, the DoD OIG released an audit report entitled "Procuring Noncompetitive Spare Parts Through An Exclusive Distributor" (the "2008 Audit"). The 2008 Audit focused its investigation on Dutch Valley Supply, the exclusive distributor for a TransDigm subsidiary. The review of Dutch Valley Supply purchases "identified significant problems," including that the DoD paid 75% more than the fair and reasonable prices for 33 parts and that, if not corrected, the DoD would pay $17.8 million more than the fair and reasonable price for those same items over a six year period, "and this valuable procurement money will not be available to support other urgent warfighter needs."

56.    The 2008 Audit "found that DoD has paid excessive prices and profit to single-source contractors for noncompetitive spare parts when cost analysis is not performed; we issued a previous report on the reasonableness of prices an exclusive distributor (TransDigm)."  The 2008 Audit defined an "exclusive distributor" as "a nonmanufacturer that has an agreement with parts manufacturers to be the sole representative for their Government sales."  The 2008 Audit emphasized that the use of an exclusive distributor may be abused so as to conceal a manufacturer's true costs, resulting in the Government overpaying for goods and supplies.

57.    For instance, the report highlighted that contracting officers sometimes relied on competitive bidding to determine that a contract price was fair and reasonable.  However, with this type of exclusive distribution arrangement, "it is clear that competition will not be independent or fair, because Dutch Valley Supply, as a single-source distributor, inherently controls its 'competitors'' costs and delivery, which gives unfair insight and a decided advantage in winning awards over its 'competitors.'"

58.    The 2008 Audit also found that the DoD "paid excessive prices and profit to single-source contractors for noncompetitive spare parts when cost analysis is not performed." With respect to the DoD's dealings with TransDigm's exclusive distributor, "DoD contracting officers were unable to effectively negotiate prices or obtain best value for noncompetitive spare parts procured through Dutch Valley Supply," which resulted in the DoD paying "75 percent more than the fair and reasonable prices for 33 parts."

59.    The 2008 Audit singled out TransDigm's Blackhawk helicopter door handle as an "example of contractors abusing their single-source status by charging the Government unreasonable prices to make excessive profits, leaving less DoD procurement money to support other urgent warfighter needs."  "DSCR had to procure the door handles anyway to support the warfighter."  Regarding TransDigm and the door handles, the 2008 Audit stated:

> In DoD IG Report No. D-2006-055, "Spare Parts Procurements From TransDigm., Inc.," February 23, 2006, we recommended that DLA seek a voluntary refund for overpriced parts when the contracting officer made a reasonable attempt to obtain cost information but was denied the information. The Blackhawk helicopter door handle was one of those items identified. The Chief of Competition and Pricing Division, DSCR (Defense Supply Center, Richmond, Virginia) requested the refund from TransDigm, parent company of Adams Rite.

60.    Overall, the 2008 Audit excoriated the exclusive distributor model, concluding that "we do not see how the distributor model can add sufficient value or be an effective alternative procurement option for DoD."  The report noted that Dutch Valley claims "that it provides value to DoD through reduced costs, improved readiness, and increased competition." However, the DoD concluded that it was "unable to validate any of Dutch Valley Supply's claims and determined that no or negligible added value was provided by the exclusive distributor."  The 2008 Audit added that "[b]ased on both audits, our experience has shown that the dealer competition policy is predominantly being used in an inappropriate way and unreasonable prices are being wrongly justified as fair and reasonable . . . ."

61.     Significantly, the 2008 Audit condemned the obfuscation methods of TransDigm's subsidiary, concluding that "[b]usiness practices such as these during a time of war clearly do not provide the best support to the warfighter."

### 3.     Even After Government Audits Put Defendants On Notice Of TransDigm's Fraudulent Practices, Defendants Continued Their Price-Gouging Scheme During The Class Period

62.     Despite being excoriated in two separate DoD audits, throughout the Class Period, TransDigm continued to unlawfully price gouge the Government and its other customers under the explicit direction of Defendants, including Defendant Howley.  Indeed, former employees confirm that Defendants specifically attended various meetings during which these practices were implemented and their effects on the Company were discussed.  One of these meetings was known as "Product Line Reviews," which were held on a quarterly basis, usually at the Company's headquarters in Cleveland or in Los Angeles several weeks after the end of each quarter.  At these meetings, the subsidiaries had to specifically highlight product price increases, explain how they would justify the price increases to customers, and discuss how to avoid Government scrutiny over TransDigm's true product costs.  Defendant Howley directly participated and spearheaded these discussions, and was very aware of the "gritty details of every sale we ever made."

63.      For instance, CW 2 recalled attending these Product Line Reviews in Cleveland where TransDigm subsidiaries would present sales and EBITDA to C-level executives, including Howley.  CW 4 recalled that Howley was "very attuned" to the data presented at quarterly meetings and "could spot where something was amiss."  The Capitol Forum interviewed several

26

former employees who described Howley as the driving force behind these meetings.  CW 6,[6] a former Director of Sales and Marketing at TransDigm subsidiary Schneller, also noted that Defendant Paradie would attend these meetings in addition to Defendant Howley.

64.     CW 2 and other business managers would present PowerPoint slides that included each subsidiary's product line with breakdowns by commercial sales, business jet sales, general aviation sales, defense and military sales, and OEM and aftermarket sales.  CW 4 confirmed CW 2's account, noting that subsidiaries would present an "income statement, then the product line P&L, and income statements and forecasts," explaining that in the forecasts, "you'd show where you finished the fiscal quarter, where you are year to date, and forecast where you'd finish up for the full year for sales and EBITDA.  Then, you'd break it down granularly by market segments (OEM, Defense OEM, Aftermarket, Defense Aftermarket) and by segment, meaning for turbine, business jets, helicopters," which gave TransDigm "a good understanding of where [a division] was going and what they had done."

65.     CW 7, a former Executive Assistant for TransDigm's then-COO and current CEO Kevin Stein from March 2017 to August 2018, additionally explained that the subsidiaries had to bring "all of their financial reporting from the previous quarter" to the meetings, which was meant to be a rundown of how they did in their sales, how many people were laid off, and how they were keeping head count down.  CW 6 noted that subsidiaries had to have written explanations as to why they had either been above or below targets, both in dollars and margins.

---

[6] CW 6 worked at Schneller LLC ("Schneller"), a TransDigm subsidiary, from January 2009 until July 2016.  Schneller designs and manufactures laminates, thermoplastic sheets, and non-textile floor coverings for aviation and rail interiors. CW 6 started at Schneller as an Account Executive, developing business in the United Kingdom. CW 6 later became the Managing Director of Sales and Marketing for European Operations and later the Director of Sales and Marketing globally.

She added that if a business unit was not hitting targets, solutions for how to hit them needed to be included as well.

66.    In fact, CW 7 was responsible for managing all of these quarterly meetings, which included preparing PowerPoint presentations for them.  CW 7 also sat in on these meetings, noting that the PowerPoint presentations would generally take about two hours per subsidiary. CW 7 recalled that price increases would be highlighted "like we were proud of them," and that the PowerPoint presentations would include a list of price increases that the subsidiaries had implemented. CW 7 remembers seeing as much as an "8,000%" increase listed for certain products.  A "big part" of the quarterly meetings, CW 7 explained, was discussing how to explain or justify price increases to customers. CW 7 said corporate would encourage saying things like the price increases "are better for everyone" and "how it makes sense."  Notably, however, CW 7 recalled that TransDigm stopped highlighting the price increases at these meetings after the DoD-IG announced an audit beginning in 2017, stating that "it seems like right after we got in trouble, we stopped listing price increases."

67.    According to CW 2, these C-level executives – including Howley – went over "everything we sold that quarter and the price – [were there] increases? Market increases? It was all spelled out very clearly."  CW 2 explained that Howley and other executives were "staying very in touch with individual product lines and customers" and were aware of the "gritty details of every sale we ever made" at these meetings.  CW 8,[7] a former Director of Operations at TransDigm subsidiary PneuDraulics for nearly a decade, concurred that she attended the

_____

[7] CW 8 was employed with PneuDraulics, Inc. ("PneuDraulics") from August 2006 to July 2016, most recently as Director of Operations.  TransDigm acquired PneuDraulics—a manufacturer of precision hydraulics components for the aerospace industry—in August 2015.  CW 8's immediate supervisor was the president of PneuDraulics.  CW 8 attended quarterly review meetings at the Company's Cleveland headquarters directed by Howley and other C-level executives.

28

quarterly product line review meetings with Howley and other senior management, and that TransDigm wanted the "granular technical processes we could deploy" to increase productivity.

68.     Indeed, CW 7 explained that these meetings were a place for the executives to "really criticize the subsidiaries and say 'you're not doing good enough, you have too many people, you need to change this and this.'"  As a result, subsidiaries were "really anxious and kind of scared for every quarter." CW 4 described those who survived this process as "basically audition[ing] to be a division president or a director."  She explained that "you were only allowed to miss twice before you got fired."  There was pressure not only from the executives, but also peer pressure from within the division because "the way the compensation worked," other divisions suffered if the numbers were not achieved elsewhere.  CW 4 explained that even if you "were missing your number for something entirely reasonable, like, you hit 2008 and the economy," the response from TransDigm was "brutal."

69.     CW 3,[8] a former Business Unit Manager and Aftermarket Sales Manager with AvtechTyee, also corroborated how involved TransDigm management was, stating that TransDigm would "go through contracts and [find] which ones they can raise [the price on] or if they can't, see if they can break the contract."  When asked if Defendant Howley was directly involved in breaking contracts, CW 3 responded, "No comment.  But, yeah."

70.     Former management-level employees interviewed by The Capitol Forum have confirmed the accounts of these quarterly meetings.  All of the former employees stated that these quarterly reviews were akin to recurring job interviews, and the inability to show acceptable growth could result in firings. According to one former employee, "I sat in a board

---

[8] CW 3 was employed with TransDigm subsidiary AvtechTyee from February 2012 until April 2017, most recently as a Business Unit Manager and Aftermarket Sales Manager.  CW 3 attended quarterly meetings directed by senior level executives, along with other business unit and product line managers.

room meeting with the big guys listening to other companies like AeroControlex and a few others that didn't get their targets and it wasn't pretty."

71.     After these meetings, CW 4 also recalled "roundtable" discussions, "where everyone talked about issues they were having – with the government, certain OEMs . . . we'd talk about negotiating tactics, and how to combat them."  Notably, CW 4 explained that these roundtable discussions <u>were not memorialized in minutes</u>, and would include stories such "oh, the government was forcing me to go over the [TINA] threshold, and we'd say oh, this is how we pushed back!"

72.     CW 7 also recalled additional meetings, going so far as to characterize the number and timing as "overkill."  She explained that in addition to the Product Line Reviews (and the roundtable discussions), Executive VPs at TransDigm had weekly calls with the presidents of the subsidiaries; each EVP had 5-6 presidents reporting to them.  CW 7 assisted four EVPs, and every week she would hear their calls with the presidents, where the EVPs would say things like "and how many people did you let go? Oh, I thought you were going to let go of more."  On Fridays, after these calls, all of the EVPs would gather to report the progress that they heard from the presidents.  CW 7 explained that these meetings were attended by Howley and were focused on sales discussions.

### C.     Former Employees Confirm that TransDigm's Most Senior Officers Ordered Subsidiaries To Hide the Company's Identity as a Parent Entity in Violation of Government Regulations Designed to Detect "Waste, Fraud and Abuse"

73.     Former employees of TransDigm confirm that, during the Class Period, the Company's senior officers, including Defendant Howley, ordered several subsidiaries to conceal the true cost of the Company's product parts (and thereby its price-gouging) by fraudulently masking that TransDigm was the parent company of several subsidiaries.  In blatant violation of Federal regulations, TransDigm failed to disclose that it was the parent company of <u>one-third of</u>

30

<u>its subsidiaries</u> that registered with the System for Award Management ("SAM") database, thus deliberately thwarting Federal regulations designed to prevent "<u>fraud, waste and abuse of taxpayer dollars</u>" through detection of "<u>Federal spending patterns across corporations</u>."

74.     Specifically, Federal Acquisition Regulations ("FAR") require Government contractors who register with the SAM database to disclose whether they are owned by another entity, and to identify the parent entity by legal name and by the parent entity's unique Commercial and Government Entity ("CAGE") code—an identifier assigned to suppliers to government and defense agencies as well as to governmental entities by the Defense Logistics Agency.

75.     The purpose of these requirements is to track the Government's total spending across a specific company and obtain more insight into supply chain traceability.  As further explained on the Federal Service Desk's website, "FAR 52.204-17, Ownership or Control of Offeror, requires entities to enter the immediate and highest level owners CAGE Codes when registering in SAM.  This is a self-certification by the offeror."[9]

76.     This rule was specifically designed to provide greater "transparency and reliability of data," and "to facilitate achievement of rigorous accountability of procurement dollars."[10]  Further, the rule "[i]ncreased transparency and accuracy of procurement data," which would "broaden the Government's ability to implement <u>fraud detection</u>."  The purpose of the rule was to "(1) support successful implementation of business tools that <u>seek insight into Federal spending patterns across corporations</u>; (2) <u>facilitate traceability</u> in the tracking of performance issues across corporations; (3) provide insight on contractor personnel outside the

---

[9]      https://fsd.gov/fsd-gov/answer.do?sysparm_kbid=03722bca6fcc710045b164826e3ee4a7&sysparm_search=
[10]     https://www.gpo.gov/fdsys/pkg/FR-2014-05-30/html/2014-12387.htm.

