# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **In re TransDigm Group, Inc.**<br>**Securities Litigation** | **Master File No. 1:17cv1677** |
| | **JUDGE PAMELA A. BARKER** |
| **This Document Relates To:**<br>**ALL ACTIONS** | **MEMORANDUM OPINION AND**<br>**ORDER** |

Currently pending is Defendants TransDigm Group, Inc., W. Nicholas Howley, and Terrance Paradie's Motion to Dismiss for Failure to State a Claim. (Doc. No. 70.) Lead Plaintiff filed a Brief in Opposition, to which Defendants replied. (Doc. Nos. 79, 82.) For the following reasons, Defendants' Motion to Dismiss is GRANTED.

## I.    Procedural Background

On August 10, 2017, Plaintiff City of Hollywood Firefighters' Pension Fund filed a Complaint against Defendants TransDigm Group, Inc., W. Nicholas Howley and Terrance Paradie, on behalf of all persons who purchased the securities of TransDigm Group, Inc. between May 10, 2016 and January 19, 2017. *See City of Hollywood Firefighters' Pension Fund v. TransDigm Group*, Inc, et al., Case No. 17 CV 1677 (N.D. Ohio). Shortly thereafter, on September 18, 2017, a second action was filed by the City of Warren Police and Fire Retirement System on behalf of all persons who purchased TransDigm's securities between May 10, 2016 and March 21, 2017. *See City of Warren Police and Fire Retirement System v. TransDigm Group, Inc., et al*. Case No. 17cv1958 (N.D. Ohio).

TransDigm is a global designer, producer, and supplier of highly engineered components for use on commercial and military aircraft. The Plaintiffs' Complaints alleged that, during the class

periods, TransDigm issued materially false and misleading statements and/or failed to disclose material adverse facts regarding its operations, business, and prospects. Specifically, Plaintiffs alleged that TransDigm failed to disclose that it used (1) shell distributors that it controlled to make noncompetitive government bids seem competitive, (2) monopolistic tactics to hike the prices of its proprietary products, and (3) a variety of tactics to evade government oversight of its cost structure and avoid government scrutiny. As a consequence, Plaintiffs asserted that TransDigm's growth and profitability during the class period were artificially inflated and that TransDigm shares traded at artificially inflated prices during the class period. Both actions alleged that Defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5 during the Class Periods.

In October 2017, Plaintiffs each filed Motions for Consolidation and for Appointment as Lead Plaintiff. (Doc. Nos. 17, 18.) On December 5, 2017, then-assigned District Judge Donald Nugent issued a Memorandum Opinion & Order in which he (1) granted the parties' Motions for Consolidation; (2) appointed Plaintiff Hollywood Firefighters as Lead Plaintiff; and (3) approved Hollywood Firefighters' selection of Saxena White P.A. as Lead Counsel for the Class and Climaco Wilcox Peca & Garofoli Co., L.P.A. as Local Counsel.[1] (Doc. No. 33.)

Lead Plaintiff filed a Consolidated Amended Complaint on February 16, 2018. (Doc. No. 40.) Defendants thereafter filed a Motion to Dismiss for Failure to State a Claim on May 7, 2018 (Doc. No. 48), which Lead Plaintiff opposed (Doc. No. 51). Judge Nugent conducted a status

---

[1] District 9, I.A. of M. & A.W. Pension Trust (hereinafter "Pension Trust") subsequently filed a motion for order certifying an interlocutory appeal with regard to the appointment of Hollywood Firefighters as Lead Plaintiff. (Doc. No. 35.) Judge Nugent denied the motion on January 30, 2018. (Doc. No. 38.) Pension Trust thereafter filed a Petition for Writ of Mandamus with the Sixth Circuit Court of Appeals, which was denied on April 9, 2018. (Doc. No. 46.)

conference on August 29, 2018, during which the parties presented oral arguments on the pending Motion. (Doc. No. 55.)

Judge Nugent then referred the Motion to Magistrate Judge William Baughman for a Report and Recommendation. (Doc. No. 56.) On October 18, 2018, Judge Baughman issued an Order in which he "strongly encouraged" counsel to discuss the possibility of amending the Complaint. (Doc. No. 57.) On October 26, 2018, Judge Baughman issued a Report & Recommendation, noting that the parties have "met, conferred, and now jointly stipulate to a schedule by which plaintiffs may file a second amended complaint, followed by an answer or other response by defendants, and then a subsequent reply by the plaintiffs." (Doc. No. 59.) Judge Baughman recommended that the Court adopt the parties' proposed schedule, and Judge Nugent agreed. (Doc. Nos. 59, 62.)

A Second Amended Complaint was filed on December 21, 2018. (Doc. No. 63.) On March 1, 2019, the parties jointly moved the Court for leave to allow Lead Plaintiff to file a Third Amended Complaint. (Doc. No. 66.) The basis of this Motion was the fact that, on February 25, 2019, the Department of Defense, Office of Inspector General ("DoD-OIG") released a report regarding TransDigm's pricing and cost practices on parts purchased by the Defense Logistics Agency and the Army. (*Id*.) Judge Nugent granted the parties' Joint Motion. (Doc. No. 67.)

The Third Amended Complaint (which is now the operative Complaint in this matter) was filed on March 29, 2019 against TransDigm, W. Nicholas Howley, and Terrance Paradie. (Doc. No. 68.) Therein, Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, on behalf of all investors who purchased or otherwise acquired TransDigm common stock between May 10, 2016 and March 21, 2017. (*Id*. at ¶ 2.)

Defendants filed a Motion to Dismiss for Failure to State a Claim on May 13, 2019. (Doc. No. 70.) Plaintiff filed a Brief in Opposition on June 27, 2019, to which Defendants responded on August 19, 2019. (Doc. Nos. 79, 82.) On December 20, 2019, Defendants filed a Notice of Supplemental Authority, to which Plaintiff filed a response. (Doc. Nos. 84, 85.) Defendants also moved for oral argument, which motion was denied. (Doc. No. 83; Non-Document Order dated August 28, 2019.)

On July 5, 2019, this matter was transferred to the undersigned pursuant to General Order 2019-13.

## II. Factual Allegations[2]

### A. TransDigm's Alleged Business Practices

Established in 1993, TransDigm designs, produces, and supplies commercial and military aerospace components worldwide. (Doc. No. 68 at ¶¶ 3, 31.) Defendant Howley is the co-founder of TransDigm and was its President and Chief Executive Officer ("CEO") from its inception until April 30, 2018, when he was named Executive Chairman. (*Id.* at ¶ 26.) Howley was also the

---

[2] Defendants ask the Court to take judicial notice of numerous Exhibits attached to their Motion to Dismiss, including the following documents: (1) full copies of audit reports completed by the DoD-OIG in 2006, 2008, and 2019; (2) certain of TransDigm's SEC filings; and (3) certain articles published by Citron Research and The Capital Forum. Plaintiff does not object to the Court's consideration of any of these documents in the context of resolving Defendant's Motion. In ruling on a Rule 12(b)(6) motion, a court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. National Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). *See also Brent v. Wayne County Dep't of Human Services*, 901 F.3d 656, 694 (6th Cir. 2018) (same). Here, Plaintiff expressly references and discusses the documents noted above in the Third Amended Complaint. Moreover, Plaintiff does not dispute that these documents are central to its claims. Accordingly, and in the absence of any opposition on the issue, the Court will consider the Exhibits attached to the Defendants' Motion to Dismiss. However, consistent with precedent within this Circuit, the Court will not consider the content any of the Exhibits attached to Defendants' Motion to Dismiss for the truth of the matters asserted therein or to decide any facts in dispute. *See, e.g., In re Cardinal Health Inc. Securities Litigation*, 426 F.Supp.2d 688, 714 (S.D. Ohio 2006); *In re First Energy Corp. Securities Litigation*, 316 F. Supp. 2d 581, 592 (N.D. Ohio 2004). *See also In re Omnicare, Inc. Securities Litigation*, 769 F.3d 455, 467 (6th Cir. 2014).

Chairman of TransDigm's Board of Directors beginning in July 2003. (*Id*.) Defendant Paradie was TransDigm's Chief Financial Officer ("CFO") and Executive Vice President from April 2, 2015 until January 2, 2018, when he left the company for personal reasons. (*Id*. at ¶ 28.) According to Plaintiff, TransDigm has annual sales in excess of $3 billion. (*Id*. at ¶ 3.) Its securities are traded on the New York Stock Exchange. (*Id*. at ¶¶ 13, 148, 151, 157.)

TransDigm is a holding company that is "focused on acquiring companies that make high-margin, but relatively low-priced proprietary aerospace products with significant aftermarket sales." (*Id*. at ¶ 32.) Specifically, TransDigm identifies and acquires companies that manufacture smaller component parts of aircraft at low price points, including companies that make parts for older aircraft. (*Id*. at ¶ 33.) According to Plaintiff, "these companies are more likely to be sole-source providers because there is reduced competition in that space, as airplanes are on the downward slope of their existing life and initial startup manufacturing costs are high." (*Id*.) Immediately after acquiring these companies, TransDigm slashes costs, lays off workers, and "exponentially" increases the component's price. (*Id*. at ¶¶ 5, 34.) Because it was often in a position where it was the only manufacturer for a part, TransDigm allegedly took advantage of its position by charging prices that resulted in gross margins of as much as 80 to 95%. (*Id*. at ¶ 36.) According to interviews with confidential witnesses (including "multiple senior employees" of TransDigm), Defendant Howley "not only had knowledge of TransDigm's price increases but was also directly involved in ordering the increases." (*Id*. at ¶ 38.)

The United States Government is TransDigm's largest customer. (*Id*. at ¶ 31.) In fiscal year 2016, approximately 30% of all of TransDigm's sales were in the defense market, a significant portion of which were made directly to the federal government and also indirectly through defense

original equipment manufacturers ("OEMs"), who incorporate TransDigm's products into aircraft and aircraft components contracted for and purchased by the federal government. (*Id*.) Confidential witnesses interviewed by Plaintiff's counsel indicated that TransDigm charged the Government prices that were "far higher" than its commercial prices.[3] (*Id*. at ¶ 40.)

According to Plaintiff, TransDigm trained employees of its subsidiaries to "use any tactic available to maximize the price charged to the Government and avoid Government scrutiny of TransDigm's prices at all costs." (*Id*. at ¶ 64.) One of these tactics was to avoid providing cost information to Government procurement officers "by any means possible," including by avoiding bids above the Truth in Negotiations Act (or so-called "TINA") threshold of $750,000. (*Id*. at ¶ 68.) On contract bids above this monetary threshold, offerors are required to submit "certified cost or pricing data" that the contractor has certified is "accurate, complete, and current." (*Id*. at ¶ 66.) In order to avoid having to provide such "certified cost or pricing data," TransDigm trained employees of its subsidiaries to use several strategies to "steer the deal to a value that was below the TINA threshold," including breaking up large contracts and avoiding signing multi-year or long-term agreements. (*Id*. at ¶¶ 69-75.)