United States (at a corporate/full organization level); and (4) <u>support supply chain traceability and integrity efforts</u>. The use of the CAGE code provides a Government-managed unique identifier for these entities, and the final rule provides a mechanism for the entities themselves to identify their hierarchical structure to the Government."  In other words, the regulation was designed to help detect widespread fraud or abuse across multiple subsidiaries—the exact scheme that TransDigm was perpetrating.

77.      In violation of this important Government regulation, TransDigm deliberately hid its identity as the parent company of at least twelve subsidiaries that sold products to the U.S. Government.  Since the SAM database required registrations to be updated on at least a yearly basis, these TransDigm subsidiaries submitted incorrect information more than once.  In fact, some of the subsidiaries, like Skurka and Avionics, had been owned by TransDigm for well over a decade.  By failing to list TransDigm as a parent entity, these subsidiaries prevented the Government from linking price increases across a range of seemingly separate companies to one single entity (TransDigm), a practice that affected procurement decisions and the transparency of pricing information.

78.      Indeed, Michelle McCaskill, the Chief, Media Relations Public Affairs Office Defense Logistics Agency, stated, the "DLA aggregates spend based on the Commercial and Government Entity (CAGE) program. A company with multiple CAGEs should ensure they have a Parent CAGE and tie their other CAGEs to that CAGE to ensure all of their spend is considered." Ms. McCaskill also stated "it is a requirement per FAR 4.18 that companies identify their ownership when establishing their CAGE codes. It is thus incumbent on the supplier to meet this requirement."

32

79.     The importance of CAGE codes is underscored by the DLA's decision to cause CAGE codes to expire to improve "data quality."  A CAGE code revoked if a company does not keep its SAM registration up to date and accurate.  According to the DLA release regarding expiration, "Taking action to expire CAGE codes is a step in the right direction for data quality… Ultimately, the goal is to provide current and correct information to everyone using this data."

80.     Indeed, the fact that TransDigm subsidiaries failed to identify that TransDigm was their parent company was neither an accident nor an inadvertent mistake.  The registration form requiring this information was not complicated or tricky.  To the contrary, the registration form includes the clearly stated question: "Does another entity own or control the entity you are registering?"  Registrants have only two choices: they may click "yes" or "no."  Remarkably, a full one third of TransDigm's registered subsidiaries that filled out this form all inadvertently or mistakenly clicked "no."  Indeed, these omissions were so egregious that Congressman Ro Khanna made them a focus of his March 20, 2017 letter to the DoD Inspector General, asking him to initiate a formal investigation of the Company.  The twelve TransDigm subsidiaries are listed below:

| Company | Date of Registration |
|---|---|
| Acme Aerospace, Inc. | 11/28/16 |
| Adams Rite Aerospace, Inc. | 09/26/16 |
| Avionic Instruments, LLC | 01/20/17 |
| CDA InterCorp, LLC | 09/12/16 |
| CEF Industries, LLC | 12/09/16 |
| Dukes Aerospace, Inc. | 05/16/16 |
| Electromech Technologies, LLC | 02/07/17 |
| Electromech Technologies LLC DBA Tyee | 08/16/16 |
| Hartwell Corporation | 10/05/16 |
| Pexco Aerospace, Inc. | 05/12/16 |
| PneuDraulics, Inc. | 06/10/16 |
| Skurka Aerospace, Inc. | 05/04/16 |

*Source: Capital Forum analysis of DLA and SAM CAGE Codes*

81.    The SAM form itself is clear that filing inaccurate reports—thereby making it more difficult for the Government to track spending—carries significant penalties.  On the final page of the certification form, registrants are asked to review all information to ensure accuracy.  This page also requires the registrant to confirm that they have read and understood all FAR provisions relating to their application, including the provisions in FAR 52.204-17 "Ownership or Control of Offeror."   Upon submitting a filing and under penalty of perjury, TransDigm employees read the following disclosure:

> By submitting this registration, you are certifying the information is accurate and complete.  Knowingly providing false or misleading information may result in criminal prosecution under Section 1001, Title 18 of the United States Code.  Criminal Penalties could include imposition of a fine, imprisonment or both.  You may be subject to other remedies as well, including, but not limited to, administrative remedies, such as suspension and debarment; ineligibility to participate in programs conducted under the authority of the Small Business Act; or civil liability under the False Claims Act.

82.     Furthermore, an April 2017 The Capitol Forum report concluded that (i) TransDigm and its subsidiaries would not disclose the Company as its parent to avoid linking price increases to TransDigm, and (ii) an additional rationale for this practice was to create the false impression that bids from two separate TransDigm subsidiaries were independent and "competitive" with one another, without drawing attention to their shared parent company. The Capitol Forum sent a Freedom of Information Act ("FOIA") request to the DLA, and FOIA returns showed that at a minimum, two out-of-compliance TransDigm subsidiaries were bidding against each other and were not registered as TransDigm subsidiaries according to historical SAM data.

83.     In addition to data evidencing that subsidiaries did not file accurate ownership disclosure forms with the Federal Government, high-ranking former employees confirmed TransDigm's senior executives, including Defendant Howley, ordered the subsidiaries' relationships with TransDigm to be hidden. Indeed, CW 2, a former Business Unit Manager for TransDigm subsidiary Champion, confirmed this practice, recalling that Champion deliberately removed TransDigm's name from its business cards because the presence of TransDigm's name "made it difficult to do business." CW 2 added that the decision to remove TransDigm's name came "straight from corporate," and that Howley and other "C-level" management directed it; indeed TransDigm "did everything they could not to advertise that each company was owned by them." CW 2 particularly recalled that around 2011, Boeing did not want to work with TransDigm because the Company was "so brutal with its pricing" that Boeing placed TransDigm on a "no new business" list, referred to as the "naughty list" – meaning that for about a year, TransDigm was barred from selling to Boeing. CW 2 described the intentional obfuscation of TransDigm's corporate ownership as a way of circumventing this prohibition and to maintain the

35

Company's dealings with Boeing. TransDigm's practice of avoiding disclosure of its identity as the parent company of its subsidiaries was thus a vital component of its scheme to mislead its customers, including the Government.

84.     Moreover, former employees at TransDigm subsidiaries interviewed by The Capitol Forum stated that TransDigm created a culture in which employees were not supposed to actively disclose a connection to the Company. According to one former employee, TransDigm instructed its employees "to not volunteer" the fact that TransDigm was the parent company of their subsidiary, and to "keep a low profile when possible."  Another former employee echoed that statement, stating that the subsidiary's president "told me [that] we never want to portray that we're part of" TransDigm.

85.     All three former employees interviewed by The Capitol Forum also independently discussed the practice of keeping the TransDigm logo off of business cards.  According to one former employee of Skurka, "we actually had our business cards at Skurka that said 'A TransDigm Company' and the very first thing that my boss did when he saw [them]… was throw away all the business cards because it said 'A TransDigm Company' and came out with new business cards that just said Skurka."

**D.     TransDigm's Network of Captive Distributors Mimics the Aesthetics of a Competitive Market, Further Allowing TransDigm to Defraud the Government**

86.     In addition to deliberately concealing TransDigm as the parent entity of its subsidiaries, the Company's illicit business practices included hiding cost structures through its use of exclusive distributors.  In order to support its monopolistic price-gouging and avoid detection, TransDigm subsidiaries used exclusive distributors to make bids appear competitive so as to not attract Government attention.  Also, if audits were required, this operational structure

meant that Government procurement officers would audit the exclusive distributor, rather than TransDigm itself.

87.     These practices violated Federal regulations requiring TransDigm to provide truthful and complete information regarding cost basis for products sold pursuant to DoD contracts.   In addition, FAR Part 15, "Contracting by Negotiation," defines when adequate competition exists so that contracting officers can rely on competitive bidding to determine a fair and reasonable price for the military's goods.   Specifically, FAR Part 15.403-1(c)(1)(i), "Adequate Price Competition," states that a "price is based on adequate price competition if two or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement…"  The Acquisition Guide for the Defense Supply Center, Columbus, Ohio ("DSCC")—which purchased many products from TransDigm subsidiaries— echoed this provision.   DSCC Acquisition Guide, Part 13, discusses price reasonableness determinations, stating: "Competitive quotations from two or more sources will normally produce a price that can be determined fair and reasonable."

88.     Throughout the Class Period, TransDigm implemented structures to fraudulently take advantage of these "competitive" bidding provisions.   For instance, TransDigm would use exclusive distributors, or non-manufacturers to serve as TransDigm's sole representative for certain Government sales.   As stated by the DoD in the 2008 Audit: "Distributors serve as 'middlemen' who perform all of the administrative tasks necessary to respond to and fill Government orders, including quoting, procuring, and receiving the item from the manufacturer and selling and shipping the item to the Government. The distributor model adds a duplicate layer of administration and shipments to the traditional procurement process."

89.     When a vendor like TransDigm is a monopoly supplier, that supplier is required to turn over its cost information about the product to the Government, or allow the Government to conduct a thorough review to determine the likely cost of the product.  However, by setting up a network of captive distributors to mimic the aesthetics of a competitive market, TransDigm was able to evade these rules and regulations, and hide the true cost of its products.

90.     Rather than bid directly for a Government contract, TransDigm would essentially bid through a captive distributor.  TransDigm would sell its product to the distributor, and that distributor would then bid on the contract.  On its face, the bid would appear "competitive," because other companies looking to submit a bid could purchase the product directly from the distributor that had the exclusive rights to the TransDigm part.  However, in reality, the bid would <u>not</u> be competitive, because the TransDigm distributor would <u>always</u> have the lowest price to offer.  That was because the distributor acquired the part directly from TransDigm, and the distributor would obviously charge the competitors a higher price for the product than the distributor had itself paid for it.  Thus, when the distributor bid on the contract, its bid would invariably be lower than any competitors' bid.

91.     Significantly, as set forth above, TransDigm had long been on notice that this practice violated DoD regulations, and resulted in "unfair" bids that concealed a monopolistic, non-competitive market.  In fact, the 2008 Audit identified this practice taking place involving Skurka Aerospace, Inc., a TransDigm subsidiary, and its exclusive distributor, Dutch Valley Supply.  The 2008 Audit noted that, with this type of exclusive distribution arrangement, "<u>it is clear that competition will not be independent or fair</u>, because Dutch Valley Supply, as the single-source distributor, inherently controls its 'competitors' costs and delivery, which gives unfair insight and a decided advantage in winning awards over its 'competitors.'"  In addition to

expressing disdain of the exclusive distributor model, stating that it "increased lead times and associated inventory levels," the 2008 Audit notably found that the Government was paying more than fair and reasonable prices and "this valuable procurement money will not be available to support other urgent warfighter needs."

92.     Despite the DoD OIG's finding regarding the use of exclusive distributors, TransDigm continued to use this practice, even those affiliated with Dutch Valley.  In fact, Skurka used ECI Defense Group, an affiliate of Dutch Valley, as the exclusive distributor for its "connectors," for which Skurka was a sole source manufacturer. For example, in April 2012, ECI Defense, and two other distributors, Pioneer Industries ("Pioneer") and BDS Supply ("BDS"), all placed bids on a Government solicitation for 59 connectors.  Because ECI Defense inherently controlled its competitors' costs and delivery, ECI's bid was approximately 15% less than the bids submitted by Pioneer and BDS.  In sum, Pioneer and BDS were unable to engage in true competitive bidding, as shown in the diagram below.



93.    Prior to its acquisition by TransDigm, Skurka sold the part directly to the DLA. After the acquisition and the shift to sales through distributors, TransDigm tripled the per unit price.  However, TransDigm was able to mask this massive price increase because the DLA procurement officer saw that there were three bids, determined that the price was reasonable because there had been a competitive bidding process, and awarded the contract to the lowest bidder.

94.    This structure was repeated on numerous occasions.  Indeed, it was standard practice that as soon as TransDigm acquired a company that sold directly to the Government, it would immediately insert an exclusive distributor as the middle-man between the subsidiary and the Government.  Year over year, TransDigm increased its reliance on distributors for sales of sole-source parts to the Government.  In 2012, distributor sales comprised 48% of sales, yet by 2016 distributors accounted for 64% of sales.