In addition, TransDigm pressured employees to provide Government procurement officers with falsified "commercial" pricing information. (*Id*. at ¶ 77.) Plaintiff alleges that federal acquisition regulations provide for a "commerciality" exception that exempts federal contractors from having to provide detailed cost information where the commercial marketplace has set a "fair and

---

[3] For example, Plaintiffs allege as follows: "CW 1, a former Aftermarket Sales Manager of TransDigm subsidiary AdelWiggins, recalled that the subsidiary charged the Government a price that was 14 times more than the price it charged Boeing for the same component. Specifically, CW 1 recalled a valve that was made for a 737 aircraft. AdelWiggins sold the part to Boeing for $850 each, but when the Government asked for the part in the aftermarket, AdelWiggins would charge them an astonishing $12,500 for the exact same item." (*Id*. at ¶ 40.)

reasonable" price for the item. (*Id*.) To take advantage of this exception, contractors are required to provide adequate commercial sales data to demonstrate a market price, including any related discounts, refunds, offsets, or other adjustments. (*Id*. at ¶ 80.) In invoking this exception, however, TransDigm failed to disclose large rebates that it provided to its commercial customers, "thus dramatically inflating its true commercial sales price." (*Id*.) TransDigm also trained employees to "deny and obstruct" any Government request for cost or pricing information and, if audited, to obscure TransDigm's costs basis. (*Id*. at ¶ 87.)

Another tactic allegedly used by TransDigm to "price gouge" the federal government was to order several of its subsidiaries to conceal the fact that TransDigm was their parent company. (*Id*. at ¶ 92.) Plaintiff alleges that federal regulations require certain government contractors to disclose whether they are owned by another entity, and to identify the parent entity by legal name and code number. (*Id*. at ¶ 93.) The purposes of these requirements are to provide greater transparency and "track the Government's total spending across a specific company and obtain more insight into supply chain traceability." (*Id*. at ¶¶ 94, 95.) TransDigm, however, deliberately hid its identity as the parent company of at least twelve subsidiaries that sold products to the federal government, thereby preventing the government from "linking price increases across a range of seemingly separate companies to one single entity (TransDigm)." (*Id*. at ¶ 96.) TransDigm's failure to disclose its parent status also created the false impression that bids from two separate TransDigm subsidiaries were independent and competitive with another.[4] (*Id*. at ¶ 101.)

_____

[4] Specifically, Plaintiff alleges that The Capitol Forum (which provides investigative reporting, independent research, and expert opinion by industry insiders and Government officials on how policy affects market competition) obtained information pursuant to a public records request that showed that "at a minimum, two out-of-compliance TransDigm subsidiaries were bidding against each other and were not registered as TransDigm subsidiaries." (*Id*. at ¶ 101.)

TransDigm also allegedly used its network of exclusive distributors to make bids appear competitive when they were not. (*Id*. at ¶ 105.) Plaintiff describes this allegedly fraudulent tactic as follows:

> 108. When a vendor like TransDigm is a monopoly supplier, that supplier is required to turn over its cost information about the product to the Government, or allow the Government to conduct a thorough review to determine the likely cost of the product. However, by setting up a network of captive distributors to mimic the aesthetics of a competitive market, TransDigm was able to evade these rules and regulations, and hide the true cost of its products.
>
> 109. Rather than bid directly for a Government contract, TransDigm would essentially bid through a captive distributor. TransDigm would sell its product to the distributor, and that distributor would then bid on the contract. On its face, the bid would appear "competitive," because other companies looking to submit a bid could purchase the product directly from the distributor that had the exclusive rights to the TransDigm part. However, in reality, the bid would not be competitive, because the TransDigm distributor would always have the lowest price to offer. That was because the distributor acquired the part directly from TransDigm, and the distributor would obviously charge the competitors a higher price for the product than the distributor had itself paid for it. Thus, when the distributor bid on the contract, its bid would invariably be lower than any competitors' bid.

(*Id*. at ¶¶ 108, 109.) In many cases TransDigm had "*de facto* control" over these distributors, making them little more than "shell middlemen" used for the sole purpose of inflating prices and creating the illusion of competition. (*Id*. at ¶ 116.)

## B.      2006 and 2008 DoD-OIG Audits

TransDigm's excessive prices did not go unnoticed. On February 23, 2006, the Department of Defense Office of the Inspector General ("DoD-OIG") issued an audit report entitled: "Acquisition: Spare Parts Procurements from TransDigm (D-2006-055)" (hereinafter "the 2006 DoD-OIG Audit"). (Doc. No. 68 at ¶ 124; Doc. No. 70-22.) This Audit was initiated in response to a Defense Hotline allegation that TransDigm subsidiary AeroControlex was charging the Defense Logistics Agency ("DLA") "excessive prices and using the commercial item definition [or

'commerciality exception'] to avoid the Federal requirement to provide cost or pricing data." (Doc.

No. 68 at ¶ 124; Doc. No. 70-22 at PageID# 2315.) The DoD-OIG explained that the "overall audit

objective was to evaluate whether prices charged by AeroControlex for spare parts were fair and

reasonable." (Doc. No. 70-22 at PageID# 2319.) To achieve this objective, the DoD-OIG expanded

its scope of review to AeroControlex's parent company, TransDigm, "and all its subsidiaries." (*Id.*)

> The Audit summarized its findings as follows:

> Given the constraints of a sole-source contracting environment, Defense Logistics
> Agency contracting officers were unable to effectively negotiate prices for spare parts
> procured from TransDigm subsidiaries. We recognize the difficulty contracting
> officers have had obtaining cost data since the inception of the Federal Acquisition
> Streamlining Act of 1994 and Federal Acquisition Reform Act of 1996; however, we
> believe that cost analysis is the most effective means to validate prices for sole-source
> spare parts. Using cost analysis, we calculated that the Defense Logistics Agency paid
> about $5.3 million . . . more than the fair and reasonable price for 77 parts . . . If
> problems are not addressed, the Defense Logistics Agency will pay about $31.8
> million more than fair and reasonable prices for the same items over the next 6 years.

(*Id.* at PageID#s 2315-2316.) Throughout the Audit, the DoD-OIG remarked upon TransDigm's

excessive prices and refusals to provide cost information. *See, e.g.* Doc. No. 70-22 at PageID# 2323

(noting that "TransDigm refused to provide" requested cost information regarding a coupling

assembly), 2327 (noting that TransDigm "would not provide" certain cost information when

requested to do so by contracting officials), 2332 (stating that TransDigm "routinely refused to

provide the requested data"). The DoD-OIG also remarked upon TransDigm's inappropriate use of

the "commerciality" exception, stating as follows:

> DLA contracting officers determined that prices for 22 of the 77 parts (28.6 percent)
> could not be found reasonable but purchased the items to ensure an adequate supply
> of needed spare parts was available for the war fighter. We calculated that DLA paid
> . . . about $1.9 million more than fair and reasonable prices for these items. TransDigm
> had significantly increased prices for its sole-source spare parts and would not provide
> 'information other than cost or pricing data' to include uncertified cost data when
> requested by contracting officials, despite the requisite authority provided in [Federal

Acquisition Regulation] 15.403-3.[5] TransDigm applies a commercial pricing strategy to its sole-source military-unique items although no commercial market exists to establish reasonable prices by the forces of supply and demand for the vast majority of items. This pricing strategy results in overpriced spare parts and increases the burden placed on the DoD budget.

(*Id*. at PageID# 2327.) Among other things, this Audit recommended that the DLA seek a voluntary refund from TransDigm of approximately $2.6 million for "overpriced parts for which contracting officers made a reasonable attempt to obtain cost data but were denied the information."[6] (*Id*. at PageID# 2328.)

Two years later, in February 2008, the DoD-OIG released an audit report (hereinafter "the 2008 DoD-OIG Audit") regarding Dutch Valley, an exclusive distributor[7] for a TransDigm subsidiary. (Doc. No. 68 at ¶ 131.) *See also* Doc. No. 70-16. Among other things, this Audit Report

---

[5] As discussed *infra*, the DoD-OIG has found that, while contracting officers are required to request cost data under certain circumstances, "there is no specific requirement in the [federal acquisition regulations] that requires or compels contractors to provide certified or uncertified cost data to the contracting officer when requested before the contract is awarded." (Doc. No. 70-7 at PageID# 1816.)

[6] The 2006 Audit also found fault with government contracting officers in certain respects. For example, the 2006 Audit Report explained: "The excessive prices were paid because the contracting officers relied on questionable price analysis of previous Government procurements . . . and made other questionable decisions to determine fair and reasonable prices. DLA contracting officers determined prices fair and reasonable for the 34 items based on the comparison of previous Government contract prices without establishing the validity of the comparison and the reasonableness of the previous prices. In addition, DLA contracting officers typically did not request information other than cost or pricing data and perform cost analysis to verify cost elements and establish the validity of the comparison." (Doc. No. 70-22 at PageID# 2322.) The Audit further noted that "the contracting officers relied on an incomplete technical analysis and inadequate commercial sales comparisons and made determinations based on unsupported judgments." (*Id*. at PageID# 2324.) In addition, on one occasion, the DLA inappropriately waived the submission of cost or pricing data for a long-term indefinite-quantity contract with an estimated total value of more than $10 million based solely on the price analysis of previous procurements. (*Id*. at PageID# 2325.)

[7] The audit report explains the term "exclusive distributor" as follows: "An exclusive distributor is a nonmanufacturer that has an agreement with parts manufacturers to be the sole representative for their Government sales. Distributors serve as 'middlemen' who perform all of the administrative tasks necessary to respond to and fill Government orders, including quoting, procuring, and receiving the item from the manufacturer and selling and shipping the item to the Government. Spare parts distributors normally do not stock items; instead ordering items from single-source manufacturers [such as TransDigm] when the Government need becomes known. Thus, the items ordered just 'pass through' the distributor on their way to DoD. The distributor model adds a duplicate layer of administration and shipments to the traditional procurement process." (Doc. No. 70-16 at PageID# 2202.)

concluded that Dutch Valley (1) accepted "excessive prices" from single-source manufacturers by not performing appropriate cost analysis or effectively negotiating prices; and (2) applied pass-through charges for "negligible or no added value." (Doc. No. 70-16 at PageID#s 2198, 2208.) The Audit Report found that DoD paid about $3 million (or 75%) more than fair and reasonable prices for 33 parts that cost about $6.9 million; and predicted that, if the problem was not addressed, DoD would pay about $17.8 million more than fair and reasonable prices for the same items over the next six years.[8] (*Id.* at PageID#s 2198-2199.)