95.    In addition to the fact that "competitive" bids attracted less Government procurement scrutiny, TransDigm would also get the added benefit of hiding its identity as the monopoly supplier behind the product.  CW 1 corroborated this practice, giving the example of AdelWiggins' use of distributor Dutch Valley in its deals with the Government for the sole purpose of avoiding cost scrutiny: "Because we are bidding it through Dutch Valley, we were shielded even with TINA."  Indeed, as CW 1 put it: "Once we [the salespeople] realized [bidding through Dutch Valley] shielded us, we didn't have to worry about a price breakdown or justifying our price" to the DLA.  CW 1 bluntly concluded "the main reason we used Dutch Valley was to shield us from being audited."  CW 4 similarly explained that TransDigm used distributors "to shield from the blowback of increased prices."

40

96.     Moreover, even if the Government asked the distributor for its costs to justify any questions into whether the price was fair and reasonable, the distributor was often labeled as the prime contractor and thus received the audit attention.  Under this labeling, the price points of the distributor would be reported to procurement officers, as opposed to the substantially lower source costs incurred directly by TransDigm.

97.     In addition, in many cases TransDigm had de facto control over these distributors, making them little more than shell middlemen used for the sole purpose of inflating prices, hiding costs, and creating the illusion of competition.  CW 4 recalled comment by one of TransDigm's Executive Vice Presidents: "distributors are whores."  Indeed, as former employees confirmed in a March 2017 The Capitol Forum report, distributors agreed to be TransDigm pawns because the Company allowed these distributors to maintain a 15-20% margin (much higher than with non-exclusive distributors) on the TransDigm parts that they sold, which were especially lucrative given that many of these parts had already received a substantial increase in cost as a result of TransDigm acquiring them.

98.     Maintaining de facto control over the distributors also allowed TransDigm to offload excess products onto the distributors in order to further artificially inflate the Company's own financial metrics.  CW 4 explained that "what we did when we needed to make inventory is, we stuff the distributor with inventory," sometimes millions of dollars' worth. She explained that distributors would accept large amounts of inventory because "TransDigm buys stuff that turns—it's like milk and bread. Milk and bread are always going to turn, doesn't matter if the economy is good or bad. So TransDigm is good at figuring out the things that are going to constantly need to be replenished. They're consumable parts."

41

99.     CW 2 confirmed the accounts of the former employees interviewed by The Capitol Forum.  She recalled times where Champion would ask a distributor to hold an additional $200,000 to $300,000 worth of product to "fill the channel."  TransDigm and Champion would count this as a sale, but if the demand was not there, the product would just "sit[] in the channel."  CW 2 recalled that filling the channel would occur when Champion was "shy on sales and needed to hit a number for Wall Street."  "Sales didn't come from market demand," she said.  Instead, Champion was "stuffing the channel."

100.    CW 5 also confirmed TransDigm's fraudulent channel stuffing practices.  She recalled that "sometimes at the end of the fiscal year if we weren't going to make our numbers, the President, Jeff Zielinksi would call Jupiter [AdelWiggins' Japanese distributor] and ask them, 'can we ship all these products?' And they would allow us to ship to them to make numbers for the month or the year and then they would return [the products] to us."

101.    The Capitol Forum interviewed three former management-level employees at two different TransDigm subsidiaries who confirmed that TransDigm upper management placed intense pressure and financial incentives on subsidiaries to hit revenue targets, which led subsidiaries to push inventory on distributors.  One of those employees explained to The Capitol Forum that "it's all about timing when recognizing sales that can count toward meeting the street's expectations," and that "you can recognize revenue when you deliver to a distributor." The former employee continued, "you need additional sales to hit the target? Well, you can get them to take a bunch of inventory maybe a little early, right?"

102.    Another former employee of a TransDigm subsidiary noted to The Capitol Forum that "you will absolutely stick [the distributor] with as much as necessary. In fact, TransDigm will call the divisions the last week of the quarter and poll them to find out how much finished

42

goods inventory they have available to ship to distribution. They will then send out a coordinated plan to the divisions to ship sufficient product to make the quarter. I've seen distributors loaded up with as much as a years worth of inventory on certain high margin part numbers just so the company makes a quarter or their fiscal year."

103.    These distributors were also utterly dependent on TransDigm for their business— in many cases, 40%, 50% or even 70+% of a distributor's business came from TransDigm parts. For example, The Capitol Forum determined that over 73% of sales to DoD by distributor Carp Industries were comprised of TransDigm components, giving TransDigm de facto control over Carp Industries.  Use of a "distributor" in such circumstances had no legitimate business purpose and instead was intended solely to insulate TransDigm from Government audits and cost scrutiny, to protect TransDigm's grossly inflated pricing, and fabricate the appearance of legitimate "competition" between TransDigm's exclusive distributor and other suppliers.

E.    **Former Employees Confirm That Defendants Explicitly Ordered and Trained Employees To Price-Gouge, Including Through "Indoctrination" Training Sessions and a Myriad of Tactics to Defraud the U.S. Government**

104.    In order to facilitate its Government price-gouging scheme, TransDigm held regular training seminars for employees of its subsidiaries who were involved in sales to the U.S. Government.  The message of these training seminars was clear: use any tactic available to maximize the price charged to the Government, and avoid Government scrutiny of TransDigm's pricing at all costs.

105.    TransDigm's training seminars were led by Halle Terrion, currently the General Counsel and Chief Compliance Officer for TransDigm, and included a PowerPoint presentation titled "Understanding How the Government Buys."  According to one former management level employee interviewed by The Capitol Forum who attended the seminars, these meetings were "very-well orchestrated indoctrination sessions."

43

106.    By way of background, federal acquisition regulations are designed to ensure that federal agencies like DoD pay a "fair and reasonable price" for items it purchases from private companies.  These regulations include a contract price "threshold" of $750,000, known as the Truth in Negotiations Act ("TINA") threshold.  *See* FAR 15.403-4.  On contract bids above the TINA threshold, offerors must submit "certified cost or pricing data," that the contractor has certified is "accurate, complete and current."  *See* FAR 15.403-4.  The regulations define "cost or pricing data" as comprising "all facts that, as of the date of price agreement, or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price, prudent buyers and sellers would reasonably expect to affect price negotiations significantly."[11]

107.    The regulations further emphasize that "[c]ost or pricing data are factual . . . and are verifiable," comprising "all the facts that can be reasonably expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred."  Offerors are further required to sign a Certificate of Independent Price Determination, in which the offeror "certifies," in part, that "[t]he prices . . . have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to (i) those prices, (ii) the intention to submit an offer, or (iii) the methods or factors used to calculate the prices offered."  *See* FAR 52.203-2.  Moreover, even on contracts below the $750,000 TINA threshold, procurement officers are directed to obtain, and contractors are expected to provide "whatever data the contracting officer needs in order to determine fair and reasonable prices."

---

[11] Federal Acquisition Regulation; Definition of Cost or Pricing Data, 48 C.F.R. § 2.101.

108.    Notwithstanding these regulations, TransDigm trained its employees to <u>avoid</u> <u>providing cost information by any means possible</u>, including avoiding the TINA threshold however they could.  The reason for this was simple.  TransDigm's prices were so grossly out of line with their costs that the Government never would have paid them had they had access to true cost information.  As CW 3 stated, the goal was to make sure the Government was kept in the dark in order to justify the exorbitant mark-ups that the Company was charging, and that Pentagon procurement officers were "<u>never going to get any cost data out of TransDigm because</u> <u>then [they] can figure out how much [TransDigm is] making</u>."  CW 4 recalled that "everybody was on the same page" and "fully versed" on how to avoid hitting the TINA threshold.  CW 7 also recalled specific discussions of "how to handle backlash" from DoD cost audits, and "how to handle the government" at quarterly financial reporting meetings that she helped with, the yearly and bi-yearly sales conferences, operations conferences, and leader conferences.  CW 2 also confirmed that TransDigm made a practice of hiding cost information from the Government any way it could.

109.    CW 7 also recalled that every quarter, "there was definitely a lunch presentation that discussed how to avoid" hitting the $750,000 TINA threshold; in fact, CW 7 helped to update the PowerPoint slides used at these presentations.  She further recounted that the directive "was about breaking up orders to avoid hitting" the TINA threshold, and that Corporate handed down instructions on how to avoid the threshold "multiple times."

110.    Specifically, according to former management level employees of multiple TransDigm subsidiaries, TransDigm trained its employees to use a myriad of tactics to avoid Government scrutiny.  One method Defendants used was to deceptively break up large contracts into smaller contracts to artificially avoid hitting the TINA contract price threshold of $750,000,

and thereby triggering the requirement to provide detailed "certified cost or pricing data" to ensure that the Government pays a fair and reasonable price. As such, TransDigm sought to keep its contracts below the TINA threshold of $750,000. CW 4 recalled another tactic used would be for a subsidiary to tell a customer that it could not predict the price for a whole year's worth of product, and that therefore the customer had to order in separate tranches, thus keeping the price under the TINA threshold.

111. Indeed, according to one source quoted by The Capitol Forum, "the government's going to ask for everything, they're going to tell you I need to see your cost basis. And if it's under 750,000 my answer is no. And if he says well I can't buy it if you don't do it I say fine well you can't buy it any other place anyway. Here, buy it from my distributor instead of me. My distributor, he's going to show his cost basis, it's the invoice he gets from me. When you're sole-source and the only IP, they're going to have to come to you eventually."

112. According to another source interviewed by The Capitol Forum, "the expectation was if you're going to be below the TINA threshold, you're going to get every penny you could get. So discrete purchases, end of the year purchases where DLA comes in and says 'I want 100 [XXXX]' and my OEM price on those is say, 8500 bucks, I should be getting 15, 16, 17 thousand a piece" from the Government. In response to a question regarding whether the tactic of charging the Government double the price was something to boost sales at the end of a quarter or a constant practice, to which the source replied that it was "constant—They don't have a choice. They have to buy it from you, you're below the TINA threshold, you don't have to let them see your numbers, they can't audit you, get the most price you can."

113. As another former employee interviewed by The Capitol Forum explained, the Company could also use geographically-dispersed distributors to artificially split up a contract:

If the Government comes to me for [$]2.1 million in spares, that's auditable right? Because it's above the [$]750,000 threshold, so it's going to limit my profitability.  But if I'm working out of a North American distributor, a European distributor, and an Asian distributor, that [$]2.1 million now will only be [$]700,000 out of each one.

114.    The former employee noted that, in fact, it was a violation of the defense acquisition regulations to split up a contract in this way without a "compelling reason."  So employees were trained to effectively fabricate purportedly "compelling reasons," *i.e.* to mislead the Federal Government.  For example, the former employee said, "my compelling reason could be, look, it's geographically distributed, each of those markets has a different requirement, it's the best way for me to administrate and service the need, the interest of the Government is best served with my working through these three distributors instead of doing it all out of one.  <u>And now I've avoided the TINA threshold, which means I get more profit</u>."  In other words, TransDigm's justifications for breaking up its contracts were bogus, and were purely invented to avoid the TINA threshold and thus maximize profit and minimize scrutiny.

115.    Defendants also pressured employees to provide procurement officers with falsified "commercial" pricing information to justify inflated sale prices and avoid cost disclosure.  As stated above, Federal acquisition regulations provide for a "commerciality" exception that exempts federal contractors from having to provide detailed cost information because the commercial marketplace has already set a "fair and reasonable" price for the item, so that less independent justification of the price is required.

116.    Defendants sought to fraudulently take full advantage of this exception.  As a former TransDigm employee interviewed by The Capitol Forum explained, "we would furnish [commercial price data] to the Government [instead of] cost data.  And it fulfilled the same requirement, that you had approved fair and reasonable pricing, correct?  If I'm pricing it—if I'm getting it from the commercial side somewhere else, is it then not fair or reasonable by market?

47

Yeah, right.  So that was the strategy."  CW 2 confirmed that the commerciality exception was a "huge tool" for the Company, whereby TransDigm and its subsidiaries could avoid disclosing cost information.

117.    Significantly, however, in order to take advantage of the commerciality exception, contractors were required by law to provide adequate commercial sales data to demonstrate a market price, and DFARS specifies that this sales data must include "any related discounts, refunds, rebates, offsets, or other adjustments."  *See* 48 C.F.R. §§ 215.401, 252.215-7010.  However, TransDigm did not disclose this required information.  Instead, it made a practice of defrauding the Government using phony "list prices" (which did not reflect actual commercial sales prices) to justify its pricing.  Indeed, while TransDigm regularly provided large rebates to its commercial customers—often 25% or more—The Capitol Forum revealed that TransDigm would not disclose these rebates to the Government in its "commercial" sales data, thus dramatically inflating its true commercial sale prices.  CW 4 explained how TransDigm's subsidiaries would exploit the rebates it paid to commercial customers to hide its true commercial sales prices:

> There's the 737 airplane. It has an engine called a CFM56. The engine has a part on it called the jet engine igniter. Delta and Air France and United have them.  Sun Country Airlines has them. Delta and United and Sun County pay different prices because they have different purchasing power based on their fleets.  Sun County is a little bitty airline. When you sell that part to [the distributor] Aviall, which is gonna sell them to all of [those airlines], it goes out at a price. And it's gonna be somewhat of a discount off of the list price. Let's say 20%.