In reaching its findings, the Auditors observed that government contracting officers sometimes relied on competitive bidding to determine that a contract price was fair and reasonable. (Doc. No. 70-16 at PageID#s 2221-2225.) However, the Report concluded that, with this type of exclusive distribution arrangement, "it is clear that competition will not be independent or fair, because Dutch Valley Supply, as a single-source distributor, inherently controls its 'competitors'' costs and delivery, which gives unfair insight and a decided advantage in winning awards over its 'competitors.'" (Doc. No. 68 at ¶ 133; Doc. No. 70-16 at PageID# 2221.) Moreover, the Report found that Dutch Valley did not effectively negotiate prices with single-source manufacturers, such as TransDigm, including failing to obtain cost data. (Doc. No. 70-16 at PageID# 2205.) The Report determined that Dutch Valley, in fact, accepted prices from single-source manufacturers that were

---

[8] As an example, the report highlighted a December 2004 contract for Blackhawk Helicopter Door handles. (Doc. No, 70-16 at PageID# 2215-2216.) In that case, Dutch Valley was the exclusive distributor (or "prime contractor") and a TransDigm subsidiary was the single source manufacturer. (*Id.*) The report found that DoD paid "excessive prices and profits, including pass-through charges for the 353 door handles that were urgently needed by the warfighter," and stated that "[t]his is another example of contractors abusing their single-source status by charging the Government unreasonable prices to make excessive profits." (*Id.* at PageID# 2216.) The report noted that this particular contract was addressed in the 2006 Audit Report and that TransDigm had been requested to submit a voluntary refund with respect to this item. (*Id.*) According to the 2008 Audit Report, TransDigm refused the request. (*Id.*) *See also* Doc. No. 68 at ¶ 135.

appreciably higher than fair and reasonable, and then applied additional pass-through charges for negligible or no value. (*Id.*)

Thus, the 2008 Audit Report concluded that "we do not see how the distributor model can add sufficient value or be an effective alternative procurement option for DoD." (Doc. No. 68 at ¶ 136.) The Audit Report noted that Dutch Valley claims "that it provides value to DoD through reduced costs, improved readiness, and increased competition." (Doc. No. 68 at ¶ 136; Doc. No. 70-16 at PageID# 2231.) However, the Audit Report concluded that it was "unable to validate any of Dutch Valley Supply's claims and determined that no or negligible added value was provided by the exclusive distributor." (*Id.*) Lastly, the Audit Report stated that "our experience has shown that the dealer competition policy is predominantly being used in an inappropriate way and unreasonable prices are being wrongly justified as fair and reasonable by contracting officers."[9] (Doc. No. 68 at ¶ 136; PageID#s 2223-2224.)

### C. TransDigm's Allegedly Misleading Statements, Press Releases, and 2016 SEC Filings

---

[9] Similar to the 2006 DoD-OIG Audit, the 2008 Audit Report concluded that government contracting officers failed in certain key respects. For example, the 2008 Audit found that "DLA contracting officers failed to correctly calculate the threshold for requiring cost or pricing data as required by FAR 15.403-4," as a result of which the DLA failed to require cost or pricing data for eight items procured on three contracts valued at about $3.5 million. (Doc. No. 70-16 at PageID# 2200.) Additionally, the 2008 Audit stated that the DLA "did not have the internal control procedures for procurement to determine the independence of offerors or dealers for noncompetitive items before relying on the offered prices to determine price reasonableness, to perform an effective cost or price analysis of the subcontractors price, or to ensure that waivers from cost or pricing data are appropriate and comply with legislative and DoD guidance." (*Id.*) This Audit also found that DoD contracting officers "primarily relied on ineffective tools such as price analysis, cost analysis of dealer costs, and dealer competition to support price reasonableness determinations," and noted that "in several instances, price reasonableness determinations were not made." (*Id.* at PageID#2205.) Moreover, as noted *supra*, while contracting officers are required to request cost data under certain circumstances, there is no specific requirement in the federal acquisition regulations that requires contractors to comply with such requests. *See* Doc. No. 70-7 at PageID# 1816.

In 2016, TransDigm issued press releases, investor presentations, and public filings with the SEC that variously attributed its strong financial results to its "value based operating strategy" and "highly engineered value-added products." (Doc. No. 68 at ¶ 194, 195.) Specifically, in May 2016, TransDigm issued a press release regarding its 2016 second quarter earnings in which Defendant Howley highlighted TransDigm's "constant focus on [its] value-based operating strategy." (*Id*. at ¶ 194.) Howley made similar comments during an investor conference call, including stating that the Company's financial results were due to its "unique in the industry" business model with "its consistency and its ability to sustain and create intrinsic shareholder value," as well as its "well-proven value-based operating strategy, based on our three value driver concept."[10] (*Id*. at ¶ 195.) In addition, then-Chief Operating Officer Kevin Stein represented that when the Company acquired a new business, it focused on "implementation of our value creation process and metrics, restructuring the company into our business unit focus groups, focusing the engineering and business development efforts on winnable and profitable new business and finally, we tighten up the cost structure." (*Id*. at ¶ 196.)

In its second quarter 2016 Form 10-Q filed with the SEC, TransDigm attributed its growth in significant part to the Company's "core value-driven operating strateg[y]" of "obtaining profitable new business" and "providing highly engineered value-added products to customers." (*Id*. at ¶ 198.) During an investor presentation shortly thereafter, in June 2016, Defendant Howley stated "we know how to create value…we know more about generating value than most people do in this industry." (*Id*. at ¶ 201.) Howley further represented that "we price to reflect the value we provide." (*Id*.)

---

[10] This "three value driver concept" is described in TransDigm's SEC filings as "obtaining profitable new business, improving our cost structure, and providing highly engineered value-added products to customers." (*Id*.)

Furthermore, throughout the presentation, Defendant Howley and other top TransDigm executives consistently emphasized "profitable new business" and "value-based pricing" as the reason for TransDigm's growth. (*Id*.)

TransDigm announced its third quarter 2016 results in August 2016, at which time it again made similar statements. On August 9, 2016, Defendant Howley stated that the Company's strong margins "reflect the strength of our proprietary products and our continued focus on intrinsic value creation." (*Id*. at ¶ 204.) He also continued to emphasize TransDigm's "well-proven value-based operating strategy." (*Id*. at ¶ 205.) Defendant Paradie represented that the Company's financial results were attributable to the "strength of our proprietary products and continuing improving our cost structure." (*Id*.) On August 10, 2016, TransDigm filed its third quarter 2016 Quarterly Report with the SEC. (*Id*. at ¶ 207.) This Report stated that the Company's growth was due in significant part to the Company's "core value-driven operating strateg[y]" of "obtaining profitable new business" and "providing highly engineered value-added products to customers." (*Id*.)

Similar statements were made in connection with TransDigm's fourth quarter and full year 2016 financial results. Specifically, on November 14, 2016, TransDigm issued a press release in which it attributed the increase in net income to "improvements to [its] operating margin resulting from the strength of [its] proprietary products, continued productivity efforts and favorable product mix." (*Id*. at ¶ 210.) During an investor conference call that day, Defendant Howley again stated that TransDigm's strong performance was due to its "consistent strategy" of implementing a business model that is "unique in the industry, both in its consistency and its ability to sustain and create intrinsic shareholder value." (*Id*.)

TransDigm's 2016 10-K (filed with the SEC on November 15, 2016) stated that the Company "compete[s] on the basis of engineering, manufacturing and marketing high quality products." (*Id.* at ¶ 214.) The 2016 10-K again emphasized the Company's "value-driven operating strategy," and stated that a key component of this strategy was that it priced its products "fairly" to reflect the "value" provided by the Company:

> *Providing Highly Engineered Value-Added Products to Customers.* We focus on the engineering, manufacturing and marketing of a broad range of highly engineered niche products that we believe provide value to our customers. We believe we have been consistently successful in communicating to our customers the value of our products. This has generally enabled us to price our products to fairly reflect the value we provide and the resources required to do so.

(*Id.*) In addition, TransDigm's 10-K described TransDigm's Code of Business Conduct and Ethics, which emphasized "the Company's policy to comply with all applicable local, national, and international laws, rules, and regulations." (*Id.* at ¶ 220.)

In this same 10-K, however, TransDigm warned investors that "we are subject to certain unique business risks as a result of supplying equipment and services to the U.S. Government," including the ability of the government to "audit our contract-related costs and fees, including allocated indirect costs." (Doc. No. 70-8 at PageID# 1926.) Of particular note, TransDigm explained:

> On contracts for which the price is based on cost, the U.S. Government may review our costs and performance, as well as our accounting and general business practices. Based on the results of such audits, the U.S. Government may adjust our contract-related costs and fees, including allocated indirect costs. *** Furthermore, even where the price is not based on cost, the U.S. Government may seek to review our costs to determine whether our pricing is 'fair and reasonable.' Our subsidiaries are periodically subject to a pricing review. Such a review could be costly and time consuming for our management and could distract from our ability to effectively manage the business. As a result of such review, we could be subject to providing a refund to the U.S. Government or we could be asked to enter into an arrangement whereby our prices would be based on cost or the DOD could seek to pursue alternative sources of supply for our parts. Any of those occurrences could lead to a reduction in our revenue form, or the profitability of certain of our supply

arrangements with, certain agencies and buying organizations of the U.S. Government.

(Doc. No. 70-8 at PageID# 1926.)

### D.    Citron Reports and Congressman Khanna Letter

Although TransDigm repeatedly emphasized its "value-based operating system" to investors, Plaintiff alleges that "the truth regarding TransDigm's fraudulent price gouging scheme" was actually revealed in early 2017. (Do. No. 68 at ¶ 145.) Specifically, on January 20, 2017, Citron Research issued a report entitled: "Could TransDigm be the Valeant of the Aerospace Industry?" *See* Doc. No. 70-3. Therein, Citron noted that President Trump "has already made lowering prices for military aircraft a pillar of his transition into office," and warned that TransDigm might be at risk in light of its history of "price gouging" the federal government. (Doc. No. 70-3.) Indeed, the report began by stating that "everyone in the aerospace industry knows that one company stands out when it comes to egregious price increases foisted on the government: TRANSDIGM." (*Id*. at PageID# 1748.) The report explained that "TransDigm acquires airplane parts companies (over 50 in total), fires employees, and egregiously raises prices" and asserted that "this business model has made them a dominant supplier of airplane parts to the aerospace industry while burdening its balance sheet with sky-high debt load." (*Id*.)

The report noted that TransDigm's single largest customer was the Department of Defense and stated that TransDigm "boasted gross margins of 54.5% selling airplane parts to our government." (*Id*. at PageID# 1749.) Citron also reviewed historical prices of over 50,000 aircraft parts and noted as much as a 736% price raise in certain parts after acquisition by TransDigm.[11] (*Id*.) It quoted from

---

[11] In reciting these figures, The Citron Report acknowledged The Capitol Forum "for assembling just a small snapshot of the impact of this game." (Doc. No. 70-3 at PageID# 1750.) This appears to be a reference to a January 17, 2017 article

the 2006 Audit Report and highlighted "some of the ways TransDigm thwarted [the government's] excessive cost audit." (*Id.* at PageID# 1753-1754.) Citron predicted a steep drop in TransDigm's share prices, stating as follows:

> The ugly underbelly of TransDigm's business is that aggressive year-over-year price increases are the only thing shielding TransDigm from revealing negative organic growth of close to -10%. Any combination of U.S. Government pressure and/or OEM's pressing on their own supply chains will expose their business to actual gross revenue contraction and a devastating cut in EPS, followed by multiple contraction.
>
> ***
>
> The easiest way for the government to encourage competitive bidding would be to audit the bidding process. They will find how TransDigm has been able to use the guise of multiple shell distributors, who have no pricing power, to make a bid seem competitive when in reality they are all shills for TransDigm -- this will be addressed in future reports. TransDigm has perfected the sole source model that understands government thresholds that avoid scrutiny- FOR NOW.