> When Aviall puts all those igniters in a bin -- they could go out to any of those airlines -- when they go to Delta, [Aviall] reports back to us, "We sold to Delta at a lower price, so you have to rebate us the difference." When it goes out to Sun County, it goes out at full price and there's no rebate. I did a commerciality thing with the government -- the F-16 igniters look an awful lot like [these igniters]. So I used the invoice to Aviall when I sold them at full price to justify the price I sold the others at.

48

The government says "Ok, they look the same, that's fine." Truth is, I didn't sell them at $500, because I was rebating based on which customer they were going out. The government could never figure it out.

118. Two sources who used to work at the same TransDigm subsidiary told The Capitol Forum about another means by which TransDigm would abuse the commerciality exception to hide its true costs.  These former employees applied the commerciality exception to products that should not have been eligible for the exception because the products were not actually available commercially.  The former employees did not disclose the existence of rebates to commercial customers when representing the commercial price to the Government. The use of rebates resulted in the commercial contract price being lower than the commercial list price, and the higher commercial list price was what DoD procurement officials would base the Government's pricing off of. The rebates were often based on volume purchases, which, according to the source, the government should have been eligible for because the Government buys in very large volumes.

119. As one former TransDigm employee interviewed by The Capitol Forum explained, "we had a Government price list, and it was exactly the same as our list price that we offered for sale to our distributors" who sold to commercial customers, such as airlines. However, in reality, the distributors sold to commercial customers for less than the list price, at which point TransDigm rebated the price difference to the distributor.  Thus, the "list price" did not reflect the true commercial sale price.  The former employee provided the following example to The Capitol Forum:

> we showed that we sold everything to Aviall [a major TransDigm distributor], and if the purchasing agent pushed us too hard, we would show that we would have shipped an invoice, a boat load of [Part X (actual part name withheld to protect identity of source)], so we would show a nice healthy volume of [Part X], that went out at list price, and that's all we had to prove. We didn't have to admit that we were ultimately rebating to the distributors based on these contract prices.

120.    The Capitol Forum also confirmed with another former employee that it was a common practice to provide inflated invoices to the Federal Government without disclosing price-adjustments for rebates.  In many cases, the undisclosed rebates created an enormous difference between the inflated list price and the actual sale price that TransDigm ultimately charged the U.S. Government:

> **Rebate grows with price increase.** We asked one of the former employees about the effect price increases on a part would have on the rebate, and posed this question: "Let's say Aviall has a contract with United, and the list price is $100, and the contract price is $80, and so the rebate is $20. <u>TransDigm comes in and buys the subsidiary, and the list price becomes $150, but Aviall is still under contract with United for $80, and so the rebate becomes $70. But when TransDigm is selling to the Government, they are saying, 'list price is $150,' even though Aviall is getting a $70 rebate</u>?" To which the former employee responded, "<u>That's right</u>."

121.    In reality, the Government should have been paying for parts at a discount, as confirmed by two former employees interviewed by The Capitol Forum.  One source went on to say that "in reality, a customer as big as the government should have been able to negotiate a discount off of list." The other former TransDigm employee agreed that a purchaser as large as the federal government should have been privy to and eligible for high-volume discounts.

122.    In addition to instructing employees to break up large contracts and manipulate commercial pricing, Defendants also trained employees to deny and obstruct any Government request for cost or pricing information, and, if audited, obscure the Company's cost basis—including by providing distributor costs, as opposed to TransDigm's true costs, wherever possible—and to use pressure tactics to wear down procurement officers to get them to accept higher prices.

123.    Indeed, according to former management-level employees of multiple subsidiaries that spoke to The Capitol Forum, TransDigm instructed its employees to "<u>challenge every single [cost information] request from a prime or an auditor</u>," and to determine what information was

"required" based on a "very strict, limited interpretation of what the regulation requires us to do," i.e. on the narrowest possible reading of what information they were required to provide. Further, employees were told to "do everything we possibly could to avoid an audit.  And if we had to succumb to an audit, we were to challenge every single request for data."

124.    Further, while TransDigm trained its employees that avoiding an audit altogether was always the goal, it was not always avoidable.  For example, when TransDigm acted as a subcontractor for a prime contractor such as Boeing, the prime contractor sometimes forced TransDigm's subsidiaries to submit to audit.   In those scenarios, TransDigm trained its employees in tactics to stall, obstruct, and/or obscure the audit process, including inflating cost basis to justify exorbitant profits.  For example, one former employee specifically described how TransDigm instructed its employees to inflate the cost of production when audited: "[t]he guidance would be something like, if during an audit you're required to show an hourly rate for technicians, find the most expensive technicians that have to do with the specific product and if the auditor wants to include a wider pool of employees, you challenge that."  This allowed the subsidiary to establish an artificially high cost-basis for purposes of the audit, which benefitted the Company since its contracts with the Government typically determined allowable profit based on "cost," (e.g. 8% profit allowed over cost), so that the larger and more inflated TransDigm's cost basis, the larger its total allowed profit.

125.    Defendants were well-aware of these obfuscating tactics.  A former employee interviewed by The Capitol Forum recalled that during the quarterly meetings, "we did talk amongst ourselves about how to get procurements with the government and how to not hit the targets to where they're looking at our books, so we could get the better margins on our parts."

126.    All told, Defendants used every fraudulent trick in the book to price gouge the U.S. Government.  In turn, Defendants' fraud had a massive real-world impact on the military's ability to maintain combat-readiness.  Indeed, as stated by the DoD Office of Inspector General in its audit report on TransDigm, the rapidly increasing cost of component parts was significant because of "its adverse impact on the DoD challenge to maintain a superior level of combat readiness and force structure as well as improve equipment quality and responsiveness. Since the terrorist attacks of September 11, 2001, and with the ongoing operations in Afghanistan and Iraq, demands for spare parts have increased.  The procurement of spare parts is essential in assisting war fighters with carrying out their missions."

### F.    TransDigm Insiders Capitalized on the Stock's Artificial Inflation Through Massive, Suspicious Insider Stock Sales

127.    Defendants capitalized on the fraudulent scheme to personally profit by tens of millions of dollars.  Indeed, Defendant Howley alone materially benefitted from the artificially inflated price of the Company's common stock through sales that were highly suspicious in timing and magnitude.  Specifically, while in possession of material, nonpublic information, Howley sold 144,500 shares of the Company's common stock at artificially inflated prices—84% of the common stock that Howley beneficially owned, according to TransDigm's publicly-reported Form 4 filings—reaping enormous insider trading proceeds of nearly $38 million:

## Howley, W. Nicholas, Chairman/CEO/Co-Founder

| Date | Shares | Price | Value |
|------|--------|-------|-------|
| 06/08/16 | 100,000 | $265.01 | $26,501,202 |
| 09/14/16 | 7,500 | $281.50 | $2,111,279 |
| 12/08/16 | 37,000 | $251.25 | $9,296,247 |
| Total | 144,500 | $262.34 | $37,908,729 |

128.    Defendant Howley's massive sales were suspicious because they were not made pursuant to an SEC Rule 10b5-1 executive trading plan, even though Howley had previously adopted such a plan for sales made in prior years.  In so doing, Howley was able to liquidate a large position quickly, without delay and restriction, thereby circumventing the very safeguards that 10b5-1 trading plans were meant to provide.  Rule 10b5-1 trading plans were established by the SEC to allow insiders of publicly traded corporations to set up a trading plan for selling stocks they own.  Specifically, 10b5-1 trading plans allow major shareholders to sell a predetermined number of shares at a predetermined time.  Notably, Defendant Howley's sales were instead open-market transactions and were designed to maximize his personal benefit from the artificial inflation in the Company's stock price.

129.    Defendant Howley's sales were also suspicious because they coincide with peaks in TransDigm's share price:



130.    In addition to Defendant Howley, TransDigm insiders including the Company's Vice Chairman, its former CFO, and a number of Executive Vice Presidents, also took full advantage of the artificial inflation of TransDigm common stock caused by Defendants' knowingly false and misleading statements.  During the Relevant Period, ten TransDigm insiders from the highest levels of the management team each obtained gross proceeds of $1 million or higher.  Moreover, Defendant Howley, Robert Henderson[12] and Bernt Iversen[13] alone took home $64 million in proceeds, a vast amount for three individuals.

131.    Collectively, the insider selling at TransDigm was massive.  Just during the period from May 10, 2016 through June 30, 2016, six insiders sold 198,740 shares for proceeds of $52 million.  Of that, Howley accounted for over half alone, grossing $26.5 million by selling 100,000 shares in a single trading day on June 8, 2016. All told, TransDigm insiders sold over 330,000 shares of TransDigm common stock during the Class Period at materially inflated prices for proceeds of more than $87 million:

---

[12]  Robert S. Henderson served as Chief Operating Officer of Airframe at TransDigm from October 2014 to December 2016. Henderson is currently Vice Chairman of TransDigm, a position he has held since January 2017, and also serves as President of AvtechTyee, a TransDigm subsidiary.

[13]  Bernt G. Iversen, II, has been the Company's Executive Vice President of Mergers & Acquisitions and Business Development since May 2012. Prior to his E.V.P. role, for over two decades, he held positions at TransDigm-related companies, including more recently as President of Champion Aerospace Inc., a subsidiary of TransDigm from 2006 to 2010.

| Insider | Position | Shares | Average Price | Gross Proceeds | % of Holdings Sold |
|---------|----------|--------|---------------|----------------|---------------------|
| Howley | Chairman/CEO | 144,500 | $262.34 | $37,908,729 | 84% |
| Henderson | Vice Chairman | 57,000 | $261.29 | $14,893,567 | 70% |
| Iversen | EVP: M&A | 40,000 | $273.12 | $10,924,921 | 89% |
| Rufus | SVP: ex-CFO | 21,000 | $244.31 | $5,130,455 | 64% |
| Leary | EVP | 20,740 | $259.89 | $5,390,152 | 69% |
| Palmer | EVP | 20,500 | $281.84 | $5,777,743 | 84% |
| Valladares | EVP | 10,000 | $254.38 | $2,543,826 | 67% |
| Jones | EVP | 7,500 | $285.92 | $2,144,380 | 65% |
| Reiss | EVP | 6,000 | $252.99 | $1,517,936 | 63% |
| Graff | Director | 3,928 | $251.33 | $987,224 | 32% |
| Total | | 331,168 | | $87,218,932 | |

132.    Moreover, even when including exercisable options as listed in TransDigm's proxy statements, these TransDigm executives' insider selling still represent material percentages of their overall holdings.  For instance, when including exercisable options as listed in TransDigm's proxy statements, Howley, Henderson, Rufus and Graff sold approximately 18%, 26%, 14% and 13% of their total holdings, respectively.

133.    Defendants were thus clearly motivated to perpetuate the fraudulent scheme alleged herein in order to benefit from the artificially inflated price of the Company's common stock through insider sales that were highly suspicious.

## VI.    DEFENDANTS' FRAUD IS EXPOSED

### A.    The Truth Regarding Defendants' Fraudulent Price Gouging Scheme Is Revealed In Early 2017

134.    On January 20, 2017, Citron Research ("Citron") issued a report revealing that TransDigm was employing an unsustainable business strategy, driven almost entirely by acquisitions—financed by copious amounts of debt—and by subsequent massive price hikes. The report detailed that TransDigm's business model resulted in "egregious price increases

foisted on the Government." Describing TransDigm as the "Valeant of the Aerospace Industry," the report made the shocking disclosure that "TransDigm has been able to use the guise of multiple shell distributors, who have no pricing power, to make a bid seem competitive when in reality they are all shills for TransDigm."

135.    The report stated that these business practices had allowed the Company to inflate its profit margins significantly above its industry peers. In addition, the report alleged that the Company had thwarted a prior Government audit into its cost structure by employing a variety of stonewalling tactics.

136.    Citron further emphasized that TransDigm's growth was highly unsustainable and maintained only by its price-gouging of the Government—a scheme that would likely end once the Federal Government caught on, causing the Company's financial results to plummet.  As Citron explained:

> The ugly underbelly of TransDigm's business is that aggressive year-over-year price increases are the only thing shielding TransDigm from revealing negative organic growth of close to -10%. Any combination of U.S. Government pressure and/or OEM's pressing on their own supply chains will expose their business to actual gross revenue contraction and a devastating cut in EPS, followed by multiple contraction.

137.    In reaction to the Citron report, TransDigm's share price dropped $24.86 per share, or nearly 10%, from $251.76 per share on January 19, 2017 to $226.90 per share on January 20, 2017—wiping out $1.3 billion in market capitalization in one trading day.

138.    On March 9, 2017, Citron published a second report titled "Citron Exposes More Undisclosed Relationships at TransDigm," stating that TransDigm was "exploiting and deceiving the Federal Government" and exposing that TransDigm had deliberately concealed its identity as the parent company of a full one-third of its subsidiaries that contracted for the Government. Specifically, no fewer than twelve different TransDigm subsidiaries—more than one-third of the

TransDigm subsidiaries that sold to the Government—all had "coincidentally" failed to disclose that they were owned by TransDigm when bidding for Government contracts, in violation of Federal regulations requiring disclosure of parent ownership as part of the Government's bidding qualification process.