(*Id.* at PageID# 1751, 1755.) *See also* Doc. No. 68 at ¶ 147.

In response to the January 2017 Citron report, TransDigm's share price dropped $24.86 per share (or nearly 10%) from $251.76 per share on January 19, 2017 to $226.90 per share on January 20, 2017. (Doc. No. 68 at ¶ 148.) Plaintiff alleges that this "wipe[d] out $1.3 billion in market capitalization in one trading day." (*Id.*) Relying on publicly available stock prices,[12] Defendants

---

by The Capitol Forum entitled "TransDigm: Military Revenues at risk from promised Trump Administration crackdown on military contract costs; large commercial customers also ready to push back on price or expensive TransDigm parts." (Doc. No. 70-13.)

[12] Plaintiff does not object to the Court's consideration of TransDigm's historical stock prices. Federal courts have found that a district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment in a securities fraud case. *See, e.g., In re Keithley Instruments, Inc. Securities Litigation*, 268 F.Supp.2d 887, fn 6 (N.D. Ohio 2002); *Beaver County Retirement Bd. v. LCA-Vision, Inc.*, 2009 WL 806714 at * 5 (S.D. Ohio March 25, 2009). Thus, and in the absence of any opposition on this issue, the Court will consider TransDigm's historical stock prices, as set forth in Exhibit 2 to Defendants' Motion to Dismiss.

allege that TransDigm's stock price rebounded to $253.12 on February 10, 2017. (Doc. No. 70-1 at p. 3, citing Doc. No. 70-2.)

On March 9, 2017, Citron Research released another report about TransDigm entitled: "Citron Exposes More Undisclosed Relationships at TransDigm." (Doc. No. 68 at ¶ 149.) *See also* Doc. No. 70-5. Therein, Citron asserted that TransDigm was "exploiting and deceiving the Federal Government" by deliberately concealing its identity as the parent company of twelve of its subsidiaries. (*Id.*) Specifically, Citron reported as follows:

> First, we must give credit to The Capitol Forum;[13] in particular, their excellent work exposing the tactics TransDigm used to circumvent the fair bidding process of the US Government. As an answer to why twelve subsidiaries submitted incorrect ownership information that is required to be updated yearly, the company just tried to float the excuse that it was merely ...A CLERICAL ERROR.
>
> How stupid does TransDigm think you are?
>
> *** It does not take a professional gumshoe to understand that TransDigm is hiding its ownership of subsidiaries to artificially inflate gross margins while avoiding price scrutiny from the Federal Government.

(Doc. No. 70-5 at PageID# 1780.) *See also* Doc. No. 68 at ¶¶ 149-150. In reaction to Citron's March 9, 2017 report, TransDigm's stock dropped $10.26 per share (or 4.25%) from a close of $241.63 per share on March 9, 2017 to a close of $231.37 per share on March 10, 2017, wiping out over $542 million in market capitalization. (Doc. No. 68 at ¶ 151.) Defendants allege that TransDigm's stock quickly recovered, closing at $240.05 on March 17, 2017. (Doc. No. 70-1 at p. 3, citing Doc. No. 70-2.)

---

[13] This appears to be a reference to an article published by The Capitol Forum six days earlier, on March 3, 2017, entitled: "TransDigm: Twelve TransDigm Group Incorporated subsidiaries appear to have submitted incorrect ownership information in federal system for Award Management Database." (Doc. No. 70-10.)

Subsequently, on March 21, 2017, United States Congressman and member of the House Committee on Armed Services Ro Khanna issued a press release announcing that he had sent a letter to the DoD Acting Inspector General, requesting an investigation into TransDigm "for potential waste, fraud, and abuse in the defense industrial base." (Doc. No. 68 at ¶ 152.) *See also* Doc. No. 70-6. Congressman Khanna expressed concern about reports that suggested that "TransDigm has been operating as a hidden monopolist by (i) engaging in a series of unreasonable price increases of products for which it is the only supplier; (ii) disguising its cost structure and identity from Pentagon procurement officers; and (iii) unreasonably hiking prices to benefit shareholders and executives." (Doc. No. 70-6 at PageID# 1792.)

Congressman Khanna noted that "federal regulations protect the taxpayer against sole source contractors like TransDigm" but expressed the following concerns:

> TransDigm appears to use a range of methods to evade these protections. For example, according to reports, TransDigm avoids showing that it is a monopoly provider of parts by setting up a network of captive distributors that mimic the aesthetics of a competitive market. Despite the illusion of competition, distributors that provide TransDigm parts, for the most part, are buying from one TransDigm subsidiary, and that subsidiary sets its price to distributors. The procurement officer, however, sees multiple sellers of the product, without realizing that he or she is in fact buying from a monopoly. Thus, the officer does not know to ask for the cost structure. Even when competition among distributors is limited, the officer may simply ask the distributor for its cost information, rather than asking TransDigm for its cost information. In fact, your office identified exclusive distributors as problematic in a 2008 audit of Dutch Valley, which is a TransDigm distributor. You concluded in 2008: "We do not believe the current exclusive distributor model is a viable procurement alternative for the DOD."

(*Id*. at PageID# 1793.) *See also* Doc. No. 68 at ¶¶ 153-155. As a result of Congressman Khanna's letter, TransDigm's stock price dropped $23.09 per share over two trading days, from $237.94 on March 20, 2017 to $214.85 on March 22, 2017, on extremely high trading volume, wiping out approximately $1.22 billion in market capitalization. (Doc. No. 68 at ¶ 157.) Defendants allege that,

by April 11, 2017, its stock had rebounded to $236.48 per share.  (Doc. No. 70-1 at p. 3, citing Doc. No. 70-2.)

In April 2017, U.S. Congressman Tim Ryan sent a letter to the Acting DoD Inspector General requesting an investigation into TransDigm for "waste, fraud, and abuse in the defense industrial base."  (Doc. No. 68 at ¶ 158.)  Shortly thereafter, on May 19, 2017, United States Senator Elizabeth Warren also sent a letter to the Acting DoD Inspector General requesting an investigation into TransDigm.  (*Id.*)

### E.    2019 DoD-OIG Audit

In response to these requests, on June 27, 2017, the DoD-OIG announced that it would begin an audit of sales of parts by TransDigm and its subsidiaries to the Federal Government.  (Doc. No. 68 at ¶ 159.)  This Audit was not completed until nearly two years later, when the DoD-OIG released its report on February 25, 2019.[14]  *See* Doc. No. 70-7.

The 2019 Audit Report (entitled "Review of Parts Purchased from TransDigm Group, Inc.") reviewed a sample of 47 parts purchased by the DoD from TransDigm on 113 contracts between January 2015 and January 2017, with a total value of $29.7 million.[15]  (Doc. No. 70-7 at PageID#

---

[14] In the meantime, in November 2017, the House and Senate Armed Services Committees requested that the U.S. Government Accountability Office ("GAO") conduct an investigation of "monopolistic practices" in spare parts procurement.  (Doc. No. 68 at ¶ 160.)  In addition, an Interagency Task Force Report entitled "Assessing and Strengthening the Manufacturing and Defense Industrial Base and Supply Chain Resiliency of the United States" (the "Interagency Report") was released in September 2018.  (*Id.* at ¶ 161.)  This Report identified single- and sole-source suppliers (such as TransDigm) as two of ten "risk archetypes" that "threaten[] America's manufacturing and defense industrial base," including by "a loss of suppliers and potential bottlenecks across the many tiers of the supply chain" and by "lower quality and higher prices resulting from reduced competition."  (*Id.* at ¶ 162.)

[15] The Audit Report further explained that "[o]ur sample consisted of 32 contracts below the simplified acquisition threshold of $150,000, 13 contracts between $150,000 and the TINA threshold of $750,000, and 2 contracts above $750,000."  (Doc. No. 70-7 at PageID# 1799.)  Contracts below the simplified acquisition threshold of $150,000 are awarded based on simplified acquisition procedures that have less restrictive requirements for determining price reasonableness. (*Id.*)

1799.)  The purpose of the audit was to determine whether the DoD purchased parts at fair and reasonable prices from TransDigm.  (*Id*.)  For purposes of the Audit Report, the DoD-OIG determined that a "reasonable profit" was 15% or less.  (*Id*. at PageID# 1813-1814.)  The Report summarized its findings as follows:

> We determined that TransDigm earned excess profits on 46 of 47 parts purchased by the DLA and the Army, even though contracting officers followed the [Federal Acquisition Regulations or "FAR"] and DFARS-allowed procedures when they determined that prices were fair and reasonable for the 47 parts at the time of the contract award.  When we compared the awarded prices for the 47 parts on 113 contracts to TransDigm's uncertified cost data, our analysis determined that only one part purchased under one contract was awarded with a reasonable profit of 11 percent. The remaining 112 contracts had profit percentages ranging from 17 to 4,451 percent for 46 parts.

(*Id*. at PageID# 1815.)  In all, the Audit Report concluded that TransDigm earned $16.1 million in excess profit for 46 parts it sold to the DLA and the Army for $26.2 million between January 2015 and January 2017.  (*Id*. at PageID# 1816.)  *See also* Doc. No. 68 at ¶¶ 166-167.

The 2019 Audit Report further found that TransDigm refused to provide uncertified cost data to contracting officers when requested to do so.  (Doc. No. 70-7 at PageID# 1828.)  Specifically, the Report found that contracting officers requested cost data for 16 contracts, and that TransDigm denied the requests for 15 of those 16 contracts.  (*Id*.)  TransDigm cited various reasons for its refusal, including that it was "against company policy to provide a cost breakdown."  (*Id*.)  The Report noted that contracting officers had "limited options" once TransDigm refused to provide the cost data because TransDigm was the sole manufacturer for 39 of the 47 parts reviewed by the audit team.  (*Id*. at PageID# 1829.)  The Report further found that denying contracting officers cost data to determine price reasonableness (and thereby forcing the contracting officers to rely on less accurate pricing

information) "allowed TransDigm to earn excess profits without detection by the contracting officers." (*Id*.)