139.    Moreover, as the March 9, 2017 Citron report made clear, the fact that twelve different TransDigm subsidiaries failed to disclose their parent company could not have been a mere "clerical error," as TransDigm reportedly claimed.  Indeed, as the report showed, the online registration form for the federal bidding process included the clear-cut question "Does another entity own or control your Immediate Owner?"  Next to the question were two clearly-marked options to be clicked – "Yes" or "No."  Moreover, the form required registrants to read a disclosure stating that they were certifying the information was accurate and complete, and that providing false information could result in "criminal prosecution" and "imposition of a fine, imprisonment or both," as well as civil and administrative remedies.  Thus, the report concluded that the likelihood that all twelve subsidiaries had simply made a mistake when submitting the form was not plausible, and that "TransDigm has intentionally used illegal tactics to inflate margins while avoiding price scrutiny from the U.S. Government."

140.    In reaction to Citron's March 9, 2017 report, TransDigm's stock dropped $10.26 per share, or 4.25%, from a close of $241.63 per share on March 9, 2017 to a close of $231.37 per share on March 10, 2017, wiping out over $542 million in market capitalization.

141.    Finally, on March 21, 2017, U.S. Congressman Ro Khanna (D., Calif.) issued a press release announcing that he had sent a letter to the DoD Acting Inspector General, Mr. Glenn Fine, requesting an investigation of TransDigm's business practices with respect to sales to the Government.  As detailed below, the letter revealed to investors TransDigm's range of

methods to evade Federal regulations that "protect the taxpayer against sole source contractors like TransDigm":

> [F]ederal regulations protect the taxpayer against sole source contractors like TransDigm. When a vendor is understood to be a monopoly supplier, that supplier is <u>required to in turn offer cost information</u> about the product to the Government or otherwise the Government must conduct a thorough review of the likely cost of the product. In addition, vendors must tell procurement officers if they belong to a holding company <u>to allow the Government access to transparency in pricing across a defense contractor's entire business.</u>

142.    Congressman Khanna's letter specifically noted that "<u>TransDigm appears to use a range of methods to evade these protections,</u>" including a "<u>network of captive distributors that mimic the aesthetics of a competitive market,</u>" which results in a procurement officer not "realizing that he or she is in fact <u>buying from a monopoly</u>":

> TransDigm avoids showing that it is a monopoly provider of parts by <u>setting up a network of captive distributors that mimic the aesthetics of a competitive market</u>. Despite the illusion of competition, distributors that provide TransDigm parts, for the most part, are buying from one TransDigm subsidiary, and that subsidiary sets its price to distributors. The procurement officer, however, sees multiple sellers of the product, <u>without realizing that he or she is in fact buying from a monopoly</u>. Thus, the officer does not know to ask for the cost structure. Even when competition among distributors is limited, <u>the officer may simply ask the distributor for its cost information, rather than asking TransDigm for its cost information</u>.

143.    Congressman Khanna's letter also emphasized that the DoD had previously informed TransDigm that the practice of using captive distributors was inherently problematic and not a "viable procurement alternative for the DoD":

> In fact, <u>your office identified exclusive distributors as problematic in a 2008 audit</u> of Dutch Valley, which is a TransDigm distributor. You concluded in 2008: "<u>We do not believe the current exclusive distributor model is a viable procurement alternative for the DoD</u>."

144.    The letter further identified TransDigm's practice of concealing the fact that TransDigm was the parent entity for its subsidiaries in U.S. Government procurement databases:

Furthermore, in DoD filings known as SAM registration forms, <u>12 TransDigm subsidiaries failed to disclose TransDigm as their corporate parent</u> . . . . The SAM form itself is clear that filing inaccurate reports—thereby making it more difficult for the Government to track spending—carries significant penalties.

145.    Congressman Khanna also emphatically stated: "<u>TransDigm Group has been operating as a hidden monopolist by (i) engaging in a series of unreasonable price increases of products for which it is the only supplier; (ii) disguising its cost structure and identity from Pentagon procurement officers, and (iii) unreasonably hiking prices…</u>"  Congressman Khanna urged the DoD to ensure that military funding does not benefit "a few individual financiers" at the expense "of our troops and weapons systems."  The Congressman concluded by requesting that the DoD Office of the Inspector General "open an investigation into TransDigm Group for potential <u>waste, fraud and abuse in the defense industrial base</u>."  Congressman Khanna sought this investigation to "strengthen our nation's defense and to support the brave men and women of the U.S. Armed Forces."

146.    As a result of Congressman Khanna's letter, TransDigm's stock price dropped $23.09 per share over two trading days, from $237.94 on March 20, 2017 to $214.85 on March 22, 2017, a decline of nearly 10%, on extremely high trading volume, wiping out approximately $1.22 billion in market capitalization.

**B.    "For TransDigm, Dirty Tricks are a Way of Business"—Post-Class Period Events Continue to Confirm the Fraud**

**1.    Bipartisan Congressional Condemnation of TransDigm Sparks A Full-Blown DoD OIG Probe of the Company**

147.    Following Congressman Khanna's letter to the DoD, on April 18, 2017, Ohio Congressman Tim Ryan, a member of the House Appropriations Committee and the Subcommittee on Defense, sent a letter to the Acting DoD Inspector General, joining

59

Congressman Khanna's request for the DoD OIG to open an investigation into TransDigm for "waste, fraud, and abuse in the defense industrial base."

148.    On June 11, 2017, CNBC reported that Senator Elizabeth Warren (D., Mass.) had urged the DoD Inspector General to investigate TransDigm's sales to the DoD.  The letter, which Senator Warren had sent to the DoD on May 19, 2017, referred to prior requests by Representative Khanna and Congressman Tim Ryan, and stated:

> As a member of the Senate Committee on Armed Services, I have also been monitoring reports that suggest TransDigm WorldWide has used a variety of tactics to avoid sharing cost information with the Government for parts for which it is the sole source supplier.  These reports further show that TransDigm has unreasonably raised prices on many parts shortly after completing acquisitions of the companies that produce them.

149.    On June 27, 2017, in response to requests from Congress, the DoD OIG announced that it would begin an audit of sales of parts by TransDigm and its subsidiaries to the DoD.  Specifically, a memo addressed to DLA and DoD procurement officials dated June 27, 2017, and published on the DoD's website, announced, in relevant part:

> SUBJECT: Audit of Spare Parts Procured From TransDigm Group Inc. (Project No. D2017-D000AH-0162.000)
>
> We plan to begin this audit in June 2017. We are conducting this audit in response to several congressional requests. Our general objective is to determine whether the DoD is purchasing spare parts at fair and reasonable prices from TransDigm Group Inc. We will consider suggestions on additional or revised objectives.

150.    The audit is still not complete and its results have not been disclosed.  However, according to The Capitol Forum, the DoD OIG's ongoing audit of TransDigm has an expected completion date of sometime between late 2018 and early 2019.  As stated by Defendant Howley during an August 8, 2017 earnings conference call: "These audits typically go slowly. This will likely take well over a year to conclude."  Notably, Howley concluded his discussion of the DoD

60

audit by stating: "I will not comment further on this unless we decide public disclosure is appropriate."

151. In addition to the DoD OIG audit, The Capitol Forum reported that on November 8, 2017, the House and Senate Armed Services Committees requested for the U.S. Government Accountability Office ("GAO") to conduct an investigation of "monopolistic practices" in spare parts procurement. The Armed Services Committee is reportedly concerned that the DLA "is paying excessive prices for noncompetitive spare parts" and is "aware of allegations that some contractors who provide spare parts to the Government may be disguising their cost structures from procurement officers, in effect acting as 'hidden monopolists', decreasing competition and increasing prices to the Government." The final report will likely be produced during the same time period as the expected end date of the DoD OIG's ongoing audit of TransDigm.

152. Moreover, the fraud's implications are now materially affecting the Company's private sector contracts and ongoing business operations. In February 2018, The Capitol Forum reported that Boeing had re-engineered its 787 Dreamliner part specifications to enable more suppliers to provide tie rods to the aviation platform, a move that will cost TransDigm subsidiary AvtechTyee a $12 million-per-year contract to supply tie rods to the aircraft. A Boeing spokesperson confirmed the design change, stating that "in 2017, Boeing made the decision to move the 787 Dreamliner tie rod work package from AvtechTyee to other suppliers." While stating that specific figures were proprietary, the Boeing spokesperson did confirm that savings from this redesign were "significant."

153. Quoting a former employee of AvtechTyee, The Capitol Forum reported that the design change was "sending a message to AvtechTyee that Boeing was moving away from costly proprietary designs, i.e. TransDigm." Notably, Boeing accounted for approximately 11% of

61

TransDigm's net sales in FY 2017, and the tie rod contract represented 20% of AvtechTyee's $60 million annual revenue.  The Capitol Forum further reported that AvtechTyee President Harry Ray was fired because the subsidiary was not growing at the rate that TransDigm required as a result of the changed tie rod specification, despite warning TransDigm corporate headquarters that Boeing was threatening to develop an alternative source for 787 tie rods as a result of frustration with TransDigm's price increases.

154.    Additionally, in August 2018, it was announced that Boeing forced TransDigm to sign a new Master Deal under Boeing's Partnering for Success program.  While the exact terms of the agreement are confidential, Boeing's program requires its suppliers, including TransDigm, to cut costs between 15% to 25% or be put on a "no fly list."  Boeing's action was clearly taken in response to TransDigm raising prices on proprietary aircraft parts.  Indeed, Citron noted that TransDigm's profitability "will be severely impacted" by Boeing's Partnering for Success initiative.

155.    Indeed, the fallout from the disclosure of TransDigm's fraudulent business model has continued to plague its operations.  In September 2018, an Interagency Task Force, created by Executive Order, released a Report entitled "Assessing and Strengthening the Manufacturing and Defense Industrial Base and Supply Chain Resiliency of the United States."  The Report described "an unprecedented set of challenges" to the American defense industrial base, including "the decline of critical markets and suppliers," which "erode the capabilities of the manufacturing and defense industrial base and threaten the Department of Defense's (DoD) ability to be ready for the 'fight tonight,' and to retool for great power competition."

156.    The Report identified single- and sole-source suppliers as two of ten "risk archetypes" that "threaten[] America's manufacturing and defense industrial base," including by

"a loss of suppliers and potential bottlenecks across the many tiers of the supply chain" and by "lower quality and higher prices resulting from reduced competition."  In particular, the Report noted that "[r]educed competition, lack of innovation, and potential single points of failure in the production of chaff countermeasures underscore risks associated with a sole source."

157.    Just days later, on October 10, 2018, TransDigm announced its intention to acquire Esterline, a sole supplier of chaff to the military, and one of two suppliers of flares.[14] The fallout from news of this acquisition was swift and severe.

158.    An October 22, 2018 report in The Capitol Forum specifically linked the Interagency Task Force Report and TransDigm's acquisition of Esterline to the ongoing DoD-IG audit of TransDigm, noting that the "OIG investigation is also a concern."  Congresswoman Jackie Speier provided a statement to The Capitol Forum:  "TransDigm is being investigated by the Department of Defense Inspector General because it continually acquires sole suppliers of critical military parts, raises the price, and then shares down the DoD.  It is the height of folly to think things will be different this time around,"

159.    The report also quoted a staffer from the office of Representative Jackie Speier as saying "if there are real competition concerns here [regarding the acquisition of Esterline], which it looks like there are, there are other kinds of channels . . . to prevent gouging down the line."

160.    Indeed, just seven days later, on October 29, 2018, Representatives Jackie Speier and Walter Jones wrote to Secretary of Defense James Mattis expressing their indignation over the acquisition because "TransDigm has repeatedly purchased companies that are sole providers of Department of Defense (DoD items and engaged in price gouging" – and that

---

[14] Chaff and flares are aerial defense countermeasures for military aircraft used to avoid radar- and infrared-guided missiles.

"[u]nsurprisingly, Esterline is the sole DoD chaff provider and one of two flare suppliers."  The

"alarm bells should be ringing," the Representatives continued, because:

> For TransDigm, ***dirty tricks are a way of business***.  A 2006 DOD-IG report found that the company avoided procurement rules by claiming nonexistent commercial markets existed for its products and creating fake competition among its subsidiaries.  ***TransDigm continues its practice of creating multiple companies to sell products, which lie about their subsidiary status, to deceive procurement officers***.  After acquiring a company, one analysis found that TransDigm increased prices of items 9% more annually than the previous supplier had.

> ***TransDigm has shown no signs of changing***.  In fact, the company's CEO, when discussing the acquisition of Esterline, told investors that, "following the same TransDigm value creation drivers, there's juice here that we can go get."  Equally troublesome is that the Trump Administration has highlighted chaff and flares as items whose vulnerable supply chains raise national security concerns.  TransDigm controlling these markets will not make them safer.