In addition, the 2019 Audit Report found that TransDigm used its network of exclusive distributors and sole-source position to force the government to pay excessive prices, resulting in profits in one instance of as much as 3,054% over the commercial price. (*Id*. at PageID# 1833, 1834-1835.) *See also* Doc. No. 68 at ¶¶ 175- 180. The Report also questioned TransDigm's use of the "commerciality" exception to the requirement to provide certified cost data, noting that "[w]hile only 4 of the 47 parts we reviewed were determined by contracting officers to be commercial items, TransDigm officials claimed an additional 32 of the 47 parts we reviewed should be considered commercial items" (and, thus, exempt from certified cost data disclosure requirements). (Doc. No. 70-7 at PageID# 1840.) Finally, the audit team was asked to determine whether twelve of TransDigm's subsidiaries improperly failed to disclose the fact that they were owned by TransDigm. (*Id*. at PageID# 1817.) The Report did not address this issue, however, because it was referred to the Defense Criminal Investigative Service "for action deemed appropriate." (*Id.*)

The 2019 Audit Report did not make any finding that TransDigm engaged in illegal conduct. Rather, the Report highlighted several weaknesses in federal acquisition regulations ("FAR") that often prevented contracting officers from obtaining uncertified cost data.[16] Specifically, the Report noted that (1) "the FAR enables sole-source providers and manufacturers of spare parts to avoid

---

[16] Like the 2006 and 2008 Audits, the 2019 Audit also found fault with the government in certain respects. For example, the 2019 Audit noted that, in response to the 2008 Audit, the government issued a policy reform memorandum requiring defense agencies to report any exclusive distributor that provided sole-source parts that refused to provide cost data in urgent situations. (Doc. No. 70-7 at PageID# 1842.) The 2019 Auditors determined, however, that that memorandum "is not being implemented within the DoD" and that "DLA Acquisition officials stated that they were unaware of the requirement in the … memorandum and that the DLA does not track this information." (*Id*.)

providing uncertified cost data, even when requested;" (2) "[t]here is no specific requirement in the FAR or DFARS that requires or compels contractors to provide certified or uncertified cost data to the contracting officers when requested before the contract is awarded;" and (3) "[s]tatutory and regulatory requirements discourage contracting officers from asking for uncertified cost data when determining whether a price is fair and reasonable." (*Id*. at PageID# 1816.) The Report concluded that "statutory change is needed to compel companies to provide cost data when required and provide the contracting officers with the ability to obtain cost data to ensure DoD is receiving fair and reasonable prices." (*Id*. at PageID# 1848.) It did, however, recommend that the DLA and Army request voluntary refunds from TransDigm in the total amount of $16,103,296. [17] (*Id*. at PageID#s 1848-1850.)

## III. Standards of Review

In considering a Motion to Dismiss a complaint alleging fraud in violation of federal securities law, there are three standards of review that must be considered. Those standards derive from Rules 12(b)(6) and 9(c) of the Federal Rules of Civil Procedure, and from the Private Securities Litigation Reform Act of 1995 ("PSLRA").

---

[17] In its Brief in Opposition, Plaintiff asks the Court to take judicial notice of numerous developments since the filing of the Third Amended Complaint. Specifically, citing public records of various Congressional proceedings, Plaintiff asks the Court to take notice that a hearing was held on May 15, 2019 by the House Committee on Oversight and Reform, during which Representative Khanna demanded that TransDigm pay back $16 million in excessive profits. (Doc. No. 79 at p. 14.) At this hearing, TransDigm's business practices were condemned by Representative Mark Meadows and Assistant Secretary of Defense for Acquisition Kevin Fahey. (*Id*.) In addition, the findings of a May 15, 2019 House Memorandum were publicized during this hearing, which allegedly confirm that TransDigm engaged in the deceptive practices outlined in the Third Amended Complaint. (*Id*. at p. 15-16.) Plaintiff also states that, on June 6, 2019, the House Committee on Oversight and Reform sent a letter to the DoD-OIG and requested that it conduct a comprehensive review of TransDigm's contracts with the DoD to identify whether TransDigm earned excess profits on all contracts awarded to TransDigm after January 1, 2017 with values between $200,000 and $250,000, and $600,000 and $750,000. (*Id*. at p. 16-17.) Defendants raise no objections to the Court's consideration of the above. Accordingly, the Court will consider the above, with the proviso that it will not consider any of it to decide a fact in dispute.

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter ...to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of all the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. The "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). In deciding a motion to dismiss under this Rule, the Court "must construe the complaint in the light most favorable to the plaintiff and accept all of the complaint's factual allegations as true." *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001).

In addition to meeting the general pleading requirements of Rule 12(b)(6), "[a]llegations of securities fraud must, as must allegations of fraud generally, satisfy the requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *In re Comshare Inc. Secs. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999). *See also Lubbers v. Flagstar Bancorp., Inc.*, 162 F.Supp.3d 571, 576 (E.D. Mich. 2016); *Government of Guam Retirement Fund v. Invacare Corp.*, 2014 WL 4064256 at * 2 (N.D. Ohio Aug. 18, 2014). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To satisfy this Rule, "the plaintiff[ ], at a minimum, 'must allege the time, place, and content of the alleged misrepresentation...'; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Heinrich v. Waiting*

*Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (citing *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003)). *See also Lubbers*, 162 F.Supp.3d at 576.

Lastly, allegations of securities fraud must meet the heightened pleading standard of the Private Securities Litigation Reform Act ("PSLRA"). The PSLRA was enacted to "curb perceived abuses of the § 10(b) private action – 'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007) (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006)). To this end, the PSLRA imposes additional pleading burdens in securities fraud cases, including that the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief,...state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Additionally, scienter must be pled with particularity. *See id.* § 78u-4(b)(2). "These requirements are purposefully demanding and have been described as 'exacting,' *Tellabs*, 551 U.S. at 313, 127 S.Ct. 2499, and as an 'elephant-sized boulder blocking [a plaintiff's securities] suit,' *In re Omnicare, Inc. Secs. Litig.*, 769 F.3d 455, 461 (6th Cir. 2014)." *Lubbers*, 162 F.Supp.3d at 576.

## IV.   Analysis

### A.   Section 10(b) and Rule 10b-5

Plaintiff asserts claims under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, on behalf of all investors who purchased or otherwise acquired TransDigm common stock between May 10, 2016 and March 21, 2017. (Doc. No. 68.) As the Sixth Circuit explained in *In re Omnicare, supra*, "[t]here are six elements to a securities-fraud suit under

§ 10(b) of the 1934 Act and SEC Rule 10b–5:[18] "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Omnicare*, 769 F.3d at 469.

Here, Defendants challenge three of these elements, asserting that Plaintiff has failed to adequately allege either a material misrepresentation or omission, loss causation, or scienter. (Doc. No. 70-1.) The Court will address each of these arguments in turn, below.

### 1.     Material Misrepresentation and/or Omission

In its 116-page Third Amended Complaint, Plaintiff asserts that during the putative class period Defendants made twenty-four (24) materially false and misleading statements. *See* Doc. No. 68 at ¶¶ 194, 195, 196, 198, 201, 204, 205, 207, 210, 211, 214, 217, 220, 221.) These statements are set forth in detail in Section II.C of this Opinion, *supra*. Generally, the challenged statements can be divided into three general categories: (1) statements attributing TransDigm's financial results to the "value" it creates and the "strength" and "quality" of its products, including references to its "value-based operating strategy" and "highly engineered value-added products;" (2) statements indicating that TransDigm priced its products to "fairly reflect the value we provide;" and (3) statements contained in TransDigm's Code of Business Conduct and Ethics.

---

[18] The United States Supreme Court has recognized that "[t]he scope of Rule 10b–5 is coextensive with the coverage of § 10(b)." *SEC v. Zandford*, 535 U.S. 813, 816 n. 1 (2002) (citing *United States v. O'Hagan*, 521 U.S. 642, 651 (1997)). As a result, the Court will "use § 10(b) to refer to both the statutory provision and the Rule." *Id. See also In re Omnicare*, 769 F.3d at fn 1.

Defendants argue that Plaintiff's claims fail because the challenged statements are not "material." [19] (Doc. No. 70-1 at pp. 6-10.) Specifically, Defendants assert that the statements identified in the Third Amended Complaint are no more than corporate puffery because they consist of broad and generic language that appears in "virtually every company's filings" and are "obviously unimportant to a reasonable investor." (*Id*. at p. 9.) Indeed, Defendants argue that "if statements as generic and ubiquitous as these were enough to require disclosure of supposedly illegal conduct, it would strip away the essential requirement that a securities fraud claim must be based on a false and misleading statement." (Doc. No. 82 at p. 8.)

Plaintiff argues that the challenged statements are "indisputably material" to investors because they concerned the "cornerstone" of TransDigm's business. (Doc. No. 79 at p. 20.) Plaintiff maintains that "Defendants made specific statements concerning the pricing and engineering of their products—statements that were then directly contradicted by the DoD-OIG's findings." (*Id*. at p. 21, fn 16.) Thus, Plaintiff asserts that the challenged statements are material misrepresentations sufficient to state a claim under Section 10(b) and Rule 10b-5. In addition, Plaintiff argues the statements are material because of what they failed to disclose; i.e. that TransDigm's success was actually based on its "price-gouging scheme" and not on its purported value-based pricing and operating strategy. (Doc. No. 79 at p. 20.) Under this theory, Plaintiff argues that the information that TransDigm failed to disclose was material because it would have been viewed by a reasonable investor as having significantly altered the "total mix" of information available.

---

[19] Defendants raise a number of additional arguments with respect to this element of Plaintiff's securities fraud claims, including that Plaintiff's claims fail because (1) the challenged statements herein are not false or misleading, and (2) the Third Amended Complaint fails to adequately allege an underlying fraud. As the Court finds that the statements are not "material," it need not reach these additional arguments.

"Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things: (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *In re Omnicare, Inc*., 769 F.3d at 470 (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011)). Here, Plaintiff appears to argue that the challenged statements are both material misrepresentations and material omissions.

A misrepresentation is an affirmative statement that is misleading or false. *In re Omnicare, Inc*., 769 F.3d at 470. When an alleged misrepresentation concerns "hard information" (i.e., "historical information or other factual information that is objectively verifiable"), it is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading. *Murphy v. Sofamor Danek Grp., Inc. (In re Sofamor Danek*), 123 F.3d 394, 401 (6th Cir.1997) (internal quotation marks omitted). *See also In re Omnicare, Inc*., 769 F.3d at 470; *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp*., 399 F.3d 651, 669–70 (6th Cir. 2005). When an alleged misrepresentation concerns "soft information," which "includes predictions and matters of opinion," a plaintiff must additionally plead facts showing that the statement was "made with knowledge of its falsity." *In re Omnicare, Inc*., 769 F.3d at 470 (quoting *Indiana State District Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.* ("*Omnicare I*"), 583 F.3d 935, 945-946 (6th Cir.2009)).