> Additionally, TransDigm's acquisition of Esterline raises significant concerns related to competition, accountability, and national security.  The DOD-IG has an ongoing investigation into this company's established pattern of predatory behavior.  Allowing TransDigm to absorb Esterline during the inquiry would signal that the company's actions have no consequences.

## VII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

161.    Defendants made false and misleading statements and material omissions during

the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5

promulgated thereunder.  Throughout the Class Period, TransDigm's press releases, investor

presentations, and public filings made with the SEC included material misstatements and/or

omissions concerning the Company's growth and profitability, which were artificially inflated as

a result of Defendants' illicit business practices.

162.    In their statements, Defendants repeatedly emphasized TransDigm's consistent

business strategy and value-based pricing, which purportedly differentiated the Company from

its competitors and created intrinsic shareholder value.  Moreover, TransDigm consistently

reported margins that were <u>several times</u> higher than those of its peer aerospace component

manufacturers, resulting in outsized profits, and attributed these results to the Company's purportedly superior business strategy and operations.

163.    As detailed above, Defendants disguised TransDigm's exorbitant cost structure and identity from government officials through a variety of means, including by colluding with exclusive distributors to make noncompetitive government bids appear competitive, and instructing subsidiaries to unlawfully hide TransDigm's identity as a parent entity when submitting government bids.  TransDigm also instructed employees to submit false commercial market prices (the commercial list price instead of the reduced-commercial rebate price) to government officials in order to charge the Government an inflated price for products, while concealing the Company's true costs.  Defendants used numerous tactics to avoid giving cost information to the government, avoid audits, and stay below contract price thresholds that would have triggered greater scrutiny and would have prevented TransDigm from furthering its unsustainable, illicit business model.

164.    Defendants' material misstatements and omissions thus created in the market an unrealistically positive assessment of TransDigm's business, operational status, profitability, and future growth prospects as the Company was relying on improper and unlawful business practices to boost profitability.

A.    **Second Quarter 2016 Results**

165.    On May 10, 2016, the first day of the Class Period, TransDigm issued a press release announcing its financial results for the second quarter ended April 2, 2016 ("Q2 2016"), reporting substantial growth.  For Q2 2016, TransDigm generated net sales of $796.8 million, up 28.7% on a year-over-year basis, and net income of $138.6 million, up 25.0%.  Defendant

Howley attributed TransDigm's strong financial results to the Company's "constant focus on [its] value-based operating strategy."

166.    Also on May 10, 2016, TransDigm held an investor conference call to discuss its Q2 2016 financial results.  At the start of the call, Defendant Howley attributed the Company's financial results to its "unique in the industry" business model with "its consistency and its ability to sustain and create intrinsic shareholder value," as well as its "well-proven value-based operating strategy, based on our three value driver concept"—which were described in the Company's SEC filings as "obtaining profitable new business, improving our cost structure, and providing highly engineered value-added products to customers."  Defendant Paradie made similar statements during the call, attributing TransDigm's improved profit margins to "the strength of our proprietary products, [and] continually improving our cost structure."

167.    Moreover, Kevin M. Stein, TransDigm's COO, touted TransDigm's "keys to delivering shareholder value," including the Company's "planning processes, unique application of the TransDigm value drivers and our organizational focus on accretive acquisitions that meet our strategic vision."  Stein further emphasized the Company's acquisition model, stating that when the Company acquired a new business, it focused on "implementation of our value creation process and metrics, restructuring the company into our business unit focus groups, focusing the engineering and business development efforts on winnable and profitable new business and finally, we tighten up the cost structure."

168.    Defendants' statements identified above in ¶¶165-167 were materially false and misleading, and omitted material facts when made.  The Company's ostensible profitability and high margins were not the result of the TransDigm's "value-based operating strategy," but of Defendants' fraudulent price gouging scheme.  Specifically, TransDigm's financial results and

growth were dependent on a range of unlawful practices, including: (i) radically overcharging the Government through exorbitant price increases that Defendants knew were unsustainable; (ii) illicitly concealing that TransDigm was the parent company of its subsidiaries, in violation of regulations designed to assist the Government in detecting "waste, fraud, and abuse"; (iii) using a network of captive distributors that mimic the aesthetics of a competitive market and avoid cost scrutiny; (iv) falsifying commercial pricing information when requested by the Government; and (v) using a variety of Corporate-directed tactics to avoid additional Government audit or inquiry into pricing, including splitting up contracts to multiple distributors to avoid triggering TINA contract size thresholds that would have resulted in heightened scrutiny. *See* Section V.A-E. TransDigm's business strategy was therefore not "unique in the industry" and supportive of the Company's strong profit margins and financial results, but was rather artificially manufactured by Defendants' widespread unlawful conduct.

169.    On May 11, 2016, TransDigm filed its 2Q 2016 Form 10-Q with the SEC, reiterating the Company's financial results.  The 2Q 2016 Form 10-Q emphasized the Company's "net increase in gross profit of approximately $34 million" for the quarter, and attributed this growth in significant part to the Company's "core value-driven operating strateg[y]" of "obtaining profitable new business."

170.    The statements in ¶169 above were materially false and misleading, and omitted material facts when made.  In reality, the Company's increase in gross profit was almost entirely due to price increases that were only enabled by Defendants' fraudulent scheme, and TransDigm did not generate a material amount of "profitable new business."  Indeed, as revealed by Citron's in-depth analysis of TransDigm's price increases and their impact on the Company's financial results (published in Citron's January 20, 2017 report), TransDigm's organic profit growth (*i.e.*

67

growth other than by acquisition) relied almost entirely on exorbitant price increases obtained in large part through Defendants' fraudulent and unsustainable scheme to price-gouge the Government.  In fact, absent Defendants' fraud, TransDigm would suffer from negative 10% organic growth, confirming that price increases were the Company's only significant driver of organic profit growth, and that there was no evidence of profitable new business being generated. *See*, *e.g.*, ¶¶40, 134-36.

> **B.      2016 Analyst Day**

171.    On June 23, 2016, TransDigm held its 2016 Analyst Day in New York City. Defendant Howley again touted the Company's "consistent strategy," stating "we know how to create value…we know more about generating value than most people do in this industry." Howley stressed how TransDigm's "price" created value and that "we price to reflect the value we provide..."  Furthermore, throughout the 2016 Analyst Day presentation, Defendant Howley and other top TransDigm executives consistently emphasized "profitable new business" as the reason for TransDigm's growth.

172.    Defendants' statements identified above in ¶171 were materially false and misleading, and omitted material facts when made.  In reality, the "prices" that TransDigm set were exorbitant, unreasonable, and inflated through unlawful tactics that violated Government regulations concealed TransDigm's true product costs from Pentagon procurement officers.  In fact, TransDigm's financial results and growth were dependent on a range of methods, including: (i) radically overcharging the Government through exorbitant price increases that Defendants knew were unsustainable; (ii) illicitly concealing TransDigm as the parent company of its subsidiaries in violation of regulations designed to assist the Government in detecting "waste, fraud, and abuse"; (iii) using a network of captive distributors that mimicked the aesthetics of a

competitive market and avoided cost scrutiny; (iv) falsifying commercial pricing information when requested by the Government; and (iv) using a variety of Corporate-directed tactics to avoid additional Government audit or inquiry into pricing, including splitting up contracts to multiple distributors to avoid triggering TINA contract size thresholds that would have resulted in heightened scrutiny.  *See*, *e.g.*, Section V.A-E.

173.    Further, the Company's high profits were almost entirely due to its exorbitant price increases, and the Company did not generate a material amount of "profitable new business."  Indeed, as Citron later revealed, TransDigm's organic profit growth (i.e. growth other than by acquisition) relied almost entirely on exorbitant price increases obtained primarily through Defendants' fraudulent and unsustainable scheme to price-gouge the Government.  In fact, absent Defendants' fraud, TransDigm would suffer from negative 10% organic growth, confirming that price increases were the Company's only significant driver of organic profit growth, and that there was no evidence of profitable new business being generated.  *See*, *e.g.*, ¶¶40, 134-36.

### C.    Third Quarter 2016 Results

174.    On August 9, 2016, TransDigm issued a press release announcing its financial results for the third quarter ended July 2, 2016 ("3Q 2016").  For 3Q 2016, TransDigm reported net sales of $797.7 million, up 15.4%, and net income of $140.6 million, up 41.9%.  The press release attributed the increase in net income to sales growth and improvements to TransDigm's "operating margin resulting from the strength of [the Company's] proprietary products and continued productivity efforts."  Defendant Howley also stated that the Company's strong margins "reflect the strength of our proprietary products and our continued focus on intrinsic value creation."

69

175.    On the same day, TransDigm held an investor conference call to discuss its Q3 2016 financial results.  Defendant Howley again attributed the Company's financial success that quarter to a business model that is "unique in the industry, both in its consistency and its ability to sustain intrinsic shareholder value," and the Company's "simple well-proven value-based operating strategy."  Defendant Paradie emphasized that the Company's financial results were attributable to the "strength of our proprietary products and continuing improving our cost structure."

176.    Defendants' statements identified above in ¶¶174-75 were materially false and misleading, and omitted material facts when made.  In reality, TransDigm's strong financial results were _not_ attributable to "the strength of [its] proprietary products and continued productivity efforts," but to exorbitant and unreasonable price increases that were unlawfully disguised from Pentagon procurement officers and were dependent on a range of illicit practices. These practices included: (i) radically overcharging the Government through price increases that Defendants knew were unsustainable; (ii) illicitly concealing TransDigm as the parent company of its subsidiaries in violation of regulations designed to assist the Government in detecting "waste, fraud, and abuse"; (iii) using a network of captive distributors that mimicked the aesthetics of a competitive market and avoided cost scrutiny; (iv) falsifying commercial pricing information when requested by the Government; and (iv) using a variety of Corporate-directed tactics to avoid additional Government audit or inquiry into pricing, including splitting up contracts to multiple distributors to avoid triggering TINA contract size thresholds that would have resulted in heightened scrutiny.  _See_, _e.g._, Sections V.A-E.

177.    On August 10, 2016, TransDigm filed its 3Q 2016 Quarterly Report for the quarter ended July 2, 2016 on Form 10-Q with the SEC ("3Q 2016 10-Q").  The 3Q 2016 10-Q

stated that the Company's "gross profit increased by $84.0 million, or 23.4%, for the quarter ended July 2, 2016 compared to the comparable quarter last year," and attributed this growth in significant part to the Company's "core value-driven operating strateg[y]" of "obtaining profitable new business."

178.    The statements in ¶177 above were materially false and misleading, and omitted material facts when made.  In reality, the Company's increase in gross profit was not due to "profitable new business," but to excessive price increases that were only enabled by Defendants' fraudulent scheme.    Indeed, as revealed by Citron's in-depth analysis of TransDigm's price increases and their impact on the Company's financial results (published in Citron's January 20, 2017 report), TransDigm's organic profit growth (*i.e.* growth other than by acquisition) relied almost entirely on exorbitant price increases obtained through Defendants' fraudulent and unsustainable scheme to price-gouge the Government.    In fact, absent Defendants' fraud, TransDigm would suffer from <u>negative</u> 10% organic growth, confirming that price increases were the Company's only significant driver of organic profit growth, and that there was no evidence of profitable new business being generated.  *See*, *e.g.*, ¶¶40, 134-36.

## D.    Fourth Quarter and Full Year 2016 Results

179.    On November 14, 2016, TransDigm issued a press release announcing its financial results for the fourth quarter ("4Q 2016") and fiscal year ended September 30, 2016 ("FY 2016").  For 4Q 2016, TransDigm generated net sales of $875.2 million, up 8.1%, and net income of $154.7 million, up 9.2%.  For FY 2016, TransDigm generated net sales of $3.174 billion, up 17.2% on a year-over-year basis, and net income of $586.4 million, up 31.1%. The Company attributed the increase in net income to "<u>improvements to [its] operating margin</u>

resulting from the strength of [its] proprietary products, continued productivity efforts and favorable product mix."

180.    Also on November 14, 2016, TransDigm held an investor conference call to discuss its 4Q 2016 and FY 2016 financial results.  Defendant Howley again attributed TransDigm's performance to its "consistent strategy" of implementing a business model that is "unique in the industry, both in its consistency and its ability to sustain and create intrinsic shareholder value."

181.    Defendants' statements identified above in ¶¶179-80 were materially false and misleading, and omitted material facts when made.  Contrary to Defendants' representations, TransDigm's financial results were <u>not</u> the result of "the strength of [its] proprietary products, continued productivity efforts and favorable product mix," or of its "consistent strategy" of implementing a "unique" business model.  Rather, the source of these results was Defendants' fraudulent scheme to price-gouge the U.S. Government.  In reality, TransDigm's financial results and growth were dependent on a host of illicit practices, including: (i) radically overcharging the Government through exorbitant price increases that Defendants knew were unsustainable; (ii) illicitly concealing TransDigm as the parent company of its subsidiaries in violation of regulations designed to assist the Government in detecting "waste, fraud, and abuse"; (iii) using a network of captive distributors that mimicked the aesthetics of a competitive market and avoided cost scrutiny; (iv) falsifying commercial pricing information when requested by the Government; and (iv) using a variety of Corporate-directed tactics to avoid additional Government audit or inquiry into pricing, including splitting up contracts to multiple distributors to avoid triggering TINA contract size thresholds that would have resulted in heightened scrutiny.  *See, e.g.*, Sections V.A-E.