"In lieu of targeting a defendant's misleading or false statements, a plaintiff may focus on a defendant's omission—its failure to disclose information when it had a duty to do so." *In re Omnicare, Inc*., 769 F.3d at 471. "A duty to affirmatively disclose 'may arise when there is insider trading, a statute requiring disclosure,' or, as relevant in this case, 'an inaccurate, incomplete[,] or

misleading prior disclosure.'" *City of Monroe*, 399 F.3d at 669 (quoting *In re Digital Island Sec. Litig.*, 357 F.3d 322, 329 n. 10 (3d Cir. 2004)). When a person or corporation comes into possession of information that makes a prior statement "inaccurate, incomplete, or misleading," different duties to disclose the new information arise depending on whether the new information is hard or soft. If the new information is hard, then a person or corporation has a duty to disclose it if it renders a prior disclosure objectively inaccurate, incomplete, or misleading. *See also Zaluski v. United American Healthcare Corp.*, 527 F.3d 564, 576 (6th Cir. 2008) (citing *City of Monroe*, 399 F.3d at 673). If the new information is soft, then a person or corporation has a duty to disclose it "'only if [it is] virtually as certain as hard facts'" and contradicts the prior statement. *In re Sofamor Danek*, 123 F.3d at 402. "In other words, the new information must be so concrete that the defendant must have actually known that the new information renders the prior statement misleading or false and still did not disclose it." *In re Omnicare, Inc.*, 769 F.3d at 471. Whether newly acquired soft information is sufficiently concrete to trigger a duty to disclose depends upon the facts in a given case, and the nature of both the prior disclosure and the new information will determine whether new information makes a prior disclose false or misleading. *Id.*

Regardless of whether a plaintiff chooses to proceed under a misrepresentation theory or one based on an omission, it will have to allege facts that satisfy § 10(b)'s materiality component. *In re Omnicare, Inc.*, 769 F.3d at 471. The Sixth Circuit has explained the materiality requirement as follows:

> The purpose of "the materiality requirement is not to 'attribute to investors a child-like simplicity, an inability to grasp the probabilistic significance of [opinion statements],' but to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision." *Basic, Inc. v. Levinson*, 485 U.S. 224, 234, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *Flamm v. Eberstadt*, 814 F.2d 1169, 1175

(7th Cir.1987)).  To this end, we have said before that **"[m]isrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as 'having significantly altered the total mix of information made available.'"** *Sofamor Danek*, 123 F.3d 394, 400 (6th Cir. 1997) (quoting *Basic, Inc.*, 485 U.S. at 232, 108 S.Ct. 978).  Put another way, a "'fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" *Basic, Inc.*, 485 U.S. at 231, 108 S.Ct. 978 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).  "'Immaterial statements include vague, soft, puffing statements or obvious hyperbole' upon which a reasonable investor would not rely." *Public Sch. Teachers' Pension & Ret. Fund of Chi. v. Ford Motor Co.* (*In re Ford Motor Co. Sec. Litig.*), 381 F.3d 563, 570 (6th Cir. 2004) (quoting *In re K–tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir. 2002)).

*Id.* at 471-472 (emphasis added).  *See also Zaluski,* 527 F.3d at 571.  Courts have recognized that assessing materiality is a "fact-specific" inquiry.  *See, e.g., Matrixx Initiatives*, 563 U.S. at 43; *Basic Inc v. Levinson*, 485 U.S. 224, 236 (1988).  Thus, at the motion to dismiss stage, courts must "engag[e] carefully with the facts of a given case and consider[] them in their full context."  *In re Omnicare, Inc.*, 769 F.3d at 472.

As noted above, here, Plaintiff appears to proceed under the argument that the challenged statements are both actionable misrepresentations and actionable omissions.  Defendants assert that, under either theory, Plaintiff has failed to state a claim because it has failed to satisfy the materiality component set forth in § 10(b).  The Court will address each of Plaintiff's theories of liability, and Defendants' arguments with respect thereto, below.

### a.     Misrepresentations

Plaintiff maintains that Defendants made material misrepresentations because they "made specific statements concerning the pricing and engineering of their products—statements that were then directly contradicted by the DoD-OIG's findings."  (Doc. No. 79 at p. 21, fn 16.) See also Doc. No. 79 at p. 18.)  Defendants assert that the challenged statements are not material because they are

nothing more than corporate puffery that would not have been relied upon by a reasonable investor. (Doc. Nos. 70-1, 82.)

For the following reasons, the Court finds that the allegedly false and misleading statements identified in the Third Amended Complaint are not material misrepresentations. With regard to the first category of statements (i.e., statements regarding TransDigm's "value-based operating strategy," "value drivers," "value creation," and "highly engineered value-added products," as well as statements regarding the "strength" and "quality" of TransDigm's products), the Court finds these statements are immaterial puffery. These statements, both standing alone and in context, are too vague, broad, and generic to have been considered material by a reasonable investor. As used by Defendants, the terms "value," "value-based," "value-added," "strength," and "quality" are inherently ambiguous and subjective. TransDigm's statements regarding these concepts are not tethered to any kind of objective standard and are so lacking in specificity that no reasonable investor could have found them important in the "total mix" of information available to investors.

In this regard, the statements at issue herein are similar to those found immaterial by the Sixth Circuit in *In re Ford Motor Co. Securities Litigation, Class Action*, 381 F.3d 563, 570-571 (6th Cir. 2004). In that case, plaintiffs alleged that Ford (which had received complaints and faced lawsuits regarding safety and quality issues with tires on its Explorer SUV) made many misleading statements about its commitment to quality, safety, and corporate citizenship, including the following: (1) "[A]t Ford quality comes first;" (2) "We aim to be the quality leader;" (3) "Ford has its best quality ever;" (4) Ford is "taking across-the-board actions to improve ... [its] quality;" (5) Ford has made "quality a top priority;" (6) "Ford is a worldwide leader in automotive safety;" (7) Ford is "designing safety into ... [its] cars and trucks" because it wants its "customers to feel safe and secure in their vehicles at all

times;" (8) Ford has "dedicated ... [itself] to finding even better ways of delivering ... safer vehicles to [the] consumer;" and (9) Ford "want[s] to be clear leaders in corporate citizenship." *Id*. at 570. The Sixth Circuit found such statements to be immaterial, explaining as follows:

> Such statements are either mere corporate puffery or hyperbole that a reasonable investor would not view as significantly changing the general gist of available information, and thus, are not material, even if they were misleading. All public companies praise their products and their objectives. Courts everywhere 'have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.' *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir.1996); *see also Nathenson v. Zonagen, Inc*. 267 F.3d 400, 404, 419 (5th Cir.2001) ("broad, general statements" about "positive" and "statistically significant" test results of a new drug were puffery); *Lasker v. N.Y. State Elec. & Gas Corp*., 85 F.3d 55, 58 (2d Cir.1996) (corporation's self-praise about its business strategy is "not considered seriously by the marketplace and investors in assessing a potential investment").

*In re Ford Motor Co*., 381 F.3d at 570-571. *See also City of Monroe*, 399 F.3d at 671 (finding statements not material because "such statements describing a product in terms of 'quality' or 'best' or benefitting from 'aggressive marketing' are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision"); *Zaluski*, 527 F.3d at 573-574 (finding statements to be immaterial because they were "'loosely optimistic statements' that are not the type that are relied on by investors").

Accordingly, the Court finds that Defendants' statements regarding TransDigm's "value-based operating strategy," "value drivers," "value creation," and "highly engineered value-added products," as well as statements regarding the "strength" and "quality" of TransDigm's products, (Doc. No. 68 at ¶¶ 194, 195, 196, 198, 204, 205, 207, 210, 211, 214, 217) are not material.

The second category of challenged statements relate to TransDigm's pricing of its products. Specifically, Plaintiff asserts the following statement in TransDigm's 2016 10-K is a material misrepresentation:

> *Providing Highly Engineered Value-Added Products to Customers*. We focus on the engineering, manufacturing and marketing of a broad range of highly engineered niche products that we believe provide value to our customers. We believe we have been consistently successful in communicating to our customers the value of our products. **This has generally enabled us to price our products to fairly reflect the value we provide and the resources required to do so**.

(Doc. No. 68 at ¶ 214) (emphasis added). Plaintiff also alleges that Defendant Howley's statement on June 23, 2016 that "we price to reflect the value we provide," constitutes a material misrepresentation. (*Id*. at ¶ 201.)

The Court disagrees. As an initial matter (like TransDigm's statements about "value," "strength" and "quality" discussed above), Defendants' statements that TransDigm "generally" priced its products to "fairly reflect the value we provide" are the type of vague and non-specific statements that courts in this Circuit have found to be immaterial puffery. Moreover, when considered in the context of all of the information available to investors at the time the statements were made in 2016, the Court cannot find that a reasonable investor would have considered these particular statements important in making an investment decision. While TransDigm broadly represented in its 2016 10-K that it "generally" priced its products to "fairly reflect" value, it also expressly warned investors in that same 10-K that the federal government might not agree that TransDigm's prices were "fair." (Doc. No. 70-8 at PageID# 1926.) Indeed, TransDigm specifically advised investors that "even where the price is not based on cost, the U.S. Government may seek to review our costs to determine whether our pricing is 'fair and reasonable.'" (*Id*.) TransDigm warned

that, as a result of such review, "we could be subject to providing a refund to the U.S. Government or we could be asked to enter into an arrangement whereby our prices would be based on cost." (*Id.*)

As Plaintiff itself emphasizes in the Third Amended Complaint, that is precisely what happened in 2006, when the DoD-OIG conducted an audit of spare parts procurement from TransDigm. (Doc. No. 70-22.) In that Audit, the DoD-OIG repeatedly remarked upon TransDigm's excessive prices, refusal to provide cost information, and inappropriate use of the "commerciality" exception. (*Id.*) It also recommended that the DLA seek a voluntary refund from TransDigm of approximately $2.6 million for "overpriced parts." (*Id.* at PageID# 2328.) Plaintiff does not argue that the 2006 Audit Report was not publicly available to investors at the time the statements at issue were made.[20]

In light of the the vague and non-specific nature of TransDigm's statements, and the other information that was available to investors at the time, the Court finds that a reasonable investor would not have viewed TransDigm's statement that it "generally" priced its products to "fairly reflect" value, as "having significantly altered the total mix of information made available." *In re Sofamor Danek*, 123 F.3d at 499 (quoting *Basic, Inc.,* 485 U.S. at 232). *See also In re Omnicare*, 769 F.3d at 471-472. Accordingly, the Court finds that, while misleading, Defendants' statements that TransDigm "generally" priced its products to "fairly reflect value" (Doc. No. 68 at ¶¶ 201, 214) are not material.[21]

---

[20] In fact, this audit report (along with the 2008 Audit report) is available on the website of the Department of Defense Office of the Inspector General. *See* https://www.dodig.mil/reports.html.

[21] The Court also notes that, according to the 2019 Audit, the defense market accounted for approximately 34% of TransDigm's sales. (Doc. No. 70-7 at PageID# 1809.) Plaintiff has not alleged that TransDigm charged excessive prices or otherwise engaged in "price gouging" with respect to its commercial sales, which accounted for a significant portion of its total sales.

The final category of challenged statements are those contained in TransDigm's Code of Business Conduct and Ethics, and Code of Ethics for Senior Financial Officers, both of which were described in TransDigm's 2016 10-K and posted and published on TransDigm's website. (Doc. No. 68 at ¶ 220, 221.) Specifically, Plaintiff alleges the following statements in TransDigm's Codes of Conduct and Ethics constitute material misrepresentations: (1) that TransDigm has a "longstanding policy" to "conduct its business lawfully and ethically;" (2) that "the Company's policy[is] to comply with all applicable local, national, and international laws, rules, and regulations;" (3) that TransDigm's "[s]enior financial officers shall act with honesty and integrity;" and (4) that "Senior Financial Officers shall endeavor to comply with all laws, rules, and regulations of federal, state, and local governments, and all applicable private or public regulatory agencies." (*Id.*)

The Court finds the above statements are not material. As the Sixth Circuit has explained, "a code of conduct is not a guarantee that a corporation will adhere to everything set forth in its code of conduct" and, instead, is simply a "declaration of corporate aspirations." *Bondali v. YumA Brands, Inc.*, 620 Fed. Appx. 483, 490 (6th Cir. 2015). Thus, the Court finds that a reasonable investor would not rely on the above statements in TransDigm's Codes of Conduct and Ethics as a guarantee that TransDigm would at all times remain in compliance with all applicable laws, rules and regulations. Instead, these statements merely set forth standards in general terms that TransDigm hoped it and its senior executives would adhere to. *See City of Brockton Retirement System v. Avon Products, Inc.*, 2014 WL 4832321 at * 15 (S.D.N.Y. Sept. 29, 2014) (finding that general statements in Avon's Ethics Codes and Corporate Responsibility Reports proclaiming compliance with ethical and legal standards to be non-material). Accordingly, the Court finds that the statements noted above in TransDigm's

Code of Business Conduct and Ethics and Code of Ethics for Senior Financial Officers (Doc. No. 68 at ¶¶ 220, 221) are not material.