182.    On November 15, 2016, TransDigm filed its 2016 Annual Report on Form 10-K with SEC ("2016 10-K").  The 2016 10-K was signed by the Individual Defendants and reaffirmed the Company's fourth quarter and fiscal year 2016 financial results.  The 2016 10-K again emphasized the Company's "<u>value-driven operating strategy</u>," and stated that a key component of this strategy was that it priced its products "<u>fairly</u>" to reflect the "<u>value</u>" provided by the Company:

> *Providing Highly Engineered Value-Added Products to Customers*. We focus on the engineering, manufacturing and marketing of a broad range of highly engineered niche products that we believe provide value to our customers. We believe we have been consistently successful in communicating to our customers the value of our products. This has generally <u>enabled us to price our products to fairly reflect the value we provide and the resources required to do so</u>.

183.    The statements in ¶182 above were materially false and misleading, and omitted material facts when made.  Contrary to Defendants' representations, TransDigm's product pricing had no connection whatsoever to the "value" provided by the Company or the "resources required" (i.e. costs) to produce them, and thus was in no sense "fair."  Indeed, as detailed further herein, TransDigm's exorbitant pricing was enabled by a plethora of deceptive tactics designed to avoid disclosing any cost information to the Federal Government, in violation of Federal regulations.  *See*, *e.g.*, Section V.A-E.  Had TransDigm provided truthful, complete and honest cost information to the Government as required by Federal regulations, procurement officers would certainly have determined that TransDigm's prices did not meet the "fair and reasonable" standard set by regulations, and would have dramatically reduced the prices the Government paid TransDigm's subsidiaries for their components.

184.    The 2016 10-K also stated that "gross profit increased by $278.3 million, or 19.2%, for the fiscal year ended September 30, 2016 compared to the comparable period last

year," and attributed this growth in significant part to the Company's "core value-driven operating strateg[y]" of "obtaining profitable new business."

185.    The statements in ¶184 above were materially false and misleading, and omitted material facts when made.  In reality, the Company's increase in gross profit was almost entirely due to price increases that were only enabled by Defendants' fraudulent scheme, and TransDigm did not generate a material amount of "profitable new business."  Indeed, as revealed by Citron's in-depth analysis of TransDigm's price increases and their impact on the Company's financial results (published in Citron's January 20, 2017 report), TransDigm's organic profit growth (*i.e.* growth other than by acquisition) relied almost entirely on exorbitant price increases obtained in large part through Defendants' fraudulent and unsustainable scheme to price-gouge the Government.  In fact, absent Defendants' fraud, TransDigm would suffer from negative 10% organic growth, confirming that price increases were the Company's only significant driver of organic profit growth, and that there was no evidence of profitable new business being generated. *See*, *e.g.*, ¶¶40, 134-36.

### E.    Code of Business Conduct and Ethics, and Code of Ethics for Senior Financial Officers

186.    TransDigm's Code of Business Conduct and Ethics was described in the Company's 2016 10-K and posted and published on TransDigm's website.[15]  The Code of Business Conduct and Ethics featured TransDigm's "longstanding policy" to "conduct its business lawfully and ethically."  Specifically, during the Class Period, the Code of Conduct emphasized "the Company's policy to comply with all applicable local, national and international laws, rules and regulations…"

---

[15] *See* https://www.transdigm.com/investor-relations/corporate-governance/

187.    In addition to the Code of Business Conduct and Ethics, TransDigm's Code of Ethics for Senior Financial Officers was described in TransDigm's 2016 10-K and falsely stated that "[s]enior financial officers shall act with honesty and integrity."[16]  The Code of Ethics further stated that "Senior financial officers shall endeavor to comply with all laws, rules and regulations of federal, state, and local governments, and all applicable private or public regulatory agencies."

188.    Defendants' statements in ¶¶186-87 above were materially false and misleading, and omitted material facts when made.  First, the Individual Defendants did not act "with honesty and integrity" in TransDigm's dealings with the Government, but instead facilitated a deceptive and fraudulent price gouging scheme, which was dependent on a host of unlawful practices, as described above.  *See*, *e.g.*, Section V.A-E.  Second, TransDigm did not "comply with all laws, rules and regulations," but instead rampantly violated Government regulations through the practices described above.  Defendants' intentionally orchestrated that TransDigm fraud specifically to circumvent these rules and regulations, and ultimately to defraud the U.S. Government, taxpayers, and the Company's shareholders.

## VIII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

189.    As alleged above, numerous facts raise a strong inference that Defendants knew, or were severely reckless in disregarding, the true facts regarding TransDigm's widespread illicit practices.  Specifically, Defendants were well aware that TransDigm was artificially inflating its profitability by egregiously price gouging the U.S. Government, engaging in waste, abuse and fraud.  These facts include, in addition to the allegations set forth above, the following.

---

[16] The Code of Ethics for Senior Financial Officers is also posted on the Company's website: https://www.transdigm.com/investor-relations/corporate-governance/

190.    *Former employees confirm that TransDigm's senior executives had firsthand knowledge, and indeed directed the Company's illicit business practices.*  In 2010 Defendant Howley asked an employee "what if you raise the price twofold" on a product.  Thinking the question to be a joke and not a real question, the employee did not answer.  An enraged Howley responded to that employee that "you're god***n right it's a real f**king question."  Indeed, former employees confirm that Howley knew of TransDigm's price gouging because he was provided with the "gritty details of every sale [TransDigm] ever made" in quarterly Product Line Review meetings that he and Paradie attended. Howley was described as the driving force behind these meetings by former employees, and "very attuned" to the data presented. Former employees also confirmed that Defendants were directly involved in fraudulently concealing TransDigm's price gouging scheme.  Specifically, quarterly lunch presentations "that discussed how to avoid" hitting the $750,000 TINA threshold and "indoctrination" sessions run by TransDigm's General Counsel and Chief Compliance Officer, taught subsidiary leadership how to avoid Generment scrutiny, apply the commerciality exception to products that should not have been eligible for the exception; conceal the use of rebates when representing commercial price in order to avoid disclosing TransDigm's true product costs; and prevent DoD contracting officials from obtaining pricing and cost data at all costs.

191.    Further, accounts from former employees, the Citron reports, and the 2008 Audit confirm TransDigm's improper usage of distributors.  TransDigm used distributors to limit government transparency and access to data, and to create the false appearance of competitive bids when, in fact, the bidding process was rigged so that a TransDigm-affiliated exclusive distributor would undoubtedly prevail.  ¶¶86-103.  These and other practices were directly orchestrated by TransDigm's executive management and provide powerful evidence of scienter.

192.    *Prior to the Class Period, TransDigm and several of its subsidiaries and exclusive distributors were the subject of Government audits, which specifically concluded that the Company was engaging in practices that contravened Federal Acquisition Regulations.*  In 2006, TransDigm was audited by the DoD, which focused on TransDigm's "excessive prices and using the commercial item definition to avoid the Federal requirement to provide cost or pricing data."  ¶¶47-54.  The 2006 Audit highlighted myriad unlawful and illicit practices that TransDigm perpetrated to circumvent Federal regulations, including that TransDigm: (i) "refused to provide" information regarding price increases to Navy Price Fighters; (ii) "applies a commercial pricing strategy to its sole-source military-unique items <u>although no commercial market exists</u>," resulting in "overpriced spare parts and increase[d] burden placed on the DoD budget"; (iii) did not provide "cost breakdowns or cost data"; (iv) cited "limited accounting resources" as an excuse to explain its failure to provide cost information; and (v) considered an item "proprietary and commercial and will not provide any cost breakdown."  *Id.*

193.    Notably, the 2006 Audit concluded that DLA contracting officers "<u>were unable to effectively negotiate prices for spare parts procured from TransDigm subsidiaries</u>," that the DLA paid TransDigm millions of dollars more than the fair and reasonable price for <u>77 parts</u>, and that the DLA would continue to pay unfair prices if the problems were not addressed.  ¶54.  Defendants were thus indisputably on notice that TransDigm was violating Government regulations meant to ensure that the DoD paid fair and reasonable prices for the Company's products.

194.    Moreover, the 2008 Audit specifically highlighted TransDigm's abuse of exclusive distributors to mimic the aesthetics of a competitive bidding process—a prelude to the illicit practices in which Defendants engaged during the Class Period.  Specifically, the 2008

Audit found that Skurka Aerospace, Inc., a TransDigm subsidiary, and its exclusive distributor, Dutch Valley Supply, were using their exclusive agreement to engage in bid-rigging-like practices that created the illusion of competition, when in fact there was only one source of the relevant part and only one bidder (the TransDigm-affiliated distributor) could win. ¶¶55-61. The 2008 Audit noted that, with this type of exclusive distribution arrangement, "it is clear that competition will not be independent or fair, because Dutch Valley Supply, as the single-source distributor, inherently controls its 'competitors'' costs and delivery, which gives unfair insight and a decided advantage in winning awards over its 'competitors.'" ¶57. The report further concluded that the DoD "do[es] not believe the current exclusive distributor model is a viable procurement alternative for the DOD," and included the remarkable assessment that "[b]usiness practices such as these during a time of war clearly do not provide the best support to the warfighter." ¶¶55-61, 143. Thus, Defendants were well aware that TransDigm's business practices ran afoul of important Government regulations meant to protect DoD and taxpayer resources.

195. *Defendants intentionally concealed the fact that TransDigm was the parent company of twelve of its subsidiaries, in violation of indisputably clear Government regulations.* As set forth above, twelve different TransDigm subsidiaries—more than one-third of the Company's subsidiaries that were registered to sell products to the DoD—failed to disclose that TransDigm was the parent entity in violation of Federal regulations. ¶¶76-82. The Government made no secret that these regulations were in place so that the DoD could track spending across corporations and to enable procurement officers to accurately determine a fair and reasonable price for defense products. It is not plausible to believe that each of these subsidiaries would have inadvertently failed to disclose this critical information, particularly when the registration

process was written in layman's terms and was crystal clear on the importance of accurately and completely identifying a parent entity.  ¶¶76-82.  These omissions were the result of a deliberate and corporate-directed effort to conceal TransDigm's affiliation in order to avoid Government scrutiny and enable Company-wide fraud and abuse of DoD regulations and protocols. Defendants' subterfuge supports a strong inference of scienter.

196.    *The Congressionally-backed Government investigations of TransDigm concern Defendants' illicit and unlawful practices*.  At the end of the Class Period, Congressman Ro Khanna called for a formal investigation of TransDigm's business practices for "waste, fraud and abuse," noting that the Company operated as a "hidden monopol[y]" and urging the DoD to ensure that military funding does not benefit "a few individual financiers" at the expense "of our troops and weapons systems."  Congressman Tim Ryan, as well as Senator Elizabeth Warren, joined in these condemnations, citing TransDigm's "range of methods" and "variety of tactics" to evade Federal regulations and "avoid sharing cost information with the government for parts for which it is the sole source supplier."  Senator Warren highlighted that "TransDigm has unreasonably raised prices on many parts shortly after completing acquisitions of the companies that produce them."

197.    Following these urgent calls for investigations into the Company, the DoD OIG announced that it had commenced an audit of TransDigm, which is expected to take up to two years to complete.  In addition, the House and Senate Armed Services Committees requested for the U.S. GAO to conduct a separate investigation into "monopolistic practices" in spare parts procurement.   The Committees cited concerns that "is paying excessive prices for noncompetitive spare parts" and is "aware of allegations that some contractors who provide spare parts to the government may be disguising their cost structures from procurement officers,

in effect acting as 'hidden monopolists', decreasing competition and increasing prices to the government."

198.    Indeed, Congressional calls for investigation have only intensified in the wake of the Class Period.  After news of TransDigm's intended acquisition of Esterline became public, Representatives Jackie Speier and Walter Jones called on Secretary of Defense James Mattis to block the acquisition, noting that "alarm bells should be ringing" because "[f]or TransDigm, dirty tricks are a way of business."  The Representatives specifically noted that to Secretary of Defense James Mattis expressing their indignation over the acquisition because "TransDigm has repeatedly purchased companies that are sole providers of Department of Defense (DoD items and engaged in price gouging" – and that "[u]nsurprisingly, Esterline is the sole DoD chaff provider and one of two flare suppliers."  These Congressional rebukes and Government investigations into the heart of Defendants' unlawful practices provide strong support for scienter.