Therefore, and for all the reasons set forth above, the Court finds Plaintiff has failed to adequately allege a material misrepresentation sufficient to state a claim under Section 10(b) and Rule 10b-5.

### b.     Omissions

In its Brief in Opposition, Plaintiff also asserts that Defendants made a material omission because they failed to disclose that TransDigm's success was actually based on its "price-gouging scheme" and not on its purported value-based pricing and operating strategy.  (Doc. No. 79 at p. 20.) Under this theory, Plaintiff argues that this omitted information would have been viewed by a reasonable investor as having significantly altered the "total mix" of information and, therefore, the statements at issue are material.   (*Id.*)  Plaintiff also asserts that Defendants had a duty to disclose the omitted information once they put TransDigm's source of revenue (i.e., its business model) at issue. (*Id.* at p. 19.)

Defendants argue that "plaintiff is wrong in suggesting that TransDigm's broad, generic statements about revenue required the company to disclose any and all allegedly illegal conduct that may have contributed to that revenue (assuming there was any such conduct to reveal)."  (Doc. No. 82 at p. 7.)  Moreover, citing numerous cases from this Circuit, Defendants assert that the challenged statements at issue here did not trigger a duty to disclose TransDigm's alleged "price-gouging scheme" because there no was "direct nexus between the illegal conduct and the challenged statements."  (*Id.* at p. 8.)  Rather, Defendants maintain that the statements at issue here were too

vague and generic to constitute an "implicit representation that would mislead a reasonable investor" to believe that illegal conduct had not occurred. (Doc. No. 70-1 at p. 7.)

The Court agrees with Defendants. The allegedly misleading statements identified in the Third Amended Complaint are simply too generic and innocuous to have triggered the duty to disclose TransDigm's alleged price-gouging scheme. As discussed at length above, TransDigm's various statements regarding its "value-based operating strategy," "highly engineered value-added products," and pricing that "fairly reflects the value we provide" are vague, non-specific, subjective, and untethered to any kind of objectively measurable standard. As other courts within this Circuit have held, these types of statements are too vague and generic to have created an implicit representation that would mislead a reasonable investor to believe that TransDigm's business model was not based on the objectionable business practices identified in the Third Amended Complaint. *See e.g., Zaluski*, 527 F.3d at 573-574; *City of Monroe*, 399 F.3d at 671; *Lubbers*, 162 F.Supp.3d at 581.[22]

Moreover, Sixth Circuit precedent supports a finding that Defendants did not make a material omission. In *In re Sofamor Danek*, *supra*, the defendant was in the business of developing, manufacturing and marketing spinal implant devices, which were subject to approval by the Food and Drug Administration ("FDA"). *In re Sofamor Danek*, 123 F.3d at 397. While the defendant's products had been approved for certain uses, the use of bone plates and sacral screws for pedicular attachment was considered a new use, and, consequently, the defendant was prohibited from promoting such a use. *Id*. The FDA issued warnings to the defendant and similar companies that

---

[22] The cases relied upon by Plaintiff regarding materiality are district court cases that are not from this Circuit and, thus, are not binding on this Court. (Doc. No. 79 at p. 20.)

regulatory action would be taken if they engaged in unapproved marketing. *Id.* The defendant disclosed the marketing prohibition and the warning in its prospectus, yet allegedly continued to allow doctors to use the products in a prohibited manner. *Id*. at 397-98. Following a television report on the dangers of using sacral screws for pedicular attachment, the FDA issued a report affirming these dangers, giving rise to several lawsuits against the company. Upon disclosure of these suits, the defendant's stock dropped in price, and the plaintiffs filed the suit at issue. *Id*. at 398-99.

The plaintiffs claimed that the defendant committed securities fraud for not disclosing the possible illegality of its marketing practices with regard to certain surgical devices, specifically that the company and certain officers "made deceptive and materially false and misleading statements which, coupled with the defendant['s] failure to disclose information that allegedly ought to have been disclosed, caused the company's stock to trade at artificially high prices." *Id*. at 399. The district court dismissed the case and the Sixth Circuit upheld the dismissal, finding that the defendant had no duty to disclose. *Id* at 400.

The court rejected the plaintiffs' theory that the defendant's statements regarding record revenues, increases in sales, and the company's explanations thereof gave rise to a duty to disclose the illegal marketing because they created the impression that the results were due to legitimate sales. *Id*. at 401. The company had accurately disclosed record revenues and sales figures and attributed the results to several factors. *Id*. at 401. Noting that the public was aware of the FDA warning, the court found there was no further duty to disclose "soft" information such as predictions regarding possible future regulatory actions or losses the company may suffer as a result.[23] *Id.* at 402.

---

[23] The court characterized the company's statements as disclosing hard information and pointed out that the plaintiffs did not allege any affirmative misstatement in the numbers or the company's analysis. *Id*. at 401. The court pointed out that the disclosure of accurate historical data does not become misleading even if less favorable results might be predictable

The Court finds that *In re Sofamor Danek* supports a finding that Plaintiff herein failed to adequately allege a material omission. Plaintiff herein does not argue that Defendants inaccurately reported any of its 2016 revenue and sales figures, either in its press releases or SEC filings. Nor does it contest that Defendants attributed these results to a variety of factors, including obtaining profitable new businesses, improving its cost structure, and continued productivity efforts. *See* Doc. No. 68 at ¶¶ 195, 196, 204. Further, it is not disputed that TransDigm expressly warned investors that it might be subject to a federal audit of its pricing and that, as a result of such review, "we could be subject to providing a refund to the U.S. Government or we could be asked to enter into an arrangement whereby our prices would be based on cost." (Doc. No. 70-8 at PageID# 1926.) Under these circumstances, the Court cannot say that Defendants' broad and generic statements regarding "value-based operating systems," "value creation," and "highly engineered value-added products" contained any implicit misrepresentations that would have misled a reasonable investor or otherwise triggered a duty to disclose TransDigm's alleged price gouging scheme.

The Sixth Circuit's decision in *Omnicare, supra* (which found that plaintiff sufficiently pled an actionable omission) is distinguishable from the instant case. In that case, Omnicare's Vice President of Internal Audit, John Stone, conducted an internal audit of certain of Omnicare's previously submitted Medicare and Medicaid claims (the "Wave I Audit"), the results of which revealed "pervasive fraud." *Omnicare*, 769 F.3d at 462. A second audit was thereafter commissioned (the "Wave II Audit"), during which Stone found further evidence of fraud. *Id.* Plaintiff alleged that

---

by the company in the future. *Id*. at 401 fn. 3. Since the defendant's statements were hard information, and the plaintiffs did not allege facts contradicting these statements, the court concluded that there was no further duty to speculate as to the legality of the company's marketing practices. *Id*. at 401-02. The court stated that "our cases firmly establish the rule that soft information must be disclosed only if ... virtually as certain as hard facts." *Id*. at 402.

the Wave I and Wave II Audit Reports were provided to Omnicare's CEO, CFO, and Senior Vice President. *Id*. Stone then conducted an audit of Omnicare's pharmacies, which again found evidence of non-compliance with Medicare and Medicaid requirements. *Id*. Following his presentation of the Pharmacy Audit to Omnicare's Internal Audit Committee, Stone was discharged. *Id*. He subsequently filed a twenty-four count *qui tam* action against Omnicare under the False Claims Act. *Id*. at 463. Only after the filing of this action did the results of the Wave I, Wave II, and Pharmacy Audits become public. *Id.*

Plaintiff thereafter filed a Complaint against Omnicare, asserting violations of §10b and Rule 10b-5 based on Omnicare's alleged misrepresentations and omissions regarding its compliance with Medicare and Medicaid regulations. Specifically, plaintiff alleged that Omnicare made (1) material misrepresentations in its SEC filings when it stated that it believed it was in compliance with federal, state, and local law; and (2) a material omission based on Omnicare's failure to report its non-compliance with the regulations after receiving the results of Stone's audits. *Id*. at 477.

The Sixth Circuit first found that plaintiff had pled sufficient facts that Omnicare made a material misrepresentation when it stated in SEC filings that "we believe that our billing practices materially comply with applicable state and federal requirements." *Id*. at 478. Specifically, the court concluded that "a reasonable jury could find that the results of the Wave II Audit and the Pharmacy Audit make Omnicare's material-compliance statements objectively false and misleading." *Id*. at 480. The court then found that plaintiff had sufficiently pled a claim under an omission theory of liability. *Id*. at 480-481. The Sixth Circuit explained that "if a reasonable jury could find that Omnicare's Form 10–K statements were objectively false, then the same jury could find that

Omnicare had a duty to disclose the results of the audits after issuing its material-compliance statements in those SEC forms." *Id*.

*Omnicare* is distinguishable from the instant case for the following reasons. First, unlike in *Omnicare*, this Court has not found that TransDigm, in fact, made any material misrepresentations regarding its business model or source of revenue. Rather, the Court has found that TransDigm's statements were no more than vague, generic, corporate puffery that would not have been important to a reasonable investor. Second, unlike the internal audit reports in *Omnicare* that were known only to defendants, the information that TransDigm allegedly failed to disclose in the instant matter (i.e., Defendants' price gouging scheme) was public knowledge and, therefore, already available to the market at the time of the alleged omissions. Specifically, and as discussed *supra*, both the 2006 and 2008 DoD-OIG Audit Reports extensively discussed TransDigm's pattern of refusing to provide cost data, charging excessive prices, and using captive distributors. Plaintiff does not dispute that these Audits are public records. Moreover, the 2006 Audit was expressly referenced in TransDigm's own 2006 10-K, which is attached to Defendants' Motion to Dismiss and available on TransDigm's website. *See* Doc. No. 70-23 at PageID# 2373.

Here, given the broad, generic statements at issue and the context in which they were made, the Court cannot find that the Defendants' statements contain any implicit representations regarding TransDigm's business model or source of revenue that would have misled a reasonable investor under the circumstances presented. Accordingly, and for all the reasons set forth above, the Court finds that Plaintiff has failed to adequately allege a material omission sufficient to state a claim under Section 10(b) and Rule 10b-5.

### 2. Loss Causation

Defendants argue Plaintiff's claims should be dismissed because the Third Amended Complaint fails to adequately allege that TransDigm's stock drop was proximately caused by the revelation of its allegedly fraudulent business practices.  (Doc. No. 70-1 at pp. 11-17.)  Specifically, Defendants assert that neither the January 2017 or March 2017 Citron Research Reports caused the drop because neither of these Reports contained any previously concealed factual information about TransDigm's business practices.  (*Id*.)  To the contrary, Defendants assert that both Reports simply regurgitated information that was already in the public domain (including in the 2006 and 2008 Audits, TransDigm's SEC filings, and previous articles published by The Capitol Forum) and made "ominous warnings" about the future in light of the recent election of President Trump.  (*Id*.)  Defendants further argue that Congressman Khanna's letter does not constitute a "corrective disclosure" because it, too, relied only on public reports and other public information.  (*Id*.)  Finally, Defendants note that TransDigm's stock price quickly rebounded after both the January and March 2017 Reports and Congressman Khanna's letter.  (*Id*.)

Plaintiff argues that it has adequately pled loss causation, asserting that the January and March 2017 Citron Reports and Congressman Khanna's letter each constitute a "corrective disclosure" that revealed Defendants' allegedly fraudulent conduct.  (Doc. No. 79 at pp. 32-35.)  Specifically, Plaintiff argues that the January 2017 Citron Report "revealed to the market that Defendants had perpetrated a Company-wide price gouging scheme whereby TransDigm foisted 'egregious price increases' on the Government that allowed the Company to inflate its profit margins."  (*Id*. at p. 33.)  Plaintiff maintains that the March 2017 Citron Report "further revealed that these subsidiaries would further the scheme by intentionally submitting false ownership information."  (*Id*.)  Lastly, Plaintiff asserts that Representative Khanna's letter revealed to the public "the range of methods" that TransDigm

used to evade federal regulations, causing TransDigm's share price to "plummet" nearly 10%. (*Id.* at 35.)

A party that brings a securities fraud claim bears the burden to prove "that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4). As the Supreme Court has explained, this is "not meant to impose a great burden upon a plaintiff." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346-347 (2005). Rather, "it is meant to prevent disappointed shareholders from filing suit merely because their shares have lost value and then using discovery to determine whether the loss was due to fraud." *Norfolk County Retirement System v. Community Health Systems, Inc.*, 877 F.3d 687, 695 (6th Cir. 2017). Thus, at the pleading stage, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347.

The Sixth Circuit has defined loss causation as follows:

> 'Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.' *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks omitted). It partakes of the traditional elements of loss and proximate causation. *See Dura Pharm.*, 544 U.S. at 346, 125 S.Ct. 1627. Any analogy to the common law tort concept, however, would be imperfect because the alleged misstatements do not generally cause a security to drop in value, but rather, the 'underlying circumstance that is concealed or misstated.' *Lentell*, 396 F.3d at 173. Thus, in the securities fraud context, 'a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor.' *Id.* (emphasis in original).

*Ohio Public Employees Retirement System v. Federal Homes Loan Mortgage Corp.*, 830 F.3d 376, 384 (6th Cir. 2016). Sometimes defendants reveal their own fraud via a "corrective disclosure," i.e., a statement that reveals what the defendants themselves previously concealed. *Norfolk County*, 877 F.3d at 695. "But such admissions can be hard to come by, and courts have otherwise held that

revelations can come from many sources, including whistleblowers, analysts, and newspaper reports." *Id.* In addition, the Sixth Circuit has found that "such revelations need not come all at once but can come in a series of partial disclosures." *Id.*

For the revelations to cause a plaintiff's losses, however, "the information must in a practical sense be new; otherwise the market will have processed and reacted to that information already." *Id.* (citing *Rand-Heart of N.Y. Inc. v. Dolan*, 812 F.3d 1172, 1180 (8th Cir. 2016)). *See also In re KBC Asset Management N.V.*, 572 Fed. Appx. 356, 360 (6th Cir. 2014) (finding that plaintiff failed to plead loss causation adequately because it had not shown the disclosed fact was new to the market); *Meyer v. Greene,* 710 F.3d 1189, 1198 (11th Cir.2013) ("Because a corrective disclosure 'obviously must disclose new information,' the fact that the sources used in the [alleged disclosure] were already public is fatal to the [plaintiff]s' claim of loss causation.")

Here, the Court finds that Plaintiff has failed to adequately allege loss causation. Neither the January 2017 Citron Report, March 2017 Citron Report, or Congressman Khanna's letter revealed new information to the market regarding Defendants' alleged price gouging scheme. The January 20, 2017 Citron Report highlighted TransDigm's history of excessive prices and warned that the Company might be at increased risk due to the recent election of President Trump who had "made lowering prices for military aircraft a pillar of his transition into office." (Doc. No. 70-3.) In reporting regarding this issue, the Report relied on the following sources: (1) publicly-available historical price data that had previously been summarized by The Capitol Forum in an article published three days earlier, on January 17, 2017 (*see* Doc. No. 70-13); (2) a 2012 Cleveland.com article that discussed a lawsuit that had been filed against TransDigm relating to its pattern of slashing costs and increasing prices; (3) the 2006 DoD-OIG Audit; and (4) TransDigm's own SEC filings. (*Id.*) Each of these

sources constitute public information that was already available to the market at the time the January 17, 2017 Citron Report was published.

Likewise, the March 9, 2017 Citron Report contained information that was already in the public domain. As noted *supra*, the March 9, 2017 Report asserted that TransDigm had improperly concealed its identity as the parent company of twelve of its subsidiaries. (Doc. No. 70-5.) As the Citron Report itself acknowledges, this information was taken from an article published by The Capitol Forum six days earlier, on March 3, 2017.[24] (Doc. No. 70-5 at PageID#1780; Doc No. 70-10.) Thus, Plaintiff has not shown that the fact disclosed by the March 2017 Citron Report (i.e., that TransDigm concealed its status as the parent entity of twelve of its subsidiaries) was "new" to the market.[25]

Finally, the Court finds that Congressman Khanna's March 20, 2017 letter to the DoD Acting Inspector General regarding TransDigm is insufficient to adequately allege loss causation because it, too, fails to disclose any new information to the market. Congressman Khanna's letter cites the same historical price data that had previously been set forth in the January 2017 Citron Research Report and Capitol Forum article. (Doc. No. 70-6 at PageID# 1793.) It raises concerns about potential waste, fraud, and abuse stemming from TransDigm's use of a network of captive distributors and failure to disclose the fact that it was the parent entity of twelve of its subsidiaries. (*Id.*) As has been discussed above, TransDigm's alleged use of captive distributors was discussed extensively in the

---

[24] Plaintiff does not assert that that Capitol Forum report constitutes a "corrective disclosure" for purposes of pleading loss causation.

[25] Moreover, as Defendants correctly note, the majority of the March 2017 Citron Report relates to allegations relating to a company called Bratenahl Capital Partners, which was founded by Michael Howley, the son of TransDigm's CEO Nicholas Howley. Plaintiff does not argue that the information disclosed relating to Bratenahl Capital Partners bears any relevance to the instant action.

2008 DoD-OIG Audit (which is expressly referenced in Congressman Khanna's letter) and was, thus, already public knowledge. Moreover, TransDigm's failure to disclose its parent status as to twelve of its subsidiaries was previously reported by both the March 2017 Citron Research Report and Capitol Forum article and, thus, is not "new" information.

Lastly, and notwithstanding Plaintiff's argument to the contrary, the Court finds that the disclosure of a request for an investigation is not sufficient to constitute a corrective disclosure in the absence of an actual revelation of fraud or admission of wrongdoing.[26] *See, e.g., Meyer*, 710 F.3d at 1201 n. 13 ("In our view, the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10b. The announcement of an investigation reveals just that – an investigation- and nothing more."); *Sapssov v. Health Management Associates*, 608 Fed. Appx. 855, 863 (11th Cir. 2015) ("Revelation of the OIG investigation, including issuance of subpoenas, does not show any actual wrongdoing and cannot qualify as a corrective disclosure."); *Norfolk County,* 877 F.3d at 696 (noting that "the announcement of an SEC investigation, *in addition to the admission by the defendant*, amounted to a corrective disclosure) (emphasis added). *See also In re Almost Family, Inc., Securities Litigation*, 2012 WL 443461 at * 13 (W.D. Ky. Feb. 10, 2012) ("Numerous federal district courts have held that a disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure."); *Chamberlain v. Reddy Ice Holdings, Inc*., 757 F.Supp.2d 683, 717-718 (E.D. Mich. 2010) (finding that announcement of DOJ investigation

---

[26] Some courts have found that the disclosure of an investigation may qualify as a corrective disclosure where the investigation is coupled with a later finding of fraud or wrongdoing. *Meyer*, 710 F.3d at fn 13. Here, however, the 2019 DoD-OIG Audit did *not* find that TransDigm engaged in illegal conduct. Moreover, although the auditors did refer the failure of twelve of TransDigm's subsidiaries to disclose the fact that they were owned by TransDigm to the Defense Criminal Investigative Service, there has been no finding of illegal conduct as of the date of this Opinion.

amounted to a corrective disclosure where it was paired with a defendant's press release announcing suspension of a senior executive for behavior relating to that investigation).

Accordingly, and for all the reasons set forth above, the Court finds that Plaintiff has failed to adequately allege loss causation sufficient to state a claim under Section 10(b) and Rule 10b-5.

**B.      Section 20(a)**

In the Third Amended Complaint, Plaintiff also asserts a claim under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  In order to plead a violation of § 20(a) for control person liability, a plaintiff must allege facts demonstrating that "the defendant 'controlled' another person who committed an underlying violation of the Act, *and* that the defendant 'culpably participated' in that underlying violation."  *In re United American Healthcare Corp. Securities Litigation*, 2007 WL 313491 at * 20 (E.D. Mich. Jan. 30, 2007) (quoting *D.E. & J Ltd. Partnership v. Conway*, 284 F.Supp.2d 719, 750 (E.D. Mich. 2003)) (emphasis in original).  *See also Lubbers*, 162 F.Supp.3d at 584.  Thus, it is clear that Plaintiff must plead a primary violation of the Act.  *Id.*  Since Plaintiff in the present case has failed to adequately plead a primary violation of § 10b and Rule 10b-5, its claim of control person liability is necessarily deficient and must also be dismissed.

**V.      Conclusion**

For all the reasons set forth above, the Court concludes that Plaintiff has failed to meet its burden in pleading either an actionable misrepresentation or omission, or loss causation.  Because Plaintiff cannot satisfy these elements of its § 10(b) and Rule 10b-5 claim, Count I of the Third Amended Complaint must be dismissed and a discussion regarding the remaining elements of the § 10(b) claim is unnecessary.  Further, because Plaintiff has failed to plead a primary violation of the

Act to serve as the predicate for § 20(a) liability, Count II against the individual Defendants Howley and Paradie is also dismissed.

Finally, Plaintiff states (summarily and in a footnote) that "if the Court decides in favor of Defendants, then Plaintiff respectfully requests leave to amend the Complaint to remedy any pleading deficiencies." (Doc. No. 79 at fn 41.) This request is denied. Plaintiff has been permitted to amend its complaint on three separate occasions over the course of this action, which has been pending since 2017. Plaintiff offers no explanation why it should be permitted yet another opportunity to amend at this stage of the proceedings.

Accordingly, Defendants' Motion to Dismiss (Doc. No. 70) is GRANTED and Plaintiff's request to seek leave to amend its Third Amended Complaint is DENIED.

**IT IS SO ORDERED.**

  _s/Pamela A. Barker_
                                                       PAMELA A. BARKER
Date:  February 19, 2020                    U. S. DISTRICT JUDGE