199.    *TransDigm's Government sales—and the outsized profit margins they provided— were of critical importance to the Company.*  TransDigm's single largest customer was the U.S. Government, and the Company's defense contracts represented approximately 30% of its revenues.  ¶30.  Accordingly, TransDigm's Government sales—and the outsized profit margins that they supplied—were the Company's core business and of critical importance to its financial success.  In fact, through Defendants' fraudulent scheme, TransDigm earned "gross margins of 54.5% selling airplane parts to our Government," while in contrast Boeing and Lockheed's gross margins were 13.6% and 10.91%.  Moreover, Defendants' fraudulent practices concealed the fact that TransDigm implemented obscene price increases on sole-source parts after acquiring their manufacturers—increases of up to 700%.  ¶35.  TransDigm mandated these price increases due

to the massive debt burden the Company incurred as the result of its acquisition binges.  The fact that Defendants' fraud concerned such a crucial aspect of TransDigm's business is further indicative of scienter.

200.  *Defendants' Insider Selling is Highly Indicative of Scienter.*  As set forth in § IV(F) above, during the Class Period, Defendant Howley and other senior TransDigm executives took full advantage of Defendants' fraud by selling massive amounts of TransDigm stock, under extremely suspicious circumstances, and at prices that were artificially-inflated by Defendants' false and misleading statements.

201.  Specifically, between June 8, 2016 and December 8, 2016, and while in possession of material, nonpublic information regarding TransDigm's business, TransDigm insiders—including Howley, the Company's Vice Chairman, its former CFO, and a number of Executive Vice Presidents—sold over 330,000 shares of the Company's common stock at materially inflated prices for proceeds of more than $87 million.  These TransDigm insiders sold a majority of their shares, with most selling at least 2/3 and some selling nearly 90% of their TransDigm common stock beneficially owned.  Defendant Howley alone sold over 144,000 shares of TransDigm stock at prices that were close to Class Period highs, reaping proceeds of more than $37 million, representing approximately 84% of his common stock that he beneficially owned.  Moreover, Defendant Howley made his sales outside of his 10b5-1 executive trading plan (unlike his previous sales in 2012 and 2013), evidencing his intent to liquidate large positions quickly and without restriction based on his possession of material adverse undisclosed facts about the Company.  ¶¶127-33.

202.  Defendants were thus motivated to perpetuate the fraudulent scheme alleged herein in order to benefit from the artificially inflated price of the Company's common stock

through insider sales that were highly suspicious.  These illicit insider sales further contribute to a strong inference of scienter.

203.  *Defendants' Compensation Structure Incentivized Fraud.*  As a result of TransDigm's compensation structure, Defendants and other Company executives had a direct incentive to manipulate TransDigm's profits to inflate the Company's share price and achieve compensation goals.  The Company's approach to compensation is that TransDigm is viewed as a private equity firm; thus, TransDigm's claimed philosophy is to "pay base salaries at a level less than similarly situated companies, preferring instead to compensate officers through performance-based equity."  Indeed, 100% of TransDigm executives' incentive compensation— and the vast majority of their total compensation—is performance-based, and the Company's measure of performance is heavily tied to EBITDA growth and acquisition performance.

204.  Thus, Defendants were incentivized to perpetrate the fraud and bolster the Company's profits.  In 2016, for instance, Howley received $18,650,700 in compensation with only $32,750 attributable to his salary, and the rest attributable to "performance."  In 2017, Howley received a whopping $61,023,102 in compensation, again with nearly all of it being "performance"-based.  A February 6, 2018 *Bloomberg* article noted that Howley surprisingly received such high compensation when shares of TransDigm merely "returned 4.7 percent in the fiscal year ended Sept. 30, including reinvested dividends, trailing the 19 percent gain for the S&P 500 Index."  Howley ranks in the top 10 of S&P CEOs with the highest take-home pay.[17]  Further, as shown, in the chart below, Howley has received approximately $278 million over five years, by far the most among his peers during this time period:

---

[17] https://www.bloomberg.com/graphics/2017-ceos-take-home-pay/



205. *The manner in which Defendants' illicit scheme came to light supports scienter.* TransDigm did not voluntarily disclose Defendants' fraudulent scheme. It instead has been revealed through public and Congressional scrutiny of the Company's unlawful practices. *See e.g.* ¶¶134-46. Even after the publication of the Citron Reports exposing Defendants' unlawful practices, Congressional rebukes of "waste, fraud and abuse," and the commencement of the DoD audit and the GAO investigation, Defendants still did not admit to the scheme. When pressed to provide additional details regarding these probes, Defendant Howley instead demurred, stating: "I will not comment further on this unless we decide public disclosure is appropriate." ¶150.

## IX. LOSS CAUSATION

206. During the Class Period, shares of TransDigm's publicly traded common stock traded on the NYSE. The market for shares of TransDigm's common stock was open, well-developed and efficient at all relevant times.

207. Throughout the Class Period, the price of TransDigm common stock was artificially inflated as a result of Defendants' materially false and misleading statements and

omissions identified above.  Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of TransDigm common stock, by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of TransDigm common stock fell precipitously as the prior artificial inflation dissipated.  As a result of their purchases of TransDigm common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

208.    By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of TransDigm's business.  Defendants' false and misleading statements had the intended effect and caused TransDigm common stock to trade at artificially inflated levels throughout the Class Period, with TransDigm common stock reaching as high as $293.19 per share on October 4, 2016.  On January 19, 2017, the last trading day before Defendants' fraud began to be revealed, TransDigm common stock traded at $251.76 per share, the last closing price prior to Citron's first report.  From its Class Period closing high of $291.81 per share on September 7, 2016 to its closing price of $214.85 per share on March 22, 2017, TransDigm's stock price dropped $76.96 per share, or 26.4%, wiping out roughly $4 billion in market capitalization.

209.    On January 20, 2017, Citron published an investigative report, exposing Defendants' illicit price gouging scheme.  The report revealed that the Company used multiple shell distributors that had no pricing power to avoid detection by making Government bids seems competitive.  Citron emphasized that the "easiest way for the Government to encourage competitive bidding would be to audit the bidding process."  In response to the January 20, 2017

Citron report, the price of TransDigm's common stock precipitously declined by 9.87% on unusually high trading volume, closing at $226.90 per share from a prior-day close of $251.76, representing a $24.86-per share decline, and wiping out over $1.3 billion in market capitalization in a single trading day.

210.　On March 9, 2017, Citron published a report exposing that TransDigm subsidiaries had failed to disclose that they were owned by TransDigm when bidding for Government contracts, in violation of numerous laws and regulations.  This report was based on an investigation that exposed that twelve TransDigm subsidiaries submitted incorrect ownership information that is required to be updated yearly as part of the Government's bidding qualification process.  The report found that "TransDigm has intentionally used illegal tactics to inflate margins while avoiding price scrutiny from the U.S. Government."  In reaction to Citron's March 9, 2017 report, TransDigm's stock dropped $10.26 per share, or 4.25%, from a close of $241.63 per share on March 9, 2017 to a close of $231.37 per share on March 10, 2017, wiping out over $542 million in market capitalization.

211.　On March 21, 2017, Congressman Ro Khanna sent a letter to the U.S. Department of Defense's Inspector General asking for an investigation into TransDigm's business practices. Specifically, the letter revealed to investors TransDigm's range of methods to evade Federal regulations that "protect the taxpayer against sole source contractors like TransDigm."  Rep. Khanna noted TransDigm's "hidden monopol[y]" and urged the DoD to ensure that military funding does not benefit "a few individual financiers" at the expense "of our troops and weapons systems."  In response to Rep. Khanna's letter, TransDigm shares dropped another $23.09 per share, or 9.7%, over a two-day period, from $237.94 on March 20 to $214.85 on March 22, 2017—wiping out an additional $1.22 billion in market capitalization.

212.    The drastic and continuing decline in TransDigm's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the Company's share price negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## X.    PRESUMPTION OF RELIANCE

213.    At all relevant times, the market for TransDigm's common stock was efficient for the following reasons, among others:

      a.    TransDigm's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

      b.    As a regulated issuer, TransDigm filed periodic reports with the SEC and the New York Stock Exchange;

      c.    TransDigm regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      d.    TransDigm was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

214.    As a result of the foregoing, the market for TransDigm's common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of TransDigm's common stock.  All purchasers of the Company's common stock during the Class Period suffered similar injury

through their purchase of TransDigm stock at artificially inflated prices, and a presumption of reliance applies.

215.     A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding TransDigm's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

216.     The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about TransDigm's present business and operations, its present financial condition, and its internal controls, among others.

217.     To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants'

statements regarding TransDigm's sales practices and compliance with Government regulations, among others.   Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by TransDigm were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

218.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of TransDigm who knew that the statement was false when made.

## XII.   CLASS ACTION ALLEGATIONS

219.   Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased, or otherwise acquired, the common stock of TransDigm between May 10, 2016 and March 21, 2017, inclusive (the "Class"), and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of TransDigm at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

220.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, TransDigm shares were actively traded on the New York Stock Exchange.   As of January 30, 2017, there were over 52.84 million shares of TransDigm common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead

Plaintiff believes that there are at least hundreds-of-thousands of members of the proposed Class. Class members who purchased shares of TransDigm common stock may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

221.    Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

222.    Lead Plaintiff will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

223.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

    a.    whether the federal securities laws were violated by Defendants' acts, as
          alleged herein;

    b.    whether the Defendants made statements to the investing public during the
          Class Period that were false, misleading or omitted material facts;

    c.    whether Defendants acted with scienter; and

    d.    the proper way to measure damages.

224.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act,
and SEC Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

225.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

226.    This Count is asserted on behalf of all members of the Class against Defendants TransDigm, Howley, and Paradie for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

227.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

228.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and other investors similarly situated in connection with their purchases of TransDigm common stock during the Class Period.

229.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the

other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of TransDigm common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the other members of the Class, regarding, among other things, TransDigm's business and operations; (b) artificially inflate and maintain the market price of TransDigm common stock; and (c) cause Lead Plaintiff and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

230.    Defendants TransDigm, Howley, and Paradie are liable for all materially false and misleading statements made during the Class Period, as alleged above.

231.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of TransDigm common stock, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

232.    Lead Plaintiff and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for TransDigm common stock, which inflation was removed from its price when the true facts became known.  Lead Plaintiff and the other members of the Class would not have purchased TransDigm common stock at the prices they paid, or at all, if they had been aware that the

market price had been artificially and falsely inflated by these Defendants' misleading statements.

233.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of TransDigm common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) Of The Exchange Act
### (Against Defendants Howley and Paradie)

234.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

235.    This Count is asserted on behalf of all members of the Class against Defendants Howley and Paradie for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

236.    During their tenures as officers and/or directors of TransDigm, each of these Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of TransDigm, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by TransDigm during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

237.    In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Howley and Paradie had direct involvement in the day-to-day

operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.   Defendants Howley and Paradie signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by TransDigm during the Class Period.   Defendants Howley and Paradie were also directly involved in providing false information, and Defendants Howley and Paradie certified and approved the false statements disseminated by TransDigm during the Class Period.   As a result of the foregoing, Defendants Howley and Paradie, together and individually, were controlling persons of TransDigm within the meaning of Section 20(a) of the Exchange Act.

238.    As set forth above, TransDigm violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

239.    By virtue of their positions as controlling persons of TransDigm, and as a result of their own aforementioned conduct, Defendants Howley and Paradie are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff, and the other members of the Class, who purchased or otherwise acquired shares of TransDigm common stock.   As detailed above during the respective times these Defendants served as officers and/or directors of TransDigm, each of these Defendants was culpable for the material misstatements and omissions made by the Company.

240.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or other acquisition of TransDigm common stock.

## XIV.  PRAYER FOR RELIEF

241.    WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a.   Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.   Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiff and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c.   Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.   Such other and further relief as the Court may deem just and proper.

## XV.   **JURY DEMAND**

242.   Lead Plaintiff hereby demands a trial by jury.

Dated:  December 21, 2018                    Respectfully Submitted,

*/s/ Scott D. Simpkins*
Scott D. Simpkins (0066775)
**CLIMACO WILCOX PECA &**
**GAROFOLI CO., LPA**
55 Public Square, Suite 1950
Cleveland, Ohio 44113
Telephone: (216) 621-8484
Facsimile: (216) 771-1632
sdsimp@climacolaw.com

*Local Counsel for Lead Plaintiff*

**SAXENA WHITE P.A.**
Maya Saxena (*pro hac vice*)
Joseph E. White, III (*pro hac vice*)
Lester R. Hooker (*pro hac vice*)
Brandon T. Grzandziel (*pro hac vice*)
Dianne M. Anderson (*pro hac vice*)
150 East Palmetto Park Road
Suite 600
Boca Raton, Florida 33432
Telephone: (561) 394-3399
Facsimile:  (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

brandon@saxenawhite.com
danderson@saxenawhite.com

-and-

Steven B. Singer (*pro hac vice*)
Joshua H. Saltzman  (*pro hac vice*)
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile:  (888) 631-3611
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com

***Lead Counsel for Lead Plaintiff***

**KLAUSNER KAUFMAN JENSEN & LEVINSON**
Robert D. Klausner
(*pro hac vice* forthcoming)
7080 Northwest 4th Street
Plantation, Florida 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com

***Additional Counsel for Lead Plaintiff***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on December 21, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users.

*/s/  Scott D. Simpkins*
Scott D. Simpkins (0066775